FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

2015 MAY 27  P 1:55

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| NATIONAL COUNCIL FOR ADOPTION, BUILDING ARIZONA FAMILIES on behalf of itself and its birth-parent clients, birth parents D.V. and N.L., and baby boy T.W. by and through his guardian ad litem PHILIP (JAY) MCCARTHY, JR., <br><br> Plaintiffs, <br><br> v. <br><br> SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior, KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs, BUREAU OF INDIAN AFFAIRS, and the UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br><br><br><br> Case No. 1:15cv675 GBL/MSN |

**COMPLAINT AND PRAYER FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs National Council for Adoption, Building Arizona Families, birth parents D.V. and N.L., and baby boy T.W. by and through his guardian ad litem Philip (Jay) McCarthy, Jr., for their complaint against Defendants Sally Jewell, in her official capacity as Secretary of the United States Department of the Interior, Kevin Washburn, in his official capacity as Assistant Secretary of Indian Affairs, the Bureau of Indian Affairs, and the Department of the Interior allege, by and through their attorneys, as follows:

## INTRODUCTION

1.      This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 551–706 ("APA"), the cause of action to enforce provisions of the United States Constitution acknowledged in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Declaratory Judgment Act, 28 U.S.C. § 2201. This action challenges the validity of the "Guidelines for State Courts and Agencies in Indian Child Custody Proceedings" (the "2015 Guidelines") that were developed by the Bureau of Indian Affairs ("BIA") and issued by the Department of the Interior on February 25, 2015, 80 Fed. Reg. 10,146 (Feb. 25, 2015), and further challenges the constitutionality of the provisions of the Indian Child Welfare Act of 1978 ("ICWA") relating to the custody of an "Indian child." 25 U.S.C. §§ 1911–1923.

2.      The 2015 Guidelines purport to provide "standard procedures and best practices" to be followed by state courts and agencies in any state-court proceeding that implicates ICWA. 80 Fed. Reg. at 10,147. ICWA is a federal statute that "establishes federal standards that govern state-court child custody proceedings involving Indian children." *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2557 (2013). Section 1915(a) of ICWA provides that, in a case involving adoption of an "Indian child," absent good cause to the contrary, preference must be given to an adoption by the child's "extended family," "other members of the child's tribe," or "other Indian families," over adoption by an unrelated non-Indian family. Section 1915(b) of ICWA similarly provides that, in a case involving foster placement of an "Indian child," preference must be given to placements with the "Indian child's extended family," a foster home "specified by the Indian child's tribe," "an Indian foster home," and an "institution . . . operated by an Indian organization," over a foster placement with an unrelated, non-Indian family.

2

3.      The 2015 Guidelines emphasize that ICWA's placement preferences apply in "any preadoptive, adoptive or foster care placement of an Indian child." 80 Fed. Reg. at 10,157. Departing from established BIA policy, the 2015 Guidelines purport to flatly prohibit state courts presiding over child custody proceedings involving an "Indian child" from considering the "best interests" of that child when making a foster or adoptive placement decision. For an "Indian child," the 2015 Guidelines say, the hierarchy of placement preferences found in Section 1915 of ICWA in every case "reflect the best interests" of the child. 80 Fed. Reg. at 10,158. The 2015 Guidelines also specifically prohibit state courts from considering any "bonding or attachment" that has occurred if the child has already been placed with a foster or pre-adoptive family that does not fit within one of ICWA's placement preferences, even if no "preferred" placement was available at the time the child was placed. *Id.*

4.      The 2015 Guidelines further dictate that any state-licensed agency seeking an adoptive or foster placement of an Indian child "must always follow the placement preferences." *Id.* at 10,157. The 2015 Guidelines permit a placement outside of the preferences only if the placement agency can demonstrate "through clear and convincing evidence that a diligent search has been conducted to seek out and identify placement options that would satisfy the placement preferences." *Id.*

5.      The 2015 Guidelines self-consciously violate the notice-and-comment requirement of the APA, and they violate the United States Constitution by instructing state courts to violate the due process and equal protection rights of "Indian children" and the birth parents of such children, and by commandeering the resources of state child-welfare agencies and state courts.

6.     ICWA violates the constitutional rights of birth parents of "Indian children" by unjustifiably impeding their ability to place their children in adoptive homes outside of ICWA's placement preferences. It violates birth parents' rights to due process under the Fifth Amendment by interfering with their ability to direct the upbringing of their "Indian" children. Further, it impermissibly discriminates against birth parents of "Indian children" by limiting adoptive placements based on the "Indian" ancestry of those children in violation of the equal protection rights secured by the Fifth Amendment.

7.     ICWA violates the due process and equal protection rights of "Indian children" as well. Non-Indian children placed in foster care and adoptions benefit from a determination that the placement is consistent with their best interests. For "Indian children," however, placement decisions are driven primarily by ICWA's placement preferences. Indeed, under the 2015 Guidelines, an "Indian child's" best interests *may not be considered* even as part of an analysis of whether "good cause" exists to depart from ICWA's placement preferences. ICWA's subordination of the best interests of "Indian children" discriminates against those children on the basis of their "Indian" ancestry in violation of their equal protection rights secured by the Fifth Amendment. And when ICWA's placement preferences are applied in order to remove an "Indian child" from a foster or pre-adoptive family with whom the child has bonded, they violate that child's liberty interest in maintaining his familial bonds in violation of the Fifth Amendment's guarantee of due process.

8.     The 2015 Guidelines were made "[e]ffective immediately" and, as the 2015 Guidelines themselves contemplate, they now are affecting child custody and adoptive proceedings throughout the United States, depriving the birth parents of "Indian children" of their fundamental rights to direct the custody and upbringing of their children, and depriving the

4

"Indian children" themselves of their constitutional rights to have their best interests considered in determining their foster or adoptive placement.

9.      Plaintiffs seek a declaration that the 2015 Guidelines violate the APA and the United States Constitution, an order setting aside the 2015 Guidelines, and injunctive relief ordering Defendants to withdraw the 2015 Guidelines. Plaintiffs further seek a declaratory judgment that the child custody provisions of ICWA, 25 U.S.C. §§ 1911–1923, violate the United States Constitution and accordingly cannot be applied to them.

## PARTIES

10.     Plaintiff National Council for Adoption ("NCFA") is a non-profit, national adoption policy organization with its headquarters and principal place of business in Alexandria, Virginia. NCFA is committed to the belief that every child deserves to thrive in a nurturing, permanent family and for over 30 years has influenced policy and raised public awareness concerning adoption. NCFA has over 60 member adoption agencies, each of which is a non-profit adoption agency.

11.     Plaintiff Building Arizona Families is a non-profit adoption agency headquartered in, and licensed by, the State of Arizona. Building Arizona Families is suing here on its own behalf and on behalf of numerous birth-parent clients whose constitutionally protected decisions to place their children, who are classified as "Indian children," into adoptive homes are frustrated by ICWA's hierarchy of placement preferences, and by the 2015 Guidelines' various requirements that seek to implement those placement preferences.

12.     Plaintiffs D.V. and N.L. are birth parents of a child who is an "Indian child" under ICWA because D.V., her father, is an enrolled member of the Pascua Yaqui Tribe located in Arizona. Plaintiffs D.V. and N.L are residents of Arizona and do not reside on an Indian reservation. Plaintiffs D.V. and N.L. have placed their child for adoption with an adoptive

placement that they selected and that is not within ICWA's placement preferences. Plaintiffs D.V. and N.L. wish to protect the confidentiality of their adoption plan and do not want the Pascua Yaqui Tribe involved in their voluntary adoption plan. Plaintiffs D.V. and N.L. are suing here on their own behalf.

13.     Plaintiff Philip (Jay) McCarthy, Jr. is a resident of Arizona. He is suing in his capacity as the court-appointed guardian ad litem for baby boy T.W., who is ten months old. T.W. is in the legal and physical custody of the Arizona Department of Child Safety and is currently in foster care. T.W. is an "Indian child" pursuant to ICWA, because he is an enrolled member of the Navajo Nation. T.W.'s foster parents are not a preferred placement under ICWA or the 2015 Guidelines because they are not extended family members nor are they Native American.

14.     Defendant Sally Jewell is, and was for all relevant periods, the Secretary of the United States Department of the Interior. She is being sued in her official capacity.

15.     Defendant Kevin Washburn is, and was for all relevant periods, the Assistant Secretary for Indian Affairs at the Bureau of Indian Affairs within the United States Department of the Interior. He is being sued in his official capacity.

16.     Defendant Bureau of Indian Affairs is a federal agency within the Department of the Interior.

17.     Defendant Department of the Interior is a federal executive department of the United States.

## JURISDICTION AND VENUE

18.     This action arises under the Administrative Procedure Act and the Constitution of the United States. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l).  This is an action against the United States and its officers and agencies, Plaintiff NCFA maintains its principal place of business in this judicial district under 28 U.S.C. § 1391(c)(2), and no real property is involved in the action.

## FACTUAL ALLEGATIONS

### I.     FACTUAL BACKGROUND OF PLAINTIFFS

#### A. Baby T.W.

20.     T.W. is a baby boy enrolled as a member of the Navajo Nation and is classified as an "Indian child" under ICWA.  From birth until three months of age, he lived in Page, Arizona, with his mother, an enrolled member of the Navajo Nation, his one-year-old sister, his paternal aunt and uncle, and their children, ages three and seven.  T.W.'s father is incarcerated for the foreseeable future.

21.     On November 4, 2014, when T.W. was three months old, his mother left him with his uncle for the day while she went to work.  T.W.'s uncle left T.W. on the couch unattended, and T.W. fell onto the floor.  While T.W. was on the floor, the other children that lived in the house started climbing on top of him and hitting his head with objects.  T.W. sustained severe brain damage, rib fractures, and numerous intra-retinal hemorrhages in both eyes.

22.     On November 8, 2014, T.W. was transferred to Phoenix Children's Hospital.  There, T.W.'s mother told a social worker that she would not be able to give T.W. the 24-hour care he now needs.  T.W.'s mother also stated that her one-year-old daughter had already been placed with T.W.'s maternal great-grandmother.  Arizona's Department of Child Safety ("AZDCS") took T.W. into protective custody.

7

23.     On December 16, 2014, T.W. was discharged from the hospital and placed by AZDCS in a foster home in Flagstaff.  He began weekly lessons with a physical therapist in January, and his foster parents continue those lessons with him at home for hours every day.

24.     On February 10, 2015, T.W.'s foster parents took him back to Phoenix Children's Hospital for an MRI and a follow-up analysis.  The neurologist found that T.W. had areas of the brain that received no oxygen, and had ocular blindness, meaning his eyes and brain cannot communicate.  The neurologist stated that there is a high likelihood that T.W. will never be able to walk, talk, eat on his own, or use the bathroom on his own.  The doctors, however, were surprised by the progress T.W. had made in the care of his foster parents and thanked his foster parents for their constant engagement with T.W.  The doctors reiterated that T.W. must have 24-hour care, which T.W.'s foster parents are able to provide.  T.W.'s foster parents have also been very accommodating of T.W.'s mother, allowing her to visit T.W. three times a week or more.  T.W.'s mother has expressed her desire for the foster parents to adopt T.W., and the foster parents have also expressed interest in adopting T.W.

25.     AZDCS has recommended that T.W. remain with his foster parents, who have demonstrated that they are able to provide the constant care that he needs.

26.     Yet, because ICWA deems T.W. an "Indian child," his foster placement necessarily is guided by ICWA's placement preferences, which provide that, absent "good cause to the contrary," the state court must prefer a foster placement with "(i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian

organization which has a program suitable to meet the Indian child's needs." 25 U.S.C. § 1915(b).

27.     T.W.'s foster parents do not fall within any of ICWA's preferred placements. Under the 2015 Guidelines, AZDCS must conduct, at the State's expense, a "diligent search . . . to seek out and identify placement options that would satisfy the placement preferences." 80 Fed. Reg. at 10,157. If AZDCS locates such an alternative foster home or institution, under ICWA, the state court could keep T.W. in his current foster home only upon a showing of "good cause." *Id.* at 10,158.

28.     The 2015 Guidelines state that in determining whether "good cause" exists to depart from ICWA's placement preferences, the state court may not consider T.W.'s best interests "because the preferences reflect the best interests of an Indian child in light of the purposes of the Act." *Id.*

29.     The 2015 Guidelines further provide that the state court may not consider "ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement." *Id.*

30.     Philip (Jay) McCarthy, Jr., a lawyer with extensive experience in adoption and family law, serves as guardian ad litem for T.W. On behalf of T.W., Mr. McCarthy is expending significant time and resources to build a case that "good cause" exists to maintain T.W.'s current foster placement.

## B. Birth Parents D.V. and N.L.

31.     D.V. and N.L. are the biological parents of a child who is an "Indian child" under ICWA because his biological father, D.V., is a member of the Pascua Yaqui Tribe located in Arizona and the child is eligible to be enrolled in the tribe. N.L. is not Native American.

32.     D.V. and N.L. have decided that they are not well-equipped to raise their child, and they desire to place him with adoptive parents who desire to adopt him but are not "Indian" within the meaning of ICWA or the 2015 Guidelines.

33.     Because the adoptive parents are not "Indian" within the meaning of ICWA, they are not an ICWA-preferred placement.  ICWA and the 2015 Guidelines therefore dictate that the state court deny their adoption petition unless "good cause" is demonstrated.

34.     The 2015 Guidelines further require that "good cause" be shown by clear and convincing evidence.  Under the 2015 Guidelines, the "request" of D.V. and N.L. that their child be adopted by the adoptive parents they have chosen may constitute evidence of "good cause" only if D.V. and N.L. attest that they have reviewed available ICWA-preferred placements.  80 Fed. Reg. at 10,158.  This requirement will, at a minimum, delay the adoption and frustrate the wishes of D.V. and N.L. that their child be adopted promptly.

35.     D.V. and N.L. are expending significant resources and time, including retention of counsel, to prepare a case that "good cause" exists to respect their wishes for the custody and upbringing of their child and allow him to be adopted by the adoptive parents that they have selected.

**C. National Council for Adoption**

36.     NCFA has over 60 member adoption agencies with over 225 offices across the United States.  To become a member of NCFA, an agency must be a non-profit adoption agency and meet a host of other standards and requirements.  The member agencies of NCFA provide NCFA's funding and elect its officers.

37.     As a result of the 2015 Guidelines, NCFA has had to divert a significant portion of its limited resources (including both money and time) to educate its members about the new requirements imposed by the 2015 Guidelines.

38.     The placement practices and operations of NCFA's member adoption agencies have been and will continue to be adversely affected by the 2015 Guidelines. To maintain their state licenses, NCFA's member agencies must comply with applicable laws, and many of NCFA's member agencies are attempting to comply with the 2015 Guidelines because those Guidelines are phrased in mandatory terms and were made effective immediately.

39.     The 2015 Guidelines impose significant burdens (financial and otherwise) on NCFA's member agencies. For example, for every prospective adoption, the 2015 Guidelines require NCFA's members to "conduct an investigation into whether the child is an Indian child." 80 Fed. Reg. at 10,152. "If there is reason to believe that the child is an Indian child, the agency must obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership, as to whether the child is an Indian child." *Id.* If the child is determined to be an "Indian child," the 2015 Guidelines further mandate that NCFA's member agencies then conduct a "diligent search" for an adoptive placement that fulfills ICWA's placement preferences. *Id.* at 10,157. Under the 2015 Guidelines, this effort must include "an explanation of the actions that must be taken to propose an alternative placement," to, among others, all "reasonably identifiable[] members of the Indian child's extended family members." *Id.*

### D. Building Arizona Families

40.     Building Arizona Families is a non-profit adoption agency headquartered in, and licensed by, the State of Arizona. It currently has several birth-parent clients who have given

birth (or imminently will give birth) to children whom ICWA classifies as "Indian children," and who wish to place their children for adoption with non-Indian families.

41. Building Arizona Families' placement practices and operations have been and will continue to be adversely affected by the 2015 Guidelines. To maintain its license as an adoption agency, Building Arizona Families must comply with applicable laws, and it is attempting to comply with the 2015 Guidelines because the 2015 Guidelines are phrased in mandatory terms and were made effective immediately.

42. The 2015 Guidelines impose significant burdens (financial and otherwise) on Building Arizona Families. For example, for every prospective adoption, the 2015 Guidelines require Building Arizona Families to "conduct an investigation into whether the child is an Indian child." *Id.* at 10,152. "If there is reason to believe that the child is an Indian child, the agency must obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership, as to whether the child is an Indian child." *Id.* If the child is determined to be an "Indian child," the 2015 Guidelines further mandate that Building Arizona Families conduct a "diligent search" for an adoptive placement that fulfills ICWA's placement preferences. *Id.* at 10,157. Under the 2015 Guidelines, this effort must include "an explanation of the actions that must be taken to propose an alternative placement," to, among others, all "reasonably identifiable[] members of the Indian child's extended family members." *Id.* These requirements impose significant financial and administrative burdens on Building Arizona Families and detract from its mission of placing children into loving adoptive homes.

43. Building Arizona Families has a close and confidential relationship with its birth-parent clients, many of whom come to Building Arizona Families pregnant, alone, and in

despair. Many of these birth-parent clients choose an adoptive placement through Building Arizona Families as an alternative to abortion.

44.     Though the 2015 Guidelines and ICWA sharply limit the ability of these birth parents to direct the adoptive placement of their child, and further impose substantial delays and other burdens on that adoptive placement, including granting Indian tribes the opportunity to intervene to oppose the voluntary adoption, there are significant obstacles to their bringing suit in their own names. Those obstacles include unwanted publicity of their choices to place their children for adoption, the necessarily short window of time they have to pursue such litigation, and the inability to fund litigation for their clients. Further, the burdens imposed by the 2015 Guidelines limit agencies' abilities to fund such litigation. *See generally Singleton v. Wulff*, 428 U.S. 106, 114–16 (1976).

45.     Building Arizona Families' compelled compliance with the 2015 Guidelines subverts its birth-parent clients' ability to place their children in their preferred adoptive homes. Building Arizona Families thus shares an interest with its birth-parent clients in the prosecution of their claims. *See Warth v. Seldin*, 422 U.S. 490, 500–02 (1975).

## II.     THE STATUTORY AND REGULATORY FRAMEWORK

### A.     The Indian Child Welfare Act

46.     In the mid-1970s, there was rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple*, 133 S. Ct. at 2557 (quoting 25 U.S.C. § 1901(4)). "This wholesale removal of Indian children from their

13

homes prompted Congress" to enact the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901–1963. 133 S. Ct. at 2557.

47.    ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." *Id.* at § 1902.

48.    An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* at § 1903(4).

49.    In the event that an Indian child is removed from a parent or Indian custodian, or voluntarily placed for adoption by a birth parent, ICWA establishes a hierarchy of preferences for the placement of the Indian child, which applies "in the absence of good cause to the contrary." *Id.* at § 1915(a) "In any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." *Id.* (emphasis added).  For foster care or pre-adoptive placements, "a preference shall be given, *in the absence of good cause to the contrary*, to a placement with—(i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." *Id.* at § 1915(b) (emphasis added).

**B.    1979 Guidelines**

50.    In 1979, in the wake of ICWA's enactment, the BIA promulgated "Guidelines for State Courts; Indian Child Custody Proceedings" (the "1979 Guidelines") that were intended to

14

assist the implementation of ICWA, but were, on their face, "not intended to have binding legislative effect." 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979).

51. The 1979 Guidelines recognized that "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id.* The 1979 Guidelines emphasized that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* "Nothing in the legislative history indicates that Congress intended this Department to exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters. For Congress to assign to an administrative agency such supervisory control over courts would be an extraordinary step." *Id.* "Assignment of supervisory authority over the courts to an administrative agency is a measure so at odds with concepts of both federalism and separation of powers that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect." *Id.*

52. As state courts applied ICWA in the ensuing decades, most held that the "good cause" exception to ICWA's placement preferences includes a consideration of the child's best interests, including any bond or attachment the child had formed with her current caregivers. *See, e.g.*, *In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); *In re Appeal in Maricopa Cnty. Juvenile Action No. A-25525*, 667 P.2d 228, 234 (Ariz. Ct. App. 1983); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 307–08 (Ind. 1988); *In re Adoption of M.*, 832 P.2d 518, 522 (Wash. Ct. App. 1992); *In re Adoption of F.H.*, 851 P.2d 1361,1363–64 (Alaska 1993); *In re Interest of A.E., J.E., S.E., and X.E.*, 572 N.W.2d 579, 583–85 (Iowa 1997); *People ex. rel. A.N.W.*, 976 P.2d 365, 369 (Colo. Ct. App. 1999); *In re Interest of C.G.L.*, 63 S.W.3d 693, 697–

98 (Mo. Ct. App. 2002); *In re Adoption of Baby Girl B.*, 67 P.3d 359, 370–71 (Okla. Ct. App. 2003).

53.     In *Adoptive Couple*, the Supreme Court held that ICWA's parental termination provisions were inapplicable where a non-Indian Latina birth mother had voluntarily placed her Indian child for adoption with an adoptive couple that she chose, and the objecting biological father had never had custody of the child under applicable state law. *See* 133 S. Ct. at 2562. The Supreme Court noted that construing ICWA as applicable to such cases would raise "equal protection concerns." *Id.* at 2565. The Supreme Court further held that ICWA's hierarchy of placement preferences did not apply on the facts of that case. Because only Adoptive Couple had formally sought to adopt Baby Girl, there was "no preference to apply." *Id.* at 2564 (internal quotation marks omitted).

### C.    2015 Guidelines

54.     Eight months after the Supreme Court issued its decision in *Adoptive Couple*, on February 21, 2014, Defendant Washburn sent a letter to certain tribal leaders stating that, "[i]n response to the recent critical issues regarding ICWA, I have directed my staff to re-examine the *Guidelines* and respectfully request your input." Letter from Kevin Washburn, Asst. Sec'y, Indian Affairs, to Tribal Leaders (Feb. 21, 2014), at 1.

55.     Without giving the public or other interested stakeholders notice or an opportunity to comment, on February 25, 2015, the BIA, through the Department of the Interior, published the new Guidelines, which became "effective immediately" upon release.

56.     The 2015 Guidelines misleadingly suggest, however, that they were promulgated through public notice-and-comment rulemaking. For instance, the 2015 Guidelines open with a declaration that they were written "in light of written and oral comments received." 80 Fed. Reg. at 10,146. The BIA further assures us that "[t]he updated guidelines are issued in response to

16

comments received during several listening sessions[ and] written comments submitted throughout 2014." *Id.* at 10,147. "The Department reviewed and considered each comment in developing these revised Guidelines." *Id.* In reality, the BIA solicited comments from only those stakeholders whose input the BIA wished to consider—the tribal leaders to whom Mr. Washburn's letter was addressed.

57.     Unlike the 1979 Guidelines, the 2015 Guidelines are phrased such that any reasonable reader would conclude that they are intended to be binding rules.

58.     First, the BIA removed the language contained in the 1979 Guidelines stating that they are not binding on state courts and, further, that they *could not* be binding on state courts because the BIA lacks the authority to dictate to state courts how to implement ICWA. *See, e.g.*, 44 Fed. Reg. at 67,584.

59.     Second, in stark contrast to the 1979 Guidelines, the 2015 Guidelines instruct state courts in mandatory language. The 2015 Guidelines declare, for example, that they "provid[e] a framework *for State courts . . . to follow*." 80 Fed. Reg. at 10,146–47 (emphasis added). They "provide standard procedures . . . *to be used* in Indian child welfare proceedings in State courts." *Id.* at 10,147 (emphasis added). The 2015 Guidelines state that "State courts *must ask*, in *every* child custody proceeding, whether ICWA applies," and that "active efforts *must begin* from the moment the possibility arises that the Indian child may be removed." *Id.* at 10,147–48 (emphases added). The 2015 Guidelines declare that they "*requir[e]* agencies and courts to consider, as early as possible, whether ICWA applies," and that they "*require[]* agencies and courts to consider whether the child is an Indian child." *Id.* at 10,148 (emphases added).

17

60.    In addition, the 2015 Guidelines detail "[w]hat actions *must* . . . State court[s]
undertake to determine whether a child is an Indian child," and "when *must* a State court dismiss
an action." *Id.* at 10,150 (emphasis added). The 2015 Guidelines mandate that reasons for not
following placement preferences "*must* be stated on the record or in writing," and that a
determination not to follow placement preferences "*must be based*" on several detailed
considerations. *Id.* at 10,158 (emphases added). Indeed, mandatory language pervades the 2015
Guidelines, continually dictating to state courts how they must interpret and implement ICWA.

61.    The 2015 Guidelines also mandate certain actions from state social services
agencies, as well as state-licensed foster and adoption agencies. The 2015 Guidelines declare
that "Agencies *must* ask whether there is reason to believe a child that is subject to a child
custody proceeding is an Indian child. If there is reason to believe that the child is an Indian
child, the agency *must* obtain verification, in writing, from all tribes in which it is believed that
the child is a member or eligible for membership, as to whether the child is an Indian child." *Id.*
at 10,152 (emphases added). "Agencies *are required* to notify all tribes, of which the child may
be a member or eligible for membership, that the child is involved in a child custody
proceeding." *Id.* at 10,153 (emphasis added).

62.    Further, the 2015 Guidelines even purport to preempt state courts' rules of
evidence and procedure in any child custody proceeding in which the child involved might be an
"Indian child." The 2015 Guidelines instruct, for example, that a State "court *may not* issue an
order effecting a foster care placement of an Indian child unless clear and convincing evidence is
presented, including the testimony of one or more qualified expert witnesses, demonstrating that
the child's continued custody with the child's parents or Indian custodian is likely to result in
serious harm to the child." *Id.* at 10,156 (emphasis added). The 2015 Guidelines then instruct

18

state courts as to "[w]ho may serve as a qualified expert witness," declaring a presumption that a "member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices" meets the "requirements for a qualified expert witness." *Id.* at 10,157.

63.     Perhaps most astonishing, the 2015 Guidelines also prohibit state courts from considering the child's "best interests" in determining whether, as ICWA requires, there is "good cause" to deviate from ICWA's statutory placement preferences. According to the BIA and the Department of the Interior, "[t]he good cause determination does not include an independent consideration of the best interest of the Indian child because the preferences reflect the best interests" of all "Indian child[ren]." *Id.* at 10,158.

64.     Specifically, when considering "good cause," a state court is now categorically prohibited from considering "ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement that does not comply with the Act." *Id.*

65.     The 2015 Guidelines also purport to repudiate state law that avoids serious equal protection issues raised by ICWA's broad definition of "Indian child" by limiting ICWA's application to circumstances where the child was at some point domiciled on Indian lands or otherwise had some significant political or cultural connection to the tribe. A number of state courts have recognized that application of ICWA to a child that has no political or cultural connection to a tribe would violate the Equal Protection Clause by irrationally discriminating among children based on their ancestry. *See, e.g., In re Bridget R.*, 49 Cal. Rptr. 2d 507, 520–22 (Ct. App. 1996); *In re Santos Y.*, 112 Cal. Rptr. 2d 692, 715–23 (Ct. App. 2001); *cf. Adoptive Couple,* 133 S. Ct. at 2565 (noting that interpreting ICWA's parental termination provisions as

applicable in any case where a child has an Indian ancestor, "even a remote one, . . . would raise equal protection concerns"). These cases form a variant of what has become known as the "Existing Indian Family Doctrine."

66.     Seeking to overrule those decisions by administrative fiat, the 2015 Guidelines declare that "[t]here is no exception to application of ICWA based on the so-called 'existing Indian family doctrine.' Thus, the following non-exhaustive list of factors should not be considered in determining whether ICWA is applicable: the extent to which the parent or Indian child participates in or observes tribal customs, votes in tribal elections or otherwise participates in tribal community affairs, contributes to tribal or Indian charities, subscribes to tribal newsletters or other periodicals of special interest to Indians, participates in Indian religious, social, cultural, or political events, or maintains social contacts with other members of the tribe; the relationship between the Indian child and his/her Indian parents; the extent of current ties either parent has to the tribe; whether the Indian parent ever had custody of the child; and the level of involvement of the tribe in the State court proceedings." 80 Fed. Red. at 10,151–52. Thus, the 2015 Guidelines require that state courts apply ICWA to an "Indian" child even if the child has never been domiciled on Indian lands, is not an enrolled member, and has no connection to any Indian tribe other than blood.

67.     Indeed, the 2015 Guidelines go so far as to take on the Supreme Court itself. In *Adoptive Couple v. Baby Girl*, the Supreme Court held that ICWA's adoptive placement preferences are "inapplicable in cases where no alternative party has formally sought to adopt the child," "because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under 1915(a) has come forward." 133 S. Ct. at 2564. Without so much as acknowledging the Supreme Court's decision, the 2015 Guidelines require adoption agencies,

birth parents, and prospective adoptive parents to scour the Nation looking for competing

adoptive placements, all while the child waits in limbo. That mandate effectively bans the

adoption of "Indian" children by anyone other than an "Indian," and cannot be reconciled with

the Supreme Court's decision in *Adoptive Couple*.

## III.   DEFENDANTS' VIOLATIONS OF FEDERAL LAW

### A.   Violations of the Administrative Procedure Act

#### 1.   Violation of the Notice-And-Comment Requirement of 5 U.S.C. § 553

68.   The 2015 Guidelines violate the APA because they have the appearance and

practical effect of binding legislative rules, but were issued without adherence to notice-and-

comment procedures.

69.   Though the 2015 Guidelines are careful not to state explicitly that they have the

force of law, they read "like an ukase" to state social services agencies, state-licensed foster and

adoption agencies, and most of all to state courts, dictating in mandatory language the manner in

which they must address cases involving the custody and placement of "Indian children." *See*

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

70.   The 2015 Guidelines use the word "must" 101 times. *See, e.g.*, 80 Fed. Reg. at

10,152 ("Agencies and State courts, in every child custody proceeding, must ask whether the

child is or could be an Indian child and conduct an investigation into whether the child is an

Indian child."); *id.* ("If there is any reason to believe the child is an Indian child, the agency and

State court must treat the child as an Indian child, unless and until it is determined that the child

is not a member or is not eligible for membership in an Indian tribe."); *id.* at 10,149 (state agency

"must demonstrate that it conducted a diligent search to identify placement options that satisfy

the placement preferences").

71.     The 2015 Guidelines also tell state authorities what they "may not" do ten times. *See, e.g., id.* at 10,156 ("In determining whether good cause exists, the court may not consider whether the case is at an advanced stage or whether transfer would result in a change in the placement of the child . . . .").

72.     Consistent with the 2015 Guidelines' mandatory and prohibitory language, state courts and agencies routinely are treating the 2015 Guidelines as binding and controlling of the manner in which cases involving "Indian children" are addressed. The 2015 Guidelines thus are affecting legal rights and obligations of Indian children, their birth parents, state courts, and both private and State-run child welfare agencies.

73.     Here, although the 2015 Guidelines operate as a legislative rule, regulated entities and interested parties, including Plaintiffs, were not afforded an opportunity to comment on the 2015 Guidelines as required by Section 553 of the APA.

### 2. The 2015 Guidelines Arbitrarily and Capriciously Depart from Prior Agency Policy Without Explanation

74.     The 2015 Guidelines are arbitrary and capricious because they depart drastically from the BIA's prior longstanding position without any reasoned explanation.

75.     The 1979 Guidelines, which were issued contemporaneously with ICWA's enactment, were self-consciously mere "guidelines" that BIA stated were "not intended to have binding effect." 44 Fed. Reg. at 67,584. At that time, the agency reasoned that "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id.* The BIA and the Department of the Interior explained that "[n]othing in the legislative history indicates that Congress intended this Department to exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters." *Id.* Defendants further observed that it "would be an extraordinary step" for

"Congress to assign to an administrative agency such supervisory control over courts." *Id.* They further opined that "[a]ssignment of supervisory authority over the courts to an administrative agency is a measure so at odds with concepts of both federalism and separation of powers that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect." *Id.*

76.     The 1979 Guidelines provided a non-exhaustive and non-binding list of factors to consider in determining whether there is "good cause" to depart from ICWA's placement preferences. *Id.* at 67,594.  At that time, Defendants emphasized that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* at 67,584.

77.     Without acknowledging or attempting to explain away the agency's prior longstanding, reasoned interpretation, the 2015 Guidelines embody a drastically altered view of the world.

78.     For example, as explained above, the 2015 Guidelines are far from mere "guidelines"; rather, they read "like an ukase" to state courts, notwithstanding Defendants prior view that it lacked authority "to exercise supervisory control over state and tribal courts."

79.     The 2015 Guidelines also depart drastically from the 1979 Guidelines' acknowledgement that Congress intended to give state courts flexibility to determine and weigh a host of considerations relevant to whether one of ICWA's "good cause" exceptions is satisfied.

80.     Specifically, the 2015 Guidelines dictate to state courts that any departure from the placement preferences "must be based" on one or more enumerated "considerations." 80 Fed. Reg. at 10,158.  To underscore the point, the 2015 Guidelines explicitly *prohibit* the

consideration of several factors that were routinely considered by state courts applying ICWA's

"good cause" exception over the past 36 years. Most notably, the 2015 Guidelines declare that

state courts may not consider "ordinary bonding or attachment that may have occurred as a result

of a placement or the fact that the child has, for an extended amount of time, been in another

placement that does not comply with the Act." *Id.* The 2015 Guidelines further declare that

"[t]he good cause determination does not include an independent consideration of the best

interest of the Indian child because the preferences reflect the best interests of an Indian child."

*Id.*

81.     Similarly, the 2015 Guidelines depart from Defendant's prior guidance to state

courts as to what constitutes "good cause" to deny a tribe's request for transfer from state court

to tribal court. Defendants acknowledge this change, but provide no reasoned explanation for it.

*See id.* at 10,149 ("The updated guidelines specifically omit some of the factors that were the

basis for finding that 'good cause' exists under the 1979 guidelines. One such factor that should

no longer be considered is whether the proceeding was at an advanced stage.").

82.     Because the 2015 Guidelines depart from prior agency interpretation without

acknowledging the agency's prior reasoning or providing any reasoned explanation for the

change, they are arbitrary and capricious in violation of the APA.

### 3. The 2015 Guidelines Contravene ICWA

83.     Even if the 2015 Guidelines had been issued in accordance with the APA's

procedural requirements, many aspects of the 2015 Guidelines would still be invalid because

they contravene ICWA and the United States Constitution, and are thus contrary to law.

84.     For example, the 2015 Guidelines' interpretation of "good cause" as limited to

three specific factors, to the exclusion of all other factors—including the individual child's

24

relationship with current caretakers, or the harm the child would suffer from the severance of his familial bonds—finds no basis in the statute or legislative history and heightens the constitutional concerns raised by ICWA generally.

85. As Defendants previously acknowledged, Congress intentionally did not define the term "good cause," not because it intended to leave a gap for the agency to fill, but because it was creating a "flexible safety valve" through which state courts could consider the unique circumstances of an individual child and determine whether a departure from ICWA's presumptive placement scheme is warranted. The "good cause" provisions of the 2015 Guidelines are thus invalid as an unreasonable interpretation of the statute.

86. The 2015 Guidelines further direct that "The party seeking departure from the preferences bears the burden of proving by clear and convincing evidence the existence of good cause to deviate from the placement preferences." 80 Fed. Reg. at 10,158. But Section 1915 does not require proof by clear and convincing evidence, though Congress *did* specify heightened burdens of proof elsewhere in ICWA. In context, Congress's exclusion of the heightened burden in the "good cause" exception must be construed as intentional, and the default civil standard (preponderance of the evidence) applies.

87. The 2015 Guidelines also contravene ICWA by imposing an affirmative and onerous requirement on state agencies to seek out and solicit alternative, competing "preferred" placements if the adoptive parents chosen by the birth-parent clients of such agencies do not fall within ICWA's placement preferences. In *Adoptive Couple*, the Supreme Court held that the adoption placement preferences in Section 1915(a) are "*inapplicable* in cases where no alternative party has formally sought to adopt the child. This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has

come forward." 133 S. Ct. at 2564 (emphasis added). In reaching that conclusion, the Supreme Court necessarily rejected the 2015 Guidelines' view that placement agencies or their clients—birth parents and prospective adoptive parents—have an affirmative duty to conduct a nationwide search for competing prospective adoptive homes. The imposition of such a duty on state agencies, to act contrary to the wishes of their clients and thereby create a contested custody proceeding where there otherwise would be none, would have the practical effect of banning the adoption of Indian children by anyone other than an "Indian."

88.     The 2015 Guidelines' definition of "active efforts" also contravenes Section 1912(d) of ICWA, as interpreted by the Supreme Court of the United States.

89.     Section 1912(d) of ICWA requires "active efforts [to] have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d).

90.     In *Adoptive Couple*, the Supreme Court held that Section "1912(d) applies only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights. The term 'breakup' refers in this context to '[t]he discontinuance of a relationship,' or 'an ending as an effective entity.'" 133 S. Ct. at 2562 (citation omitted) (alteration in original). Accordingly, when the "child has never been in the Indian parent's legal or physical custody, there is no 'relationship' that would be 'discontinu[ed]'—and no 'effective entity' that would be 'end[ed]'—by the termination of the Indian parent's rights. In such a situation, the 'breakup of the Indian family' has long since occurred, and § 1912(d) is inapplicable." *Id.* (alterations in original).

91.     Yet, the 2015 Guidelines state that "the requirement to engage in 'active efforts'" is triggered "the moment the possibility arises that an agency case or investigation may result in

the need for the Indian child to be placed *outside the custody of either parent*"—without regard

to whether the child is or ever was in the custody of an Indian parent. 80 Fed. Reg. at 10,152

(emphasis added). This provision of the 2015 Guidelines is therefore irreconcilable with

*Adoptive Couple* and contrary to law.

92. Section 1912(a) of ICWA requires notice to tribes of involuntary proceedings

involving the custody of an "Indian child." The text and legislative history of ICWA establish

that notice to tribes is *not* required in voluntary proceedings, as every reported case to have

considered the issue has concluded. *See, e.g., Navajo Nation v. Superior Court*, 47 F. Supp. 2d

1233 (E.D. Wash. 1999); *Catholic Soc. Servs., Inc. v. C.A.A.*, 783 P.2d 1159 (Alaska 1989).

Moreover, the 1979 Guidelines made it clear that "[u]nder the Act confidentiality is given a

much higher priority in a voluntary proceeding than in involuntary one. The Act mandates a

tribal right of notice and intervention in involuntary proceedings but not in voluntary ones." 44

Fed. Reg. at 67,586.

93. The 2015 Guidelines, however, suggest strongly that notice to tribes *is* required in

voluntary proceedings. "In seeking verification of the child's status, in a voluntary placement

proceeding where a consenting parent evidences a desire for anonymity, the agency or court

must keep relevant documents confidential and under seal. A request for anonymity does not

relieve the obligation to obtain verification from the tribe(s) or to provide notice." 80 Fed. Reg.

at 10,153. This provision is an unreasonable interpretation of the statute and is thus contrary to

law.

94. The 2015 Guidelines further contravene ICWA by purporting to give tribes an

automatic right to intervene in voluntary adoption cases. ICWA defines four categories of "child

custody proceedings": (1)"foster care placement," (2) "termination of parental rights," (3)

"preadoptive placement," and (4) "adoptive placement. An "adoptive placement" is defined as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U.S.C. § 1903(1)(iv). The statute provides tribes a right to intervene only in a "State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child," and not in a preadoptive or adoptive placement proceeding. *Id.* at § 1911(b). The 1979 Guidelines previously recognized Congress's intent on this point: "The Act mandates a tribal right of . . . intervention in involuntary proceedings, but not in voluntary ones." 44 Fed. Reg. at 67,586.

95.    Similarly, the 2015 Guidelines purport to authorize a tribe to petition for a transfer to tribal court "each distinct Indian child custody proceeding." 80 Fed. Reg. at 10,149. Yet, Congress made only two types of proceedings subject to transfer: foster care and termination proceedings. *See* 25 U.S.C. § 1911(b). The 2015 Guidelines further hamstring a state court's ability to deny such petitions for "good cause," instructing that state courts may not consider, as they had under the 1979 Guidelines, whether the proceeding is "at an advanced stage" at the time the tribe requests the transfer.

### 4. The 2015 Guidelines Violate the United Stated Constitution

#### a) Deprivations of Due-Process-Protected Liberty Interests

96.    Fit parents have a constitutionally protected liberty interest in directing the upbringing of their children. The Supreme Court has long recognized "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion).

97.    This constitutionally protected liberty interest extends to custodial birth parents' decisions to place their children in the care and custody of adoptive families. *See In re Interest*

*of N.N.E.*, 752 N.W.2d 1, 11–16 (Iowa 2008) (birth mother's fundamental right to direct care of her child is not lessened because she intended to terminate her rights in favor of adoptive placement).

98.     When a child is classified by ICWA and the 2015 Guidelines as an "Indian child," the 2015 Guidelines substantially burden the ability of a birth parent wishing to transfer custody of her child through a voluntary adoption to choose the adoptive home of his or her child. For example, the 2015 Guidelines require that the child's Indian tribe be provided notice of the voluntary adoption proceedings and the opportunity to intervene in the proceedings. *See* 80 Fed. Reg. at 10,157. The 2015 Guidelines further mandate application of ICWA's placement preferences, which, under the 2015 Guidelines, can be set aside only upon a showing of good cause by clear and convincing evidence. *See id.* at 10,158. And under the 2015 Guidelines, the "request of the parents" may provide evidence of "good cause" to depart from the placement preferences only where "*both parents* attest that they have reviewed the placement options that comply with the order of preference." *Id.* (emphasis added). This requirement effectively disables a single parent of an Indian child—for example, a single mother of an "Indian child" whose birth father lacks parental rights because of abandonment or otherwise—from placing that child in a voluntary adoption where an ICWA-preferred placement is available. It also effectively disables the parents of an "Indian child" from directing the placement of the child in the event of their death through a will to persons who are not preferred by ICWA.

99.     The 2015 Guidelines substantially burden the constitutionally protected liberty interest of birth parents of "Indian children" to direct the custody and upbringing of those children.

100.    Those "Indian children"—like their parents—also enjoy a constitutionally protected liberty interest in their familial and family-like relationships. *See Troxel*, 530 U.S. at 88 (Stevens, J., dissenting) ("While this Court has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds, it seems to me extremely likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation.") (citation omitted); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) ("[B]ecause the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State."); *In re Jasmon O.*, 878 P.2d 1297, 1307 (Cal. 1994) ("Children, too, have fundamental rights—including the fundamental right to be protected from neglect and to have a placement that is stable and permanent.") (internal quotation marks and alterations omitted).

101.    This constitutionally protected liberty interest extends to Indian children's familial relationships with foster and pre-adoptive families.

102.    Psychological and child development research has shown that young children develop strong attachment bonds with foster and adoptive parental figures. Leslie M. Singer, et al., *Mother-Infant Attachment in Adoptive Families*, 56 Child Dev. 1543, 1547, 1550 (1985). When these attachments are maintained, the children can thrive. Leah Matas, et al., *Continuity of Adaptation in the Second Year: The Relationship Between Quality of Attachment and Later Competence*, 49 Child Dev. 547, 553 (1978). Disruptions with this attachment, such as removing children from their parental figures with whom they have developed such an attachment, are known to cause serious and lasting developmental and psychological problems

for the children. Carol George, et al., *Incorporating Attachment Assessment into Custody Evaluations: The Case of a 2-Year Old and Her Parents*, 49 Fam. Ct. Rev. 483, 483 (2011); Lois A. Weithorn, *Developmental Neuroscience, Children's Relationships with Primary Caregivers, and Child Protection Policy Reform*, 63 Hastings L.J. 1487, 1531 (2012); *see Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 844 (1977) ("No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.") (footnotes omitted).

103.    State courts applying ICWA accordingly have held that the statute's placement preferences may not constitutionally be applied to remove a child from a pre-adoptive or foster home where she is thriving to an ICWA-preferred placement. *See, e.g.*, *Bridget R.*, 49 Cal. Rptr. 2d at 520–22; *Santos Y.*, 112 Cal. Rptr. 2d at 715–23.

104.    The 2015 Guidelines violate the constitutionally protected liberty interests of "Indian children" by mandating application of ICWA's placement preferences without regard to the familial bonds developed with non-Indian foster or prospective adoptive parents. Even where an "Indian child" is thriving in a foster or pre-adoptive placement, if that placement is not an ICWA-preferred placement, the 2015 Guidelines dictate that state authorities seek out potential ICWA-preferred placements for the child. *See, e.g.*, 80 Fed. Reg. at 10,152. And if such an ICWA-preferred placement is located, the 2015 Guidelines categorically prohibit state

courts from considering the child's bond and attachment to her current caregivers, or the harm that would be caused by terminating that relationship, in considering whether "good cause" exists to depart from ICWA's placement preferences. *Id.* at 10,158.

105. The 2015 Guidelines violate the due process rights of "Indian children" in non-ICWA-preferred foster and pre-adoptive placements to maintain their familial bonds with their current caregivers.

### b) Violations of Equal Protection of Federal Law

106. The Fifth Amendment guarantees all persons in the United States equal protection under federal law.

107. The 2015 Guidelines deny "Indian children" and their birth parents equal protection of the laws by impermissibly discriminating against them on the basis of the ancestry of the "Indian children."

108. Tracking the language of ICWA, the 2015 Guidelines define "Indian child" as "any unmarried person who is under age eighteen and is either (1) a member of an Indian tribe; or (2) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* at 10,151.

109. Most Indian tribes have only blood quantum or lineage requirements as prerequisites for membership. *See, e.g.*, Paul Spruhan, *The Origins, Current Status, & Future Prospects of Blood Quantum as the Definition of Membership in the Navajo Nation*, 8 Tribal L.J. 1, 5 (2007); Miss. Band of Choctaw Indians Const. art. III, § 1; Cherokee Nation Const. art. IV, § 1; Choctaw Nation of Okla. Const. art. II, § 1; Muscogee (Creek) Nation Const. art. III, § 2. As a result, most children are classified as "Indian children" under the 2015 Guidelines' interpretation of ICWA based solely on their ancestry. Indeed, some tribes purport to automatically enroll children upon birth based solely on their ancestry, regardless of whether a

parent has consented or is enrolled. *See Nielson v. Ketchum*, 640 F.3d 1117, 1122 (10th Cir. 2011) (describing the Cherokee Citizenship Act, which "provides that every newborn child who is a Direct Descendant of an Original Enrollee shall be automatically admitted as a citizen of the Cherokee Nation for a period of 240 days following the birth of the child") (internal quotation marks omitted).

110.    The 2015 Guidelines sharply limit the ability of birth parents of "Indian children" to direct the placement of their children in adoptive or foster homes by mandating application of ICWA's placement preferences unless the birth parents show by clear and convincing evidence that "good cause" exists to depart from ICWA's placement preferences. *See* 80 Fed. Reg. at 10,158.

111.    The 2015 Guidelines further severely limit the ways in which "good cause" may be shown.  For example, the Guidelines prohibit state courts from independently assessing the best interests of an Indian child because, according to the 2015 Guidelines, ICWA's placement preferences reflect the best interests of Indian children. *Id.*

112.    While the 2015 Guidelines do allow a finding of "good cause" to be based on a "request of the parents," that is permissible only when "both parents attest that they have reviewed the placement options" complying with ICWA's placement preferences. *Id.*

113.    The requirement that "both parents attest that they have reviewed the placement options" effectively makes it impossible for the wishes of a single parent of an "Indian child" to overcome an alternative ICWA-preferred placement.

114.    Birth parents of non-Indian children who wish to place those children in a foster or adoptive placement need not satisfy ICWA's "good cause" requirement or the 2015 Guidelines' interpretation of that "good cause" requirement.

115. The 2015 Guidelines impermissibly discriminate against birth parents of "Indian children" in the exercise of their constitutionally protected rights to direct the custody and upbringing of their children based on the ancestry of their children.

116. The discrimination against birth parents of "Indian children" is especially irrational when the birth parents are not domiciled on Indian lands and otherwise have no political or cultural affiliation with an Indian tribe.

117. When birth parents of an "Indian child" (including single non-Indian birth parents with sole custody) are not domiciled on Indian lands and have no political or cultural connection with a tribe, they are free to raise that child without affiliating the child with an Indian tribe. Mandating application of ICWA's placement preferences in such circumstances to restrict birth parents' ability to select the adoptive or foster placement for their child is not "reasonable and rationally designed to further Indian self-government," *Morton v. Mancari*, 417 U.S. 535, 555 (1974), and therefore irrationally discriminates on the basis of the ancestry of the "Indian child."

118. State courts have avoided this constitutional defect by construing ICWA as inapplicable to children who have never been part of a family with cultural, social, or political ties to a tribe, an approach that has become known as the "Existing Indian Family Doctrine." *See, e.g.*, *In re Interest of S.A.M.*, 703 S.W.2d 603, 608–09 (Mo. Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653–54 (S.D. 1987); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *In re Adoption of Crews*, 825 P.2d 305, 310–11 (Wash. 1992); *Hampton v. J.A.L.*, 658 So. 2d 331, 335 (La. Ct. App. 1995); *Rye v. Weasel*, 934 S.W.2d 257, 261–64 (Ky. 1996); *Santos Y.*, 112 Cal. Rptr. 2d at 717 n.16 (describing split in California state appellate courts); *In re Parental Rights as to Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880, at *1 (Tenn. Ct. App. Nov. 19, 1997); *Ex parte C.L.J.*, 946 So. 2d 880 (Ala. Civ. App. 2006); *In re N.J.*, 221 P.3d 1255,

1264–65 (Nev. 2009). *But see Thompson v. Fairfax Cnty. Dep't of Family Servs.*, 747 S.E.2d

838, 847–48 (Va. Ct. App. 2013) (collecting cases from state courts rejecting the Existing Indian

Family Doctrine). *Cf. Adoptive Couple*, 133 S. Ct. at 2565 (noting that interpreting ICWA's

parental termination provisions as applicable in any case where a child has an Indian ancestor,

"even a remote one, . . . would raise equal protection concerns").

119.     The 2015 Guidelines, however, purport to foreclose state courts from interpreting

ICWA to avoid these constitutional pitfalls by declaring that there "is no existing Indian family

(EIF) exception to application of ICWA." 80 Fed. Reg. at 10,148. The 2015 Guidelines thus

embrace and affirmatively command application of ICWA even where the interest in "Indian

self-government" is most attenuated, if it exists at all.

120.     The 2015 Guidelines' restrictions on the ability of birth parents of "Indian

children" to choose adoptive or foster placements for their children are so substantial, and the

discrimination vis-à-vis the birth parents of non-Indian children is so manifest, that they violate

the Fifth Amendment's guarantee of equal protection of the laws in every application involving

voluntary adoption or foster placements.

121.     The 2015 Guidelines also violate the equal protection rights of the Indian children

themselves.

122.     The Supreme Court has held that children have a right to have their best interests

considered in decisions concerning their custody and placement. *See Stanley v. Illinois*, 405 U.S.

645, 649 (1972) (describing "[t]he State's right—indeed, duty—to protect minor children

through a judicial determination of their interests in a neglect proceeding"); *cf. Palmore v. Sidoti*,

466 U.S. 429, 433 (1984) ("The goal of granting custody based on the best interests of the child

is indisputably a substantial government interest for purposes of the Equal Protection Clause.").

123. For non-Indian children, the focus of any state-court foster or adoptive placement proceeding is that particular child's best interest.

124. The 2015 Guidelines, however, purport to prohibit state courts from independently examining the best interests of an "Indian child" on the ground that ICWA's placement preferences themselves reflect a determination of all Indian children's best interests. 80 Fed. Reg. at 10,158. The 2015 Guidelines similarly prohibit courts from taking into consideration an Indian child's bonds with and attachment to his current placement in determining whether "good cause" exists to depart from ICWA's placement preferences. *Id.*

125. Non-Indian children suffer no similar prohibition on independent judicial determination of their best interests and consideration of the harm they might suffer if removed from their current placement.

126. There is no government interest that could justify prohibiting state courts from considering the harms an "Indian child" may suffer if he is removed from his current placement.

127. There is no government interest that could justify denying "Indian children" a placement in accordance with their best interests. Likewise, there is no government interest that could justify mandating placement of an "Indian child" in an environment that would (if a best-interests determination were permitted) be determined to be clearly contrary to the child's best interests.

128. The 2015 Guidelines' violation of the equal protection rights of "Indian children" is most stark in those situations in which the "Indian child" has no connection to an Indian tribe other than blood. In these situations, application of ICWA's placement preferences and the 2015 Guidelines' "good cause" standard is not rationally related to any interest in "Indian self-

government," *Morton*, 417 U.S. at 555, and accordingly violates the equal protection rights of such children.

### c)  Violations of the Tenth Amendment

129.    Even where Congress is legislating pursuant to its enumerated powers, the Tenth Amendment of the United States Constitution prohibits Congress from commandeering state resources to achieve its federal policy objectives.  "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *United States v. Printz*, 521 U.S. 898, 935 (1997).

130.    The 2015 Guidelines violate the Tenth Amendment to the United States Constitution by impermissibly commandeering state courts, state agencies, and state-licensed agencies in numerous ways.

131.    The 2015 Guidelines require, for example, that state child-welfare and placement agencies "ask whether there is reason to believe a child that is subject to a child custody proceeding is an Indian child.  If there is reason to believe that the child is an Indian child, the agency must obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership, as to whether the child is an Indian child."  80 Fed. Reg. at 10,152.  "Agencies are required to notify all tribes, of which the child may be a member or eligible for membership, that the child is involved in a child custody proceeding." *Id.* at 10,153. The 2015 Guidelines commandeer foster agencies to act as investigative bodies on behalf of the federal government, in furtherance of the 2015 Guidelines' unlawful interpretation of ICWA.

132.    The 2015 Guidelines similarly violate the anti-commandeering doctrine by mandating that state courts perform investigations to further the federal policy agenda set forth the 2015 Guidelines.  The 2015 Guidelines order that state courts "in every child custody

proceeding . . . conduct an investigation into whether the child is an Indian child." *Id.* at 10,152. If the court finds that the child is an "Indian child," then the "agency or court must send notice of each such proceeding" to the relevant tribes. *Id.* at 10,153. The 2015 Guidelines thus commandeer state courts to act as investigative bodies on behalf of the federal government.

133. The 2015 Guidelines further violate the Tenth Amendment by instructing state courts "[w]ho may serve as a qualified expert witness." *Id.* at 10,157. Congress does not have the power to dictate procedural rules to state courts. *See Congressional Authority to Require State Courts to Use Certain Procedures in Products Liability Cases,* 13 Op. O.L.C. 372, 373–74 (1989) (stating that "potential constitutional questions" arise when Congress "attempts to prescribe directly the state court procedures to be followed in products liability cases."). Rules of evidence regarding expert witnesses are procedural, rather than substantive. Therefore, the 2015 Guidelines violate the Tenth Amendment by dictating specific expert witness standards.

### d) ICWA Exceeds Congress's Authority Under the Indian Commerce Clause.

134. Adoption proceedings are adjudicated exclusively in state family courts, and domestic relations have long been regarded as a virtually exclusive province of the States.

135. ICWA purports to restrict a state court's ability to terminate the parental rights of a parent of an "Indian child" and to determine an appropriate foster or adoptive family for an "Indian child."

136. For its authority to enact ICWA, Congress invoked the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and "other" (unidentified) "constitutional authority," which ICWA asserts provides Congress with "plenary power over Indian affairs." 25 U.S.C. § 1901(1).

137. The Indian Commerce Clause gives Congress authority "[t]o regulate *commerce* . . . with the Indian tribes." U.S. Const. art. I, § 8, cl. 3 (emphasis added).

138. "Commerce" consists of selling, buying, and bartering goods and services, as well as transporting for these purposes.

139. Children are not chattels, and state-court child custody proceedings are not a species of "Commerce . . . with the Indian tribes."

140. No other enumerated power supports Congress's intrusion into this area of traditional state authority.

**B.    Defendants' Violations of Plaintiffs' Rights Under the U.S. Constitution**

141. Irrespective of whether the 2015 Guidelines are binding legislative rules, Defendants' promulgation of the 2015 Guidelines purport to command and, at minimum, urge state agencies and state courts to violate Plaintiffs' constitutional rights. Defendants' inducement of violation of constitutional rights itself violates Plaintiffs' constitutional rights. *See, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1195–96 & n.3 (10th Cir. 2010).

### 1.    Defendants' Violations of the Constitutional Rights of "Indian Child" T.W.

142. Plaintiff T.W. has a constitutionally protected liberty interest in building and maintaining his familial bonds and in having his best interests considered in decisions concerning his custody and placement.

143. Plaintiff T.W. also has a constitutionally protected interest in enjoying the same protections under the law as non-Indian children. Plaintiff T.W. has a right to be free from federal discrimination because of his Indian ancestry.

144. ICWA classifies Plaintiffs T.W. as an "Indian child."

145. Through the 2015 Guidelines, Defendants are commanding, or at a minumum urging, the state courts that will supervise T.W.'s placement not to undertake "an independent

consideration of the best interest of the Indian child" and to disregard the "bonding or attachment" between T.W. and his current foster parents. 80 Fed. Reg. at 10,157–58.

146. Defendants' actions are causing ongoing harm to T.W. In an effort to preserve his familial bonds with his foster parents, T.W.'s guardian ad litem, Philip (Jay) McCarthy, Jr., must devote time and resources to demonstrating, by clear and convincing evidence, that "good cause" exists under the 2015 Guidelines to maintain T.W.'s non-ICWA-preferred placement.

147. In the absence of Defendants' promulgation of the 2015 Guidelines, T.W.'s guardian ad litem would not need to devote as much time and as many resources to justify departure from ICWA's placement preferences because ICWA does not contain a requirement that "good cause" be shown by clear and convincing evidence, nor does it contain a prohibition on consideration of T.W.'s best interests, which demonstrably militate in favor of continued placement with his foster parents in whose care T.W. is making progress.

148. If T.W. were not classified by ICWA as an "Indian child," T.W.'s guardian ad litem would not need to devote time and resources to justify departure from ICWA's placement preferences, because those placement preferences would not apply. T.W.'s placement would be guided principally by his best interests, including any bond or attachment formed with his current foster parents.

149. Defendants' promulgation of the 2015 Guidelines unlawfully threatens T.W.'s familial bonds and thus violates T.W.'s constitutional rights under the Fifth Amendment's due process and equal protection components.

### 2. Defendants' Violations of the Rights of Birth Parents of "Indian Children"

150. Plaintiffs D.V. and N.L. have a constitutionally protected liberty interest in directing the custody and care of their child, whom ICWA classifies as an "Indian child."

151.    Birth-parent clients of Building Arizona Families similarly have a constitutionally protected liberty interest in directing the care and custody of their children.

152.    Plaintiffs D.V. and N.L. and the birth-parent clients of Building Arizona Families (collectively "Birth-Parent Plaintiffs") also have a constitutionally protected interest in enjoying the same protections under the law as parents of non-Indian children. Birth-Parent Plaintiffs have a right to be free from federal discrimination based on the Indian ancestry of their children.

153.    Defendants, through the 2015 Guidelines, are commanding, or at least urging, state courts to require birth parents who wish to place a child for adoption outside of ICWA's placement preferences to demonstrate "good cause" for the non-preferred placement by clear and convincing evidence. Defendants, through the 2015 Guidelines, further are commanding, or at least urging, to require birth parents who want their "request" to be considered evidence of "good cause" to "attest that they have reviewed the placement options that comply with the order of preference." 80 Fed. Reg. at 10,158.

154.    Defendants, through 2015 Guidelines, are currently causing concrete harm to Birth-Parent Plaintiffs. The 2015 Guidelines' requirement that departure from ICWA's placement preferences requires clear and convincing evidence of "good cause" is requiring Birth-Parent Plaintiffs to spend substantial time and resources to build their case that they have "good cause" for their selection of adoptive placements outside of ICWA's preferences.

155.    Moreover, the 2015 Guidelines' requirement that Birth-Parent Plaintiffs' "request" may constitute evidence of good cause only when "both parents attest that they have reviewed" the available ICWA-preferred options, imposes a substantial delay in the adoption proceedings while the adoption agency attempts to locate potential alternative (but not desired) placements in conformity with ICWA's placement preferences. This delay constitutes a

substantial burden on the fundamental right of Birth-Parent Plaintiffs to direct the upbringing of their children.

156.    Indeed, for the Birth-Parent Plaintiffs that are single parents, the requirement that "both parents attest that they have reviewed" the available ICWA-preferred options is impossible to satisfy. For this subset of Birth-Parent Plaintiffs, the 2015 Guidelines render their "request" of a non-ICWA-preferred placement legally meaningless. For these Birth-Parent Plaintiffs, the 2015 Guidelines' attestation requirement imposes not just a delay, but a complete bar on the state court's consideration of their directives for the custody and upbringing of their children. Given the 2015 Guidelines' edict that "good cause" "must be based on" (a) the "request of the parents, if both parents attest that they have reviewed the placement options that comply with the order of preference," (b) the "request of a child . . . able to understand . . . the decision," (c) "extraordinary physical or emotional needs of the child," or (d) the inability to locate an ICWA-preferred placement, 80 Fed. Reg. at 10,158, the 2015 Guidelines effectively preclude a single birth parent of a healthy infant "Indian child" from demonstrating "good cause" for non-ICWA-preferred adoptive placement where an ICWA-preferred placement is available. This constitutes a substantial burden on the fundamental right of Birth-Parent Plaintiffs to direct the upbringing of their children.

157.    In the absence of Defendants' promulgation of the 2015 Guidelines, Birth-Parent Plaintiffs would not need to devote as much time and as many resources to establish "good cause" to  depart from ICWA's placement preferences because ICWA does not require that "good cause" be demonstrated by clear and convincing evidence.

158.    In the absence of Defendants' promulgation of the 2015 Guidelines, Birth-Parent Plaintiffs would be able to complete the adoptive placement of their children without the

substantial delay imposed by the requirement that they attest they have reviewed the potential alternative ICWA-preferred placements.

159. In the absence of Defendants' promulgation of the 2015 Guidelines, single Birth-Parent Plaintiffs' directive of a non-ICWA-preferred adoptive placement could establish "good cause" to depart from ICWA's placement preferences, and they would be able to complete the adoptive placements for their children that they have chosen, promptly.

160. If Birth-Parent Plaintiffs' children were not classified by ICWA as "Indian children," Birth-Parent Plaintiffs would not need to devote any time or resources to justify departure from ICWA's placement preferences, because those placement preferences would not apply. Their children's placement would be guided principally by their wishes, so long as concordant with the child's best interests.

161. Defendants' promulgation of the 2015 Guidelines unlawfully burdens Birth-Parents Plaintiffs' decisions concerning the custody and upbringing of their children and violates Birth-Parent Plaintiffs' constitutional rights under the Fifth Amendment's due process and equal protection components.

### 3. The 2015 Guidelines Impermissibly Commandeer the Resources of Building Arizona Families and NCFA's Members.

162. The Tenth Amendment prohibits the federal government from commandeering the regulatory apparatuses of the States to fulfill federal policies. When it is operating pursuant to one of its enumerated powers, Congress may preempt state laws. But Congress may not compel the States to use its regulatory apparatuses and resources to implement a federal policy.

163. The 2015 Guidelines impose onerous requirements on an "agency," which includes "a private, State-licensed agency . . . involved in . . . a child custody proceeding." 80 Fed. Reg. at 10,151.

164. Under the 2015 Guidelines, voluntary adoptions and pre-adoptive placements are "child custody proceeding[s]." *Id.* Building Arizona Families and NCFA's members (collectively, "Adoption Agency Plaintiffs") therefore are "agenc[ies]" subject to the 2015 Guidelines' many requirements.

165. For each and every voluntary adoption the agencies facilitate, the 2015 Guidelines require Adoption Agency Plaintiffs to "conduct an investigation into whether the child is an Indian child." *Id.* at 10,152. Where there is "any reason" to believe a child "could be" an "Indian child," the 2015 Guidelines further require Adoption Agency Plaintiffs to "obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership." *Id.* Where it is discovered that a child is eligible for membership in an Indian tribe, "the agency should take the steps necessary to obtain membership for the child." *Id.* at 10,153.

166. The 2015 Guidelines further state the Adoption Agency Plaintiffs "must always follow the placement preferences." *Id.* at 10,157. In furtherance of that federal policy agenda, the 2015 Guidelines require the Adoption Agency Plaintiffs to conduct a "diligent search . . . to seek out and identify placement options that would satisfy the placement preferences." *Id.* The 2015 Guidelines specify that such a "diligent search" should include notification to the child's Indian tribe and all of the child's extended family. *Id.*

167. The Department of the Interior and BIA do not administer voluntary adoptions. The 2015 Guidelines therefore rely on the regulatory apparatuses of the States to enforce the compliance of state-licensed agencies such as Adoption Agency Plaintiffs with the 2015 Guidelines' commands.

pipe

168.    Adoption Agency Plaintiffs' state licenses require compliance with applicable laws. Adoption Agency Plaintiffs accordingly are attempting to comply with the 2015 Guidelines.

169.    These requirements impose substantial financial and non-financial burdens on Adoption Agency Plaintiffs. Adoption Agency Plaintiffs have been forced to divert significant resources towards complying with the 2015 Guidelines. The result is that Adoption Agency Plaintiffs are not able to assist as many clients as they would otherwise, and must reduce the time and resources dedicated to its existing clients.

170.    The 2015 Guidelines impermissibly commandeer the regulatory authority and power of the States to compel Adoption Agency Plaintiffs' compliance with the 2015 Guidelines' unfunded mandates. Defendants' issuance of the 2015 Guidelines violates the Tenth Amendment to the United States Constitution.

## COUNT I
## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

171.    Plaintiffs incorporate Paragraphs 1–170 above as if fully restated here.

172.    The 2015 Guidelines constitute final agency action. They are substantive rules that have immediate legal consequences on regulated entities and interested parties, including Plaintiffs.

173.    Plaintiff T.W. is classified by ICWA as an "Indian child," and the 2015 Guidelines therefore require the observance of several procedures and substantive rules during his placement in foster care.

174.    Birth-Parent Plaintiffs are birth parents of children classified by ICWA as "Indian children." Birth-Parent Plaintiffs have decided to place their children for adoption, and the 2015

Guidelines therefore mandate the observance of several procedures and substantive rules that will apply to those adoption proceedings.

175.    Adoption Agency Plaintiffs are state-licensed adoption agencies currently seeking to place "Indian child[ren]" in adoptive placements. Adoption Agency Plaintiffs currently are diverting significant resources to their efforts to comply with the 2015 Guidelines. The 2015 Guidelines currently are imposing significant operational and financial burdens on Adoption Agency Plaintiffs with regard to their placement of "Indian" children.

176.    Plaintiff NCFA is a non-profit association of state-licensed, non-profit adoption agencies. NCFA is diverting significant resources to educate its member agencies and adoption and foster professionals about the requirements of the 2015 Guidelines.

177.    The APA proscribes agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Section 553 of the APA prescribes the procedures that must be undertaken for notice-and-comment rulemaking.

178.    The APA also proscribes agency action that is "arbitrary, capricious, . . . or otherwise contrary to law." Id. at § 706(2)(A).

179.    A live, substantial, and concrete controversy exists as to whether the 2015 Guidelines are invalid because they were issued "without observance of procedure required by law," exceed the agency's statutory authority, are arbitrary and capricious, or violate the United States Constitution. Id. § 706(2).

180.    The 2015 Guidelines accordingly are invalid and must be set aside.

## COUNT II
## (VIOLATION OF T.W.'S RIGHT TO DUE PROCESS)

181.    Plaintiffs incorporate Paragraphs 1–180 above as if fully restated here.

182.    Plaintiff T.W. is classified by ICWA as an "Indian child."

183.    Because T.W. is an Indian child, ICWA and the 2015 Guidelines require the observance of several procedures during his placement in foster care. These procedures include, but are not limited to, ICWA's placement preferences, and the 2015 Guidelines' mandate that departure from those placement preferences be justified by "good cause" shown by clear and convincing evidence, which cannot include an independent assessment of his best interests or the harm he might suffer if removed from his current placement.

184.    Defendants' promulgation of the 2015 Guidelines unduly burdens T.W.'s constitutionally protected liberty interests in maintaining his familial bonds with his current foster parents and having any determination of his placement be guided by his best interests rather than the interest of certain adults in "Indian self-government."

185.    Defendants' promulgation of the 2015 Guidelines violates T.W.'s liberty interests in maintaining his familial bonds and custodial placements in accordance with his best interests, which are safeguarded from federal intrusion by the Fifth Amendment of the United States Constitution by urging state agencies and state courts to violate his liberty interests.

186.    Defendants' promulgation of the 2015 Guidelines causes T.W. concrete injury in that his guardian ad litem, to maintain T.W. in his current placement, must expend substantial resources to build a case under the legal standards and rules of evidence prescribed by the 2015 Guidelines.

187.    T.W has no adequate remedy at law to redress the burdens now being imposed by Defendants' promulgation of the 2015 Guidelines.

188.    T.W. accordingly seeks injunctive relief commanding Defendants to withdraw the 2015 Guidelines.

## COUNT III
## (VIOLATION OF T.W.'S RIGHT TO EQUAL PROTECTION OF THE LAWS)

189. Plaintiffs incorporate Paragraphs 1–188 above as if fully restated here.

190. Defendants' promulgation of the 2015 Guidelines creates a serious threat of irreparable harm to T.W.'s constitutionally protected liberty interests in maintaining his familial bonds with his current foster parents and having any determination of his placement be guided by his best interests rather than the interest of certain adults in "Indian self-government."

191. The 2015 Guidelines would not apply to T.W. were he not classified by ICWA as an "Indian child." If T.W. were not an "Indian child," his foster placement would be guided primarily by his best interests.

192. The 2015 Guidelines' discrimination against T.W. and other similarly situated "Indian children" is discrimination based on ancestry that cannot be justified by reference to an interest in "Indian self-government."

193. Even if the 2015 Guidelines are not effectively binding rules, Defendants' promulgation of the 2015 Guidelines induces state courts to violate T.W.'s rights to equal protection under the laws by imposing burdens on his ability to maintain his familial bonds with his current foster parents solely because he is an "Indian child."

194. Defendants' promulgation of the 2015 Guidelines therefore violates T.W.'s rights to equal protection under federal law accorded under the Fifth Amendment of the United States Constitution.

195. Defendants' promulgation of the 2015 Guidelines causes T.W. concrete injury in that his guardian ad litem, to maintain T.W. in his current placement, must expend substantial resources to build a case under the legal standards and rules of evidence prescribed by the 2015 Guidelines.

196. T.W has no adequate remedy at law to redress the burdens now being imposed by Defendants' promulgation of the 2015 Guidelines.

197. T.W. accordingly seeks injunctive relief commanding Defendants to withdraw the 2015 Guidelines.

## COUNT IV
## (CLAIM OF T.W. FOR DECLARATORY JUDGMENT)

198. Plaintiffs incorporate Paragraphs 1–197 above as if fully restated here.

199. T.W. alleges that application of ICWA's placement preferences would violate his rights under the due process and equal protection components of the Fifth Amendment. T.W. further alleges that ICWA exceeds the legislative authority of Congress under Article I of the United States Constitution.

200. A live and concrete controversy exists as to whether ICWA, and the 2015 Guidelines purportedly interpreting it constitutionally may be applied to T.W. and the proceedings concerning his placement and custody.

201. T.W. has no adequate remedy at law to redress the burdens now being imposed upon him by ICWA and the 2015 Guidelines purporting to interpret ICWA. A declaration that ICWA cannot constitutionally be applied to T.W.'s placement and custody proceedings would redress those injuries.

202. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57, Plaintiff T.W. seeks a declaratory judgment that ICWA and the 2015 Guidelines purporting to interpret it cannot constitutionally be applied to T.W. and the proceedings concerning his placement and custody.

## COUNT V
## (VIOLATION OF BIRTH PARENTS' RIGHT TO DUE PROCESS)

203. Plaintiffs incorporate Paragraphs 1–202 above as if fully restated here.

204. The Birth-Parent Plaintiffs are parents of children classified by ICWA as "Indian children," and Birth-Parent Plaintiffs have determined to place their children for adoption in homes that do not satisfy ICWA's placement preferences.

205. The 2015 Guidelines require the observance of several procedures in voluntary adoption proceedings involving children classified by ICWA as "Indian children," which impose substantial and undue burdens on Birth-Parent Plaintiffs' fundamental right, guaranteed by the due process component of the Fifth Amendment, to direct the custody and upbringing of their children.

206. Even if the 2015 Guidelines are not effectively binding rules, Defendants' promulgation of the 2015 Guidelines violates Birth-Parent Plaintiffs' constitutionally protected liberty interests by inducing state agencies and state courts to violate those liberty interests.

207. Defendants' promulgation of the 2015 Guidelines causes Birth-Parent Plaintiffs concrete injury in that they must expend substantial resources to build a case under the legal standards and rules of evidence prescribed by the 2015 Guidelines.

208. Birth-Parent Plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Defendants' promulgation of the 2015 Guidelines.

209. Birth-Parent Plaintiffs accordingly seek injunctive relief commanding Defendants to withdraw the 2015 Guidelines.

## COUNT VI
### (VIOLATION OF BIRTH PARENTS' RIGHT TO EQUAL PROTECTION OF THE LAWS)

210. Plaintiffs incorporate Paragraphs 1–209 above as if fully restated here.

211. The 2015 Guidelines would not apply to Birth-Parent Plaintiffs' children were they not classified by ICWA as "Indian children."

212. The 2015 Guidelines discriminate against Birth-Parent Plaintiffs based on the "Indian" ancestry of their children.

213. The 2015 Guidelines' discrimination against Birth-Parent Plaintiffs cannot be justified by reference to an interest in "Indian self-government."

214. Even if the 2015 Guidelines are not effectively binding rules, Defendants' promulgation of the 2015 Guidelines thus induces state courts to violate Birth-Parent Plaintiffs' rights to equal protection under the laws by imposing burdens on their ability to direct the custody and upbringing of their children solely because those children are classified by ICWA as "Indian children."

215. Defendants' promulgation of the 2015 Guidelines therefore violates Birth-Parent Plaintiffs' rights to equal protection under federal law accorded under the Fifth Amendment of the United States Constitution.

216. Defendants' promulgation of the 2015 Guidelines causes Birth-Parent Plaintiffs concrete injury in that they must expend substantial resources to build a case under the legal standards and rules of evidence prescribed by the 2015 Guidelines.

217. Birth-Parent Plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Defendants' promulgation of the 2015 Guidelines.

218. Birth-Parent Plaintiffs accordingly seeks injunctive relief commanding Defendants to withdraw the 2015 Guidelines.

## COUNT VII
## (CLAIM OF BIRTH PARENT PLAINTIFFS FOR DECLARATORY JUDGMENT)

219. Plaintiffs incorporate Paragraphs 1–218 above as if fully restated here.

220. Birth-Parent Plaintiffs allege that application of the 2015 Guidelines and ICWA's placement preferences would violate their rights under the due process and equal protection

components of the Fifth Amendment. Birth-Parent Plaintiffs further allege that ICWA exceeds the legislative authority of Congress under Article I of the United States Constitution.

221.    A live and concrete controversy exists as to whether ICWA and the 2015 Guidelines purportedly interpreting it constitutionally may be applied to Birth-Parent Plaintiffs and the proceedings concerning the voluntary adoptive placements of their children.

222.    Birth-Parent Plaintiffs have no adequate remedy at law to redress the burdens now being imposed upon them and imminently threatened to be imposed upon them by ICWA and the 2015 Guidelines purporting to interpret ICWA. A declaration that ICWA cannot constitutionally be applied to Birth-Parent Plaintiffs and their children would redress those injuries.

223.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57, Birth-Parent Plaintiffs seek a declaratory judgment that ICWA and the 2015 Guidelines purporting to interpret it cannot constitutionally be applied to them.

### COUNT VIII
### (VIOLATIONS OF TENTH AMENDMENT)

224.    Plaintiffs incorporate Paragraphs 1–223 above as if fully restated here.

225.    The federal government does not administer or adjudicate adoptions or any other proceeding involving the custody of children classified as "Indian children" by ICWA.

226.    The Adoption Agency Plaintiffs are subject to several onerous and unfunded requirements imposed by the 2015 Guidelines that turn Adoption Agency Plaintiffs into investigative arms of the federal government. These burdens divert substantial resources away from the core missions of the Adoption Agency Plaintiffs.

227.    To coerce Adoption Agency Plaintiffs' compliance with the 2015 Guidelines, the 2015 Guidelines impermissibly commandeer the regulatory licensing apparatuses of the States.

228.    The 2015 Guidelines therefore violate the Tenth Amendment to the United States Constitution.  Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57, Adoption Agency Plaintiffs seek a declaratory judgment that the 2015 Guidelines' mandates on Adoption Agency Plaintiffs violate the Tenth Amendment and cannot be enforced.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

1.    Declare that the 2015 Guidelines violate the Administrative Procedure Act, hold them invalid, and set them aside;

2.    Issue a permanent injunction requiring Defendants to withdraw the 2015 Guidelines.

3.    Issue a declaratory judgment that the provisions of ICWA concerning child custody proceedings, 25 U.S.C. §§ 1911-1925, and the 2015 Guidelines purporting to interpret them may not constitutionally be applied to Plaintiff T.W. or to proceedings in connection with his placement and custody.

4.    Issue a declaratory judgment that the provisions of ICWA concerning child custody proceedings, 25 U.S.C. §§ 1911–1925, and the 2015 Guidelines purporting to interpret them may not constitutionally be applied to the Birth-Parent Plaintiffs or to proceedings in connection with the voluntary adoption of their children.

5.    Issue a declaratory judgment that the provisions of the 2015 Guidelines that impose unfunded mandates on the Adoption Agency Plaintiffs violate the Tenth Amendment and are unenforceable.

6.    Award Plaintiffs their costs and reasonable attorney's fees as appropriate; and

7.      Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,

Dated:  May 27, 2015

JACOB S. SILER (Va. Bar No. 80934)
MATTHEW D. MCGILL (*pro hac vice* pending)
ROBERT GONZALEZ (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

LORI ALVINO MCGILL (*pro hac vice* pending)
QUINN EMANUEL URQUHART
& SULLIVAN LLP
777 6th Street, N.W.
Washington, DC 20001
Telephone:  (202) 538-8210
Facsimile:  (202) 538-8100

*Attorneys for Plaintiffs*