## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| NATIONAL COUNCIL FOR ADOPTION, BUILDING ARIZONA FAMILIES, on behalf of itself and D.V. and N.L., and T.W. by and through his guardian ad litem, PHILIP (JAY) MCCARTHY, JR., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:15cv675 |
| SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior, KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs, BUREAU OF INDIAN AFFAIRS, and the UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION AND FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

STANDARD OF REVIEW ............................................................................................ 3

ARGUMENT ................................................................................................................... 4

I.   Plaintiffs Do Not Have Standing to Bring Their Claims. .................................... 4

   A.   The Arizona Plaintiffs Have Not Alleged that the Guidelines or ICWA Caused Them
        Injury or That the Relief Requested Would Provide Redress. ............................... 4

   B.   BAF Does Not Have Standing to Represent the Interests of Birth Parents and Has Not
        Itself Been Injured. ................................................................................................. 8

   C.   NCFA Has Not Alleged that Its Members Have Been Injured and Has Not Itself
        Suffered Injury From the Guidelines That Is Redressable By the Relief Sought. ............. 13

II.   Plaintiffs' Claims Are Not Ripe Because Their Adjudication Will Require
      Factual Assumptions About Whether and How State Courts Will Apply the
      Guidelines and Because Plaintiffs Will Suffer No Hardship From Delay. ................... 14

III.   This Court Should Abstain From Review of  Plaintiffs' Claims, and the Anti-
       Injunction Act Requires Dismissal of  Counts IV and VII ........................................... 16

IV.   The Complaint Should Be Dismissed For Failure to State Any Claim for Relief. ....... 19

   A.   Plaintiffs' Administrative Procedure Act Claim Fails Because the Guidelines Are Not
        Final Agency Action and Did Not Require Notice And Comment. ................................... 19

   B.   Arizona Plaintiffs' Equal Protection Claims Fail Because ICWA and the Guidelines
        Apply to a Parent or Child's Political Affiliation, Not Race. ............................................ 19

   C.   Arizona Plaintiffs Have Failed to Identify a Cognizable, Constitutional Liberty
        Interest In Support of Their Due Process Claims. ............................................................. 23

   D.   Arizona Plaintiffs' Claim That ICWA Exceeds Congress' Authority Must Be
        Dismissed Because It Understates the Breadth of the Indian Commerce Clause. .............. 27

   E.   Organizational Plaintiffs Cannot, As a Matter of Law, Demonstrate That the
        Guidelines Impermissibly Commandeer State Courts or State or Private Agencies. .......... 28

CONCLUSION .............................................................................................................. 30

i

**INTRODUCTION**

On March 20, 2015, the Department of the Interior and the Bureau of Indian Affairs ("BIA") published proposed regulations to implement the Indian Child Welfare Act ("ICWA"). 25 U.S.C. § 1901 *et seq*. (1978).  If promulgated, these regulations would mark the first time since ICWA's passage that the federal government has issued substantive standards that apply to state courts' administration of child-welfare cases involving Indian children.  Rather than challenge the regulations, Plaintiffs have instead sued to overturn non-binding guidelines issued earlier this year.  Guidelines for State Courts & Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015) ("Guidelines").  Plaintiffs also challenge the application of the Guidelines and ICWA to their child-welfare cases, although state courts are perfectly capable of addressing the constitutional issues they raise.  While Plaintiffs evidently disagree with the Guidelines' recommendations, their objections should not be permitted to transmute what is essentially a state child-welfare law question regarding the application of ICWA into a federal cause of action.  Nor should they be permitted to re-define a 37-year old statute and hundreds of years of federal Indian law as "race-based" in order to contest state action intended to protect Indian children, parents, and tribes.

 The premature nature of Plaintiffs' concerns permeates their case.  Plaintiffs cannot establish a controversy because the Guidelines are non-binding, and because they have not alleged that there is any child-welfare case pending in the state courts, or that the outcome turns on the Guidelines' or ICWA's application rather than on the independent decisions of third parties not before this court and who are governed by state law.  National Council for Adoption ("NCFA") and Building Arizona Families ("BAF") (together, "Organizational Plaintiffs") are not injured because their mission of finding children loving homes is not frustrated by law and policies that

promote adoption by relatives and tribal families.  Nor have they alleged facts sufficient to show that they are suitable advocates for the third-party interests they purport to represent.  Because the Guidelines have yet to be "applied" at all, much less to Plaintiffs' child-welfare cases, their claims are also not ripe for adjudication.  Should this Court nonetheless find that it has subject-matter jurisdiction, it should abstain from hearing Plaintiffs' claims in consideration of the role of state courts, where these questions are best resolved.

Plaintiffs also fail to state any claim for relief.  The Guidelines do not create legal rights or entitlements under the Administrative Procedure Act ("APA") and therefore are neither final agency action nor subject to notice-and-comment requirements.  Plaintiffs' equal protection and due process claims also fail as a matter of law, because ICWA and the Guidelines apply based on an individual's political affiliation with a tribe, not according to race or ancestry, and because federal law does not recognize the "fundamental rights" that Plaintiffs propose.  Nor will the Indian Commerce Clause unseat ICWA, as the Constitution confirms Congress' plenary power to legislate in the field of Indian affairs, including through legislation to protect Indian children from unwarranted removal from their families and tribes.  Requests for declaratory judgment barring application of ICWA and the Guidelines to state-court proceedings involving Plaintiffs cannot be granted because such relief is prohibited under the Anti-Injunction Act.  Finally, the Guidelines do not violate the Tenth Amendment because they neither command nor impermissibly affect state courts, state agencies, or private-adoption agencies.

## STATEMENT OF FACTS

ICWA protects the best interests of Indian children by establishing minimum Federal standards for state-court proceedings involving the removal of Indian children from their families

and the placement of such children in foster or adoptive homes.  25 U.S.C. § 1902.  The

Department of the Interior ("DOI") and the BIA issued ICWA guidelines in 1979.[1]

Plaintiffs' complaint consists of eight counts.  All Plaintiffs join Count I, which alleges

that the Guidelines are invalid under the APA, Compl. ¶¶ 171-180, and is the subject of a pending

summary judgment motion.  ECF No. 20.  Counts II through VII allege that the Guidelines cannot

be constitutionally applied to birth parents of Indian children D.V., N.L., and unspecified birth

parents represented by BAF (together "Birth Parents") or to Phillip (Jay) McCarthy, representing

T.W., an Indian child (collectively, "Arizona Plaintiffs"), because they violate principles of equal

protection and due process.  Compl. ¶¶ 181-223.  Counts IV and VII also allege that ICWA itself

cannot constitutionally apply to Arizona Plaintiffs for the same reasons and because it exceeds

Congress' legislative authority under the Indian Commerce Clause.  *Id.* ¶ 223.  Finally,

Organizational Plaintiffs' Count VIII alleges that the Guidelines violate the Tenth Amendment.

*Id.* ¶¶ 202, 212.  Defendants are DOI, BIA, Secretary Jewell, and Assistant Secretary Washburn.

## STANDARD OF REVIEW

Adjudication of a challenge to jurisdiction under Federal Rule 12(b)(1) or to the merits

under Rule 12(b)(6) requires the Court to accept all material allegations of the complaint as true

and construe them in favor of the complaining party.  *S. Walk at Broadlands Homeowner's Ass'n*

*v. OpenBand at Broadlands LLC*, 713 F.3d 175, 181-82 (4th Cir. 2013); *Sec'y of State for*

*Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  The Court need not,

however, accept as fact mere "legal conclusions" or "naked assertions."  *S. Walk*, 713 F.3d at 182

(internal citation omitted).  To survive a Rule 12(b)(6) motion to dismiss, the complaint must set

---

[1] Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979).  The guidelines, proposed regulations and ICWA's background are discussed in the opposition to summary judgment and, for economy, are not repeated here.  ECF No. 48 at 2-9.

forth "a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A motion for judgment on the pleadings is assessed under the same standards as a motion to

dismiss under Rule 12(b)(6). *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013).

## ARGUMENT

### I.   Plaintiffs Do Not Have Standing to Bring Their Claims.

Plaintiffs must demonstrate that they have standing to appear before this court before it

may exercise jurisdiction over their claims. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560

(1992).  To carry this burden, Plaintiffs must show (1) they have suffered an "injury in fact" to a

legally protected interest and that injury is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*

528 U.S. 167, 180-81 (2000); *Defenders,* 504 U.S. at 560.  Review of standing must be

"especially rigorous when reaching the merits of a dispute would force [a court] to decide whether

an action taken by one or the other two branches of Federal Government was unconstitutional."

*Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

### A.   The Arizona Plaintiffs Have Not Alleged that the Guidelines or ICWA Caused Them Injury or That the Relief Requested Would Provide Redress.

*Injury in Fact*.  Arizona Plaintiffs allege that the Guidelines' and ICWA's application to

their child-custody proceedings will infringe their due process and equal protection rights.  This

chain of possibilities, for several reasons, is highly uncertain and does not demonstrate even a

substantial risk of injury, much less the certainty required by Article III of the Constitution.  At a

minimum, "plaintiffs bear the burden of pleading and proving concrete facts showing that the

defendant's actual action has caused the substantial risk of harm" and "cannot rely on

4

speculation." *Clapper v. Amnesty Int'l U.S.A.*, 133 S. Ct. 1138, 1150 n.5 (2013).  Injury to a party seeking standing must be *certainly* impending in order to satisfy constitutional requirements.  *Id.* at 1147; *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990); *see also Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 323 (4th Cir. 2002) (no standing where injury "require[d] numerous, questionable assumptions" and was resolvable by other means).

First, Arizona Plaintiffs do not allege that they are presently engaged in a state-court proceeding.  *See* Compl. ¶¶ 11-13, 24-30, 32-35, 43-45, 145-48, 154-60.  They have accordingly failed to meet their burden by demonstrating facts sufficient to show that an actual proceeding has or will commence.  *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 754 (4th Cir. 2013) (discerning no injury when sex offender had not taken steps necessary to access properties otherwise off-limits to her); *Rosenfeld v. Montgomery Cnty. Public Schs.*, 25 Fed. App'x 123 (4th Cir. 2001) (concluding that middle-school student did not have standing to challenge minority preferences in high-school admissions because she had yet to apply).

Second, even assuming that proceedings for each child are ongoing in state courts somewhere, Arizona Plaintiffs do not allege that T.W.'s placement with his foster-care family or Birth Parents' preference for a non-Native placement has been or might be challenged.[2]  State-court, child-custody proceedings may follow a myriad of pathways and still arrive at Plaintiffs' desired outcome.  The non-binding Guidelines may not be considered by the state court, and if considered, may still be found not to apply.  Moreover, a state court could, consistent with both the Guidelines and ICWA, place T.W. with his current foster parents and follow Birth Parents'

---

[2] *See In re Jassenia H.*, 864 N.W.2d 242, 249 (Neb. 2015) ("Until the court takes action to implement or contravene the heightened protections afforded by ICWA . . ., we cannot conclude that the mere determination of applicability affects a substantial right"); *see also Moore v. Sims*, 442 U.S. 415, 429 (1979) (identifying no injury where "no [child-abuse] proceeding was pursued in this case to the point where the standard could be applied").

choice of adoptive parents.[3]  As a result, Arizona Plaintiffs may obtain non-Native placements

through the normal operation of the courts, which renders their alleged injuries hypothetical.  *See*

*Doe*, 713 F.3d at 754 (deeming injury "hypothetical" when entitlement plaintiff sought might not

be withheld); *Ferrell*, 282 F.3d at 321-22.

      Third, even if Arizona Plaintiffs' preferred outcomes were challenged by the State or the

Tribe, Plaintiffs provide no reason to believe that such challenges would be likely to succeed.

The disputes would be arbitrated by independent state-court judges and, as any litigant knows, the

outcome of legal action is never guaranteed.  *See Clapper*, 133 S. Ct. at 1150 ("It is just not

possible for a litigant to prove in advance that the judicial system will lead to any particular result

in his case").  In addition, injury to Plaintiffs must "be traced to the challenged action of the

defendant, and not injury that results from the independent action of some third party not before

the court."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Clapper*,

133 S. Ct. at 1150 (refusing to presume that court would ever authorize collection of

communications with human-rights groups' foreign contacts).  To hold otherwise would "endorse

standing theories that require guesswork as to how independent decisionmakers will exercise their

judgment."  *Id*.  The state courts involved in the adoptions that Arizona Plaintiffs plan are just

such independent actors, capable of deciding for or against Plaintiffs based on the facts, and any

claim that attempts to predict the outcome of their decisionmaking is necessarily speculative.

      Fourth, even if state-court judges were to uphold challenges to non-Native placements,

Arizona Plaintiffs have not shown that those courts would be likely to ground an unfavorable

---

[3] ICWA does not direct a particular placement for an Indian child, but rather states an order of
preference which state courts may find is overcome by a showing of good cause to place the child
elsewhere.  25 U.S.C. § 1915.  The Guidelines advise that a court considering whether good cause
exists may consider the extraordinary physical needs of a child like T.W. as well as the request of
Birth Parents for a specific placement, so long as Birth Parents have reviewed placement options
that comply with the placement preferences.  80 Fed. Reg. at 10,158 (§ F.4(c)(1), (3)).

decision in the Guidelines as opposed to state law.  *See Clapper*, 133 S. Ct. at 1148 (finding that fear of surveillance authorized by the challenged law was no more than a speculative injury when the government could institute the same program under separate authority).  In sum, Plaintiffs have failed to establish that injury based on a potential negative outcome following a child-custody proceeding is certainly impending, presents any substantial risk, or would necessarily be based on application of the Guidelines.

Alternatively, Arizona Plaintiffs have alleged that they suffer present injury in the form of litigation and other expenses incurred in anticipation of the Guidelines' application.  This argument was raised by the human-rights groups in *Clapper* who argued that the perceived risk of surveillance forced them to take costly and burdensome measures to protect the confidentiality of their international communications.  *Id*. at 1143.  The Court had little trouble concluding that this did not create a case or a controversy:  Parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id*. at 1151.  In addition, ICWA and Arizona laws already require any party advocating for a particular placement to demonstrate support for that placement.  *See* 25 U.S.C. § 1915(a), (b); Ariz. Rev. Stat. § 8-116(A) (requiring state court to find adoption is in best interests of the child).  Arizona Plaintiffs fail to allege how the issuance of federal guidelines has changed that calculus.  *See Clapper*, 133 S. Ct. at 1152 (considering present injury not fairly traceable to challenged law because human-rights attorneys had similar fear of surveillance under other laws).

*Traceability*.  Arizona Plaintiffs' equal protection and due process injuries are also not attributable to the Guidelines or to ICWA.  An injury is not "fairly traceable" to the challenged action if it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control

or to predict." *Defenders*, 504 U.S. at 562.  Of the multiple, independent actors involved in state-court proceedings[4] Plaintiffs have not explained why *any* of them would be likely to behave as required to cause Plaintiffs injury.   Nor have Plaintiffs joined *any* of these actors in the present suit.  Instead, Plaintiffs have elected to sue the Federal government – the only entity that will not be party to their state-court proceedings, and which is unlikely to affect the end result.

*Redressability*.  Likewise, Arizona Plaintiffs have not identified concrete relief that would be obtained by the withdrawal of the Guidelines or a declaratory judgment that neither the Guidelines nor ICWA should apply to them.  A declaratory judgment itself is not enough; "[r]ather, plaintiffs must identify some further concrete relief that will likely result from the declaratory judgment."  *S. Walk*, 713 F.3d at 183 (internal citations omitted).  Even if the Guidelines are withdrawn, state courts may apply the same principles, many of which originated in state law.  Nor is it clear that a declaratory judgment would prevent a state court from assessing the constitutionality of ICWA and the Guidelines itself.  *See Owsley v. Peyton*, 352 F.2d 804, 805 (4th Cir. 1965) ("Although state courts may for policy reasons follow the decisions of the Court of Appeals whose circuit includes their state, they are not obliged to do so.") (internal citations omitted).

  B. <u>BAF Does Not Have Standing to Represent the Interests of Birth Parents and Has Not Itself Been Injured.</u>

*Third-Party Standing*.  If the interests of Birth Parents themselves are too attenuated to create constitutional standing, BAF's claim to injury is yet another degree removed from an actual

---

[4] Parties to a state-court proceeding are likely to include prospective adoptive parents, who must elect to petition for adoption; the various States in which the Indian children will be adopted, *see, e.g.*, N.H. Stat. § 170-B:28 (requiring permission of the Commissioner of the New Hampshire Department of Health and Human Services for an out-of-state child to be adopted), including Arizona, which took protective custody of T.W., Compl. ¶22; in T.W.'s case, the Navajo Nation; and most significantly, the state court itself.

case or controversy.  One of the tenets of prudential standing is that "one may not claim standing .
. . to vindicate the constitutional rights of some third party."  *Singleton v. Wulff*, 428 U.S. 106,
113-14 (1976) (citation and internal quotation marks omitted).  Exceptions to this rule are strictly
limited, and are not applicable here.  First, there is no genuine obstacle to the assertion of the right
by the third party, so that the court may consider that the litigant is, by default, the "right's best
available proponent."  *Id*. at 116.  In the Fourth Circuit, "the hurdle preventing a third party from
asserting . . . her own rights must be high indeed," and cannot be satisfied by the mere fact of that
person's disability, illness, or indigency.  *Lucas v. Henrico Cnty. Sch. Bd.*, 822 F.Supp.2d 589,
605 (E.D. Va. 2011) (citing *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir.
2002)); *see also Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 422 (4th Cir. 1984).  BAF
purports to represent unspecified birth parents who allegedly wish to place their children for
adoption with a family that is not afforded preference by ICWA.  Compl. ¶ 40.  It would be
absurd to suggest that birth parents are not capable of bringing these claims on their own behalf,
particularly here, where D.V. and N.L. are parties to this lawsuit.  *Id*. ¶ 12; *see Equal Rights Ctr.
v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 523 (D. Md. 2010) (no third-party standing
where third party was also co-plaintiff).

Even if these unidentified birth parents are unable to vindicate their rights on their own
behalf, BAF is not the proper party to act in their stead.  Courts may allow third-party standing if
the relationship between the litigant and the third party is close, such that the former is "fully, or
very nearly, as effective a proponent of the right as the latter."  *Singleton*, 428 U.S. at 115.
However, as a matter of law, BAF's interests and those of birth parents are not in parallel.  *See,
e.g.*, *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 15 (2004) (rejecting father's claim
to third-party standing based on recognition that his interests might conflict with those of his wife

9

and daughter), *abrogated on other grounds by Lexmark Intern, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 n.3 (2014).  Although BAF alleges a "close and confidential relationship" with unspecified birth parents, Compl. ¶ 43, conflict of interest inheres in the relationship between a birth parent and a private adoption agency.[5]  *See Taeger v. Catholic Family & Cmty. Servs*, 995 P.2d 721, 728-29 (Ariz. Ct. App. 2000).  Nor would consent for the limited purpose of finding an adoptive home for a particular child necessarily translate into broader acquiescence for BAF to achieve its broader goal of neutralizing ICWA and the Guidelines.

Moreover, the relief that BAF seeks on birth parents' behalf would not relieve the injuries they allege.  BAF alleges that the Guidelines limit birth parents' control of their child's placement, and that invalidating the Guidelines would relieve them of this burden.[6]  The Guidelines, however, provide that parents should review available placements with family or the parent's Tribe before making a decision, and would only expand the range of options available to birth parents.  80 Fed. Reg. at 10,158 (§ F.4(c)(1)).  Striking the Guidelines, therefore, would not leave birth parents with greater freedom to choose a placement; rather they would be more

---

[5] The interests of a private-adoption agency in the business of placing children and those of birth parents seeking to exercise parental control over their child's placement, as alleged here, may be adverse as often as they are aligned.  Private-adoption agencies may also experience economic pressure to serve the interests of adoptive parents, who often pay for the agency's services, over the interests of birth parents, who frequently require financial assistance.  *See generally*, Kathryn Joyce, Do you understand that your baby goes away and never comes back?, THE NEW REPUBLIC, Apr. 21, 2015.  Out of consideration for these conflicts, some states require that birth parents and adoption agencies be separately represented.  *See, e.g.*, Illinois Dept. of Children and Family Servs., Birth Parents' Rights and Responsibilities In Illinois 3 (May 2010) *at* http://www.illinois.gov/dcfs/aboutus/notices/Documents/cfs403c.pdf ("An attorney may not represent both [birth parent] and . . . the adoption agency at the same time.").

[6] As discussed *supra* Section I.A, Birth Parents have not adequately alleged that even this "direct" injury is impending.

dependent on the choices that BAF presents.  Even if BAF had a relationship in which its interests were completely aligned with those birth parents, BAF has not alleged facts sufficient to show that it is birth parents' parental rights – not BAF's economic interests – that have been injured.[7]

*Direct Standing*.  Whether BAF seeks to enforce the rights of birth parents or to proceed on a theory of direct injury, it must prove that the organization itself has been harmed.  *Kowalski v. Tesmer*, 543 U.S. 125, 129 n.2 (2004).  For the same reasons that bar claims by Arizona Plaintiffs, BAF cannot demonstrate that ICWA and the Guidelines caused its alleged injuries or that such injuries would be alleviated by the declaratory and injunctive relief BAF seeks.[8]  *See supra* Section I.A.; ECF No. 48 at 16-20.

But BAF also fails to allege any cognizable injury.  BAF alleges that the Guidelines apply to it as a condition of its state license, which requires compliance with applicable laws.  Compl. ¶ 41.  BAF claims to be administratively and financially burdened by the need to determine whether a potential adoptee is an Indian child, to notify the child's tribe, and to look for a familial or tribal placement (even if the search is ultimately unsuccessful).  *Id.* ¶ 42.  Finally, BAF argues that the Guidelines detract from its mission of placing children into loving, adoptive homes, and that it has incurred financial burden by funding the present litigation.  *Id.* ¶ 44.

The purported harm BAF suffers may reveal BAF's motive in bringing suit, but does not describe injury suitable for federal-court adjudication.  As an initial matter, the Guidelines are not binding and will not become a requirement for BAF's licensing unless Arizona specifically adopts them:  BAF's voluntary decision to abide by the Guidelines does not give rise to injury.  *See*

---

[7] BAF has not alleged economic injury caused by the need to diversify its placement options through outreach to families that may be less likely to pay for BAF's services.

[8] To the extent that BAF purports to represent birth parents, the declaratory relief it seeks on their behalf is specific to them and will not redress BAF's need to comply with ICWA or Guidelines.

*Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997) (no standing where injury was caused, not by the challenged law, but by voluntary choice of state party that triggered its application). A reduction of funds available for the provision of services that are at the core of an organization's mission may constitute injury, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), but the Fourth Circuit does not recognize "mere expense" as an organizational injury where the diversion of resources was the result of the organization's own budgetary choices. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012). Otherwise, "any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another." *Id.* (internal citations omitted).

BAF's decision to start complying with existing state and federal laws and best practices and simultaneously fund litigation to resist these standards reflects its own budgetary priorities, not any requirement imposed by the Guidelines. ICWA, as well as Arizona law, has always applied to adoption proceedings for BAF's clients, and the Guidelines have not changed that fact. *See Ferrell*, 282 F.3d at 325 (declining to "launch standing doctrine into outer space" by finding injury in a complaint that "an opportunity [was] taken away when one does not have a real, concrete opportunity in the first place").[9] Because the Guidelines are not the source of any

---

[9] The specific injuries that BAF complains of are not unique to the Guidelines: ICWA and Arizona Juvenile Court Rules require identification of Indian children, and their placement with family or within the tribal community. 25 U.S.C. §§ 1912, 1913, 1915 (extending statutory protections to Indian children and their parents in involuntary and voluntary proceedings, including a preference for familial or tribal placements); Ariz. Juv. Ct. R. 79(A)(1) (adoption petition must state whether child is an Indian child); *id.* 84(C)(6)(c) (juvenile court must determine compliance with ICWA's placement preferences). Notification of the tribe is identified as a best practice for voluntary proceedings – necessary in order to meaningfully comply with the statutory preference for family and tribal placements. Native American Rights Fund, A Practical Guide to the Indian Child Welfare Act § 4.16 (2007), http://www.azcourts.gov/improve/ICWA-Issues-in-Adoption-Cases (select "ICWA-Notice in Voluntary Adoptions").

obligation BAF has to comply with federal and state laws in state adoption proceedings, no

identifiable injury is caused by the Guidelines or could be redressed by their elimination.[10]

C.   NCFA Has Not Alleged that Its Members Have Been Injured and Has Not Itself
Suffered Injury From the Guidelines That Is Redressable By the Relief Sought.

NCFA's standing is based on the claims presented by its unnamed members, whose

alleged injuries are duplicative of BAF's allegations.[11]  *See* Compl. ¶¶ 38-39.  In the alternative,

NCFA alleges that it is injured directly by having to divert resources to educate its members about

the Guidelines.  *Id.* ¶ 37.  Either way, NCFA would have to show that the Guidelines' withdrawal

and a declaration that they cannot be enforced would prevent injury to its members or prevent

NCFA from diverting resources to education.  *Id.* ¶¶ 171-80 (Count I), 224-28 (Count VIII).

Because NCFA's claim is premised in part upon the standing of unnamed organizations alleged to

be suffering the same injuries as BAF, and in part upon arguments similar to those BAF raises in

support of organizational injury, its claim fails for the same reasons.

As an initial matter, NCFA has failed to plead any specific facts about any specific

member.  *See S. Walk*, 713 F.3d at 184-85 (requiring association seeking to represent its members

to "make specific allegations establishing that at least one *identified member* had suffered or

would suffer harm").  Nor could NCFA establish that its member agencies have standing to sue in

their own right, even if it had been adequately pled, for the same reasons that BAF does not have

---

[10] Finally, BAF does not elaborate as to why placement with an Indian child's family or tribe could not also be "loving," and its silence is telling.  ICWA was designed as a remedy for precisely this type of bias: the stereotype held by some child-welfare advocates that Indian children will be better off placed with a non-Indian family.  *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (reiterating that Congress feared that application of a "white, middle-class standard" will, "in many cases, foreclose[] placement with [an] Indian family").  BAF's misguided view is, at best, an "abstract concern" that is insufficient to create standing.  *See Lane*, 703 F.3d at 675 (citing *Simon*, 426 U.S. at 40).

[11] Unlike BAF, NCFA's complaint is only with the Guidelines, and NCFA does not allege that they frustrate its members' missions, or that member agencies may represent birth parents.

organizational standing.  The diversion of resources that NCFA claims as a direct, organizational

injury is even less concrete that that described by BAF.  "[E]ducating members" and "responding

to member inquiries," are "merely abstract concerns" not suitable for adjudication, *Lane*, 703 F.3d

at 675, nor has NCFA alleged that these expenditures in any way frustrate its mission.  Finally,

NCFA cannot demonstrate that any injury it suffered was caused by or could be redressed by the

Guidelines' elimination.  *See infra* Sections I.A. & I.B; ECF No. 48 at 16, 18-20.

## II.    Plaintiffs' Claims Are Not Ripe Because Their Adjudication Will Require Factual Assumptions About Whether and How State Courts Will Apply the Guidelines and Because Plaintiffs Will Suffer No Hardship From Delay.

In the event that this Court finds that Plaintiffs have standing, their claims should be

dismissed nonetheless because they are not ripe for consideration.  Ripeness doctrine protects

courts from premature adjudication likely to "entangl[e] them[] in abstract disagreements over

administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  To determine if a

claim is ripe, a Court must assess both the claim's fitness for adjudication and any hardship to its

proponent that may be caused by withholding review.  *Id*. at 149.  Where, as here, an injury is

contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the

subject of decision in a federal court.  *Doe*, 713 F.3d at 758.  It is Plaintiffs' burden to prove

otherwise.  *Id*.

Plaintiffs cannot carry their burden.  Consideration of Plaintiffs' claims will require this

Court to make multiple assumptions about whether and how state courts might apply the

Guidelines.  *See, e.g.*, *Nat'l Ass'n of Home Builders v. USACE*, 1 Fed. App'x 243, 244-45 (4th

Cir. 2001) (finding challenge to guidance memorandum unripe because it might never affect

appellants) (per curiam).  To resolve the claims that the Guidelines violate the APA, the Tenth

Amendment, and Arizona Plaintiffs' constitutional rights, this Court must assume that Arizona

and other state courts will apply the recommendations contained in the Guidelines; that these courts will do so, not because they agree with the substantive principles therein, but because they have determined that they are manifestly binding; and, for individual Plaintiffs, that state courts will apply the Guidelines in a way that contravenes the rights they assert in the Complaint.

Because these questions are all unknown, as of yet, the Court should not address Plaintiffs' claims, if at all, until after they are fully resolved in child-custody proceedings before state courts. *See Franks v. Ross*, 313 F.3d 184, 194-95 (4th Cir. 2002) (concluding that case was not ripe until state and local governments took the final step in the permitting process). Federal courts "are required to wait until [a plaintiff] obtains a decision from the [State] authorities in order to contend with an injury – if it still exists after [the plaintiff] petitions those entities – that affects [plaintiff] with finality." *Doe*, 713 F.3d at 754 n.5. As the Fourth Circuit explained, "principles of federalism and comity counsel in favor of providing at the least an opportunity for the processes provided by [a state's] statute to address [plaintiff's] claims before intervening." *Id.* at 753. Just as the state courts in *Doe* were "much better equipped" to make sex-offender determinations in the first instance, state courts in Arizona and around the country will be the best interpreters of how the Guidelines should apply to child-custody cases under ICWA because they handle them with relative frequency. *Id.*[12]

Furthermore, Plaintiffs will suffer no hardship because they must seek relief from state courts anyway and may raise the same claims there. *Doe*, 713 F.3d at 759 ("[T]he fact remains

---

[12] Plaintiffs' claims are also unripe because the Guidelines are not a final agency action. *See Wheeling-Pittsburgh Steel Corp. v. EPA*, 129 F.3d 118 (4th Cir. 1997) (noting that ripeness principles preclude review of agency action until it is final). Their challenge is therefore premature because the Guidelines are neither binding, nor have they provided the basis for enforcement action by state courts or by Federal Defendants. *See Home Builders*, 1 Fed. App'x at 244-45. *Cf. W. Va. Coal Ass'n v. Reilly*, Nos. 90-2034, -2040, 1991 WL 75217, *2 (4th Cir. May 31, 1991) (deeming challenge to EPA policy ripe because it was used to block water permits).

that even if we were to strike down that policy at this juncture, [plaintiff] would have to petition a [State] court.")  Nor are Plaintiffs in the position of choosing between burdensome compliance with the Guidelines and risky non-compliance, *see Abbott Labs*, 387 U.S. at 152-53, because the Guidelines are non-mandatory and any burdens Plaintiffs complain of are the result of requirements of state law or ICWA itself.

### III.    This Court Should Abstain From Review of Plaintiffs' Claims, and the Anti-Injunction Act Requires Dismissal of Counts IV and VII.

Assuming the existence of concurrent state proceedings, because all Guidelines-related claims in the Complaint depend on predicting how and whether they will be applied by state courts, this Court's consideration of Plaintiffs' claims is precluded by abstention doctrines and the Anti-Injunction Act ("AIA"), 28 U.S.C. § 2283.  The abstention doctrine and the AIA reflect the judgment of the courts and Congress as to the appropriate balance between principles of federalism and judicial economy when overlapping questions of federal and state law are adjudicated simultaneously in both courts.  Their application in the present case leads to the conclusion that "the court cannot interfere with [] state proceedings . . . by issuing an injunction or a declaratory judgment concerning issues that the [state adjudicatory body] must decide." *Employers Res. Mgmt. Co. v. Shannon*, 869 F. Supp. 398, 404 (E.D. Va. 1994).  In particular, the *Pullman* abstention doctrine requires dismissing all constitutional claims and, in the alternative, *Younger* abstention and the AIA require dismissal of Counts IV and VII.[13]

---

[13] These Counts request declarations that ICWA and the Guidelines may not be constitutionally applied to T.W. and Birth Parents or in their proceedings to determine placement and custody. Compl. ¶¶ 202, 223.  The declaration is intended to have the same practical effect as an injunction prohibiting state courts from applying the statute and the Guidelines in their child-custody hearings. *See Samuels v. Mackell*, 401 U.S. 66, 72 (1971) (barring declaratory relief under the AIA because it would "result in precisely the same interference and disruption of state proceedings that the . . . policy limiting injunctions was designed to avoid").

The prerequisites for abstention under the *Pullman* doctrine require that a case present (1) an unclear issue of state law for decision, (2) the resolution of which may moot or place in a different posture the federal constitutional issue such that the state law issue is potentially dispositive. *R. R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941); *Educ. Servs. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170 (4th Cir. 1983). Arizona law is clear as to the discretionary application of the federal guidelines. *See In the Matter of the Appeal in Pima Cnty. Juvenile Action No. S-903*, 635 P.2d 187, 191-92 (Ariz. Ct. App. 1981) (considering but not applying the 1979 guidelines). If this Court concludes, however, that the matter is unclear, then the correct approach is to abstain from considering Plaintiffs' claims until the Arizona courts answer this fundamental question. If the Guidelines are indeed not binding on state courts, then this Court has no need to consider the constitutional issues presented by Plaintiffs' claims.

Counts IV and VII should also be dismissed under the *Younger* doctrine. In *Younger v. Harris*, 401 U.S. 37, 46 (1971), the Supreme Court counseled against federal-court interference with a pending state-court proceeding in the absence of great and immediate irreparable injury to the federal plaintiff. *Id*. at 54. In *Moore v. Sims*, the Supreme Court clarified that even the State's removal of a child from its parents does not rise to the level of "great and immediate irreparable injury" unless there is evidence of bad faith, harassment, or unless the applicable law is flagrantly unconstitutional.[14] The Court reversed a federal-court opinion declaring Texas child-welfare laws unconstitutional and remanded the case with instructions to dismiss in favor of ongoing state proceedings. 442 U.S. at 424, 434-35. Courts have since determined that *Younger* abstention

---

[14] This exception to *Younger* abstention is extremely narrow. *Moore*, 442 U.S. at 424 (requiring challenged law to be "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it") (internal citations omitted). Plaintiffs' allegations do not meet this standard. *See* Compl. ¶ 120 (alleging Fifth Amendment violations only in voluntary placement).

requires, at a minimum, (1) the existence of a pending state proceeding, (2) that plaintiff has adequate opportunity to raise federal constitutional claims in the state forum, and (3) that the federal action implicates an important state interest. *Employers Res.*, 869 F. Supp. at 407.

All of these requirements are met here. Assuming that state courts have begun proceedings to consider appropriate adoptive placements, Arizona Plaintiffs have failed to identify any procedural barrier that would prevent the same courts from evaluating claims that ICWA and the Guidelines violate their constitutional rights to due process and equal protection. *See Moore*, 442 U.S. at 432 (abstaining because, *inter alia*, appellees failed to show that state procedural law would bar their claims); *see, e.g.*, *Pima Cnty.*, 635 P.2d at 193 (determining that private-adoption agency's equal protection claim challenging ICWA's transfer provision had "no validity"). Nor will T.W. and Birth Parents will suffer great and immediate irreparable injury. As a result, Counts IV and VII should be dismissed in favor of pending state-court proceedings.

In addition, the AIA prohibits federal courts from enjoining, directly or *indirectly*, state proceedings, including by granting declaratory relief, unless expressly authorized by statute.[15] Like the judicially created doctrine of abstention, the AIA represents Congress' attempt to allow state-court proceedings to "continue unimpaired by intervention of the lower federal courts." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970). The AIA is "an absolute prohibition against any injunction of state-court proceedings, unless the injunction falls within one of the three specifically defined exceptions in the Act." *Denny's, Inc. v. Cake*, 364

---

[15] "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

F.3d 521, 529 (4th Cir. 2004).  These exceptions do not apply here and Counts IV and VII must

therefore be dismissed.[16]

**IV.     The Complaint Should Be Dismissed For Failure to State Any Claim for Relief.**

A.      Plaintiffs' Administrative Procedure Act Claim Fails Because the Guidelines Are
        Not Final Agency Action and Did Not Require Notice And Comment.

Plaintiffs' challenge to the Guidelines is not reviewable because the APA limits

jurisdiction to final agency actions, 5 U.S.C. § 704, and because only legislative rules are subject

to notice-and-comment procedures.  *Id*. § 553(b), (c).  The Guidelines, which determine no rights,

obligations, or legal consequences are neither final agency action, *see Bennett v. Spear*, 520 U.S.

154, 178 (1997), nor legislative rules, *see Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340 (4th Cir.

1995).  *See* ECF No. 48 at 15, 20-30.  For these reasons, and those stated in Defendants' earlier

memorandum in opposition to Plaintiffs' partial motion for summary judgment (which

Defendants incorporate here), this Court does not have subject-matter jurisdiction to hear Count I,

nor have Plaintiffs stated a claim that the Guidelines required notice and comment.

B.      Arizona Plaintiffs' Equal Protection Claims Fail Because ICWA and the
        Guidelines Apply to a Parent or Child's Political Affiliation, Not Race.

Claims by Arizona Plaintiffs that ICWA and the Guidelines violate the Fifth

Amendment's guarantee of equal protection must be dismissed because they depend on an

interpretation of ICWA that is incorrect as a matter of law.  In Counts III, IV, VI, and VII, the

---

[16] Exceptions to the AIA are narrowly construed.  *Atl. Coast Line*, 398 U.S. at 297.  Neither the
Declaratory Judgment Act ("DJA") itself, nor ICWA, constitute a congressionally authorized
exception.  *See Samuels*, 401 U.S. at 70.  Injunctions are "necessary in aid of [] jurisdiction" only
in removal, *Mitchum v. Foster*, 407 U.S. 225, 234-37 (1972), or real-property cases.  *Toucey v.
N.Y. Life Ins. Co.*, 314 U.S. 118, 135-36 (1948).  Injunctions are not required to "promote or
effectuate" a federal judgment unless claim or issue preclusion should bar rehearing in a state
court, *Nationwide Mut. Ins. Co. v. Burke*, 897 F.2d 734, 737 (4th Cir. 1990); neither operates here
because this suit does not join state-court parties.

Arizona Plaintiffs allege that these laws discriminate against T.W. and Birth Parents because they apply to them only as a result of their Indian ancestry.[17]  Compl.  ¶¶ 107, 192, 199, 212, 220. This is manifestly untrue from the face of the statute.  ICWA applies only to child custody proceedings involving an "Indian child," which is defined as children who are themselves members of an Indian tribe, or who are eligible for membership and have a biological parent who is a member of an Indian tribe.  25 U.S.C. § 1903(4).  Thus, the law expressly limits its application based on political affiliation with a tribe; it makes no mention of race or ancestry.

The Supreme Court has flatly rejected the argument that federal laws providing for "special treatment" of Indians are based on a "racial" classification.  In *Morton v. Mancari*, 417 U.S. 535 (1974), the Court held that a government-employment preference for qualified Native Americans did not run afoul of the Fifth Amendment because it was "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities…."  *Id*. at 554; *see also id.* at 554 n.24 ("The preference is political rather than racial in nature").  This distinction is based on tribes' unique legal status under federal law as domestic, dependent nations, and upon Congress' plenary power to "single[] Indians out as a proper subject for separate legislation" under, *inter alia*, the Indian Commerce Clause of the U.S. Constitution.  *Id*. at 551-52; U.S. CONST. Art. II, s.2, cl.2; *see also Mancari*, 417 U.S. at 555 (describing tribes' "unique legal status" as "long standing," and "its sources are diverse"); *Worcester v. Georgia*, 6 Pet. 515, 8 L.Ed. 483 (1832) (Indian nations are "distinct, independent communities, retaining their original natural rights," and the United States has authority to regulate relations with the tribes).

---

[17] Counts III and VI are directed solely at the Guidelines; Counts IV and VII are requests for declaratory judgment that also challenge the statute.

Indeed, the principle that Congress may "single[] out Indians for particular and special treatment" in order to fulfill the United States' "unique obligation toward the Indians" underlies much of federal Indian law and policy. *See Mancari*, 417 U.S. at 552 (noting that, if laws targeting tribal Indians "were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized."). Thus, the Supreme Court has consistently rejected racial discrimination claims where the differing treatment turns on political affiliation with a federally recognized Indian tribe. *See, e.g., United States v. Antelope*, 430 U.S. 641, 646 (1977); *Fisher v. Dist. Ct. of Sixteenth Jud. Dist. of Mont.*, 424 U.S. 382, 390-91 (1976). And, the Fourth Circuit (along with other courts of appeal) has affirmed the continued vitality of *Mancari*'s reasoning. *See United States v. Garrett*, 122 Fed. App'x 628, 631 (4th Cir. 2005) (rejecting equal protection challenge to North Carolina laws authorizing Indian gaming); *United States v. Zepeda*, 792 F.3d 1103 (9th Cir. 2015) (affirming that *Mancari* applies to statutes such as the Indian Major Crimes Act that might impose "disproportionate burdens [] on Indians").

ICWA's protections for Indian children fall squarely within *Mancari* and its progeny. The application of ICWA depends on political affiliation with a federally recognized Indian tribe, not race. 25 U.S.C. § 1903(4). ICWA thus does *not* apply to proceedings involving children who may have Native American ancestry but are not themselves members of a tribe, or eligible for membership and the child of a tribal member.[18] Both D.V. and T.W. are members of federally recognized Indian tribes, and the application of ICWA to their child-welfare proceedings has nothing to do with their race.

---

[18] *See In re L.S.*, 812 N.W. 2d 505, 508-09 (S.D. 2012) (ICWA is not based on a racial classification, and does not apply to a child who is not a member and whose parent has not taken required steps to enroll in Crow Creek Tribe).

And, ICWA's protections for Indian children "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Mancari*, 417 U.S. at 555.[19]  On the basis of extensive evidence that large numbers of Indian children were being removed from their families and tribes and placed in non-Indian homes and that this practice seriously harmed those children, families, and tribes, *see Holyfield*, 490 U.S. at 32-35, Congress relied explicitly on "the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people" in enacting ICWA.  25 U.S.C. § 1901.  Congress found that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." *Id.* § 1901(3).

ICWA's placement preferences are narrowly tailored to this interest.  In an adoption proceeding, absent "good cause to the contrary," a preference must be given to a placement with (1) a member of the child's extended family; (2) other members of the child's tribe; or (3) other Indian families.  *Id.* § 1915(a).  The determination of "good cause" to deviate from these preferences is in the discretion of the state court, but the BIA has consistently opined that both "the request of the parents" and "the extraordinary physical and emotional needs of the child" constitute "good cause."  *See* 80 Fed. Reg. at 10,158 (§ F.4(c)); *see also* 44 Fed. Reg. 67,584,

---

[19] Numerous state courts have concluded that ICWA does not violate the equal protection guarantee of the U.S. Constitution because it is based on a political classification and is rationally related to the protection of Indian families and tribes and the fulfillment of Congress' unique obligations to the Indians.  *See, e.g.*, *In re K.M.O.*, 280 P.2d 1203, 1215 (Wyo. 2012) (rejecting equal protection challenge to ICWA's standard of proof); *In re Beach*, 246 P.3d 845, 849 (Wash. Ct. App. 2011) (ICWA does not deny Indian child equal protection or substantive due process); *In re N.B.*, 199 P.3d 16 (Colo. Ct. App. 2007) (ICWA is constitutional); *In re A.B.*, 663 N.W.2d 625, 636 (N.D. 2003) (rejecting equal protection challenge); *Application of Angus*, 655 P.2d 208, 213 (Or. App. 1982) (ICWA does not deny equal protection).

67594 (§ F.3(a)). [20]   Thus, ICWA imposes modest requirements on child-welfare proceedings to facilitate Congress's purpose of preventing the unwarranted removal of Indian children from their families and tribes and their placement in non-Indian homes.  As a matter of law, ICWA furthers "Congress' unique obligation to the Indians," and Congress' judgment should "not be disturbed." *Mancari*, 417 U.S. at 555.  Counts III, IV, VI, and VII should be dismissed.

> C.   <u>Arizona Plaintiffs Have Failed to Identify a Cognizable, Constitutional Liberty Interest In Support of Their Due Process Claims.</u>

Claims by Arizona Plaintiffs that ICWA and the Guidelines violate the Due Process Clause must be dismissed because they do not infringe upon any recognized, fundamental right. In Counts II and V, Arizona Plaintiffs allege that the Guidelines unduly burden and violate (1) T.W.'s interest in maintaining familial bonds with foster parents, (2) T.W.'s right to have his placement determined based on his own best interests, and (3) Birth Parents' right to direct the adoptive placement of their child.  Compl. ¶¶ 184, 185, 205, 206.  They reprise these arguments with respect to the statute in their request for declaratory judgment in Counts IV and VII.  Compl. ¶¶ 199, 220.  None of these rights are currently recognized under federal law, nor does the remedial purpose of ICWA and the Guidelines interfere with their free exercise.

Substantive due process analysis "must begin with a careful description of the asserted right," the Supreme Court has counseled, "for '[t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [courts] are asked to break new ground in this

---

[20] Although some state courts have limited the "good cause" analysis to those factors listed in the 1979 guidelines, other courts have considered additional factors.  *See In re Adoption of M.*, 832 P.2d 518, 522 (Wash. 1992) ("Good cause is a matter of discretion, and discretion must be exercised in light of many factors."); *In re Adoption of F.H.*, 851 P.2d 1361, 1363-64 (Alaska 1993) (Good cause "depends on many factors."); *see also In re A.J.S.*, 204 P.3d 543, 551 (Kan. 2009) ("ICWA's overall design, including its 'good cause' threshold in 25 U.S.C. 1915, ensure that all interests – those of both natural parents, the tribe, the child, and the prospective adoptive parents – are appropriately considered and safeguarded.")

field.'" *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal citations omitted). The Court has recognized that children and parents share a "vital" interest in preventing the erroneous termination of their natural relationship, *Santosky v. Kramer*, 455 U.S. 745, 760 (1982), and that the state has a "substantial" interest in allowing custody decisions in divorce proceedings to be guided by a child's best interests. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). An available parent's right to make decisions concerning the care, custody, and control of his or her non-alien child is "fundamental" and also protected by the Due Process Clause, *Troxel v. Granville*, 530 U.S. 57, 66 (2000), but that has never been extended to give parents complete control over the adoptive placement and upbringing of a child when they seek to relinquish familial rights.

Arizona Plaintiffs now ask the Court to discern in these precedents not one, not two, but *three*, new extensions of their fundamental rights. First, based on the recognition that children have a vital interest in avoiding the erroneous termination of their relationship with a natural parent, McCarthy alleges that children have a similarly strong interest in remaining with one particular foster family as opposed to another.[21] The realization of this right in T.W.'s case, according to McCarthy, would require keeping T.W. with a non-compliant foster family with whom T.W. has already spent time rather than moving him to a compliant foster family that might be new to him. Compl. ¶ 147. But neither the Supreme Court nor the Fourth Circuit have identified a constitutional right on the part of children to maintain interpersonal relationships, and

---

[21] McCarthy cites two cases that are inapposite. *See Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (application of state statute forbidding male-only organization from continuing to discriminate on the basis of sex did not interfere with any right of adult members to maintain highly personal relationships); *In re Jasmon O.*, 878 P.2d 1297, 1307 (Cal. 1994) (identifying a child's right under California law to be protected from neglect and have a stable and permanent placement).

those cases most pertinent suggest that no such right exists.[22]  In *Holyfield*, Indian children had been with a non-compliant adoptive family for three years, yet the Court did not contemplate that the possibility that they might be placed in a new home would violate their constitutional rights. Indeed, the Court intimated that the children's interest in being raised with their Tribe, in combination with the Tribe's interest in protecting its children and the interest of the Court in deterring injustice, might outweigh the difficulty of the change to the children.  *See* 490 U.S. at 53-54 (leaving it to the Tribe to determine "whether the trauma that might result from removing these children from their adoptive family should outweigh the interest of the Tribe – and perhaps the children themselves – in having them raised as part of the [Tribe's] community").

Second, McCarthy would have this Court draw from the a *state's* non-fundamental interest in protecting a child's best interests in custody proceedings, *Palmore v. Sidoti*, 466 U.S. at 437, to create a fundamental right on the part of a *child* to have the best-interests standard applied to placement decisions on its behalf.  T.W.'s best interests, McCarthy suggests, will only be satisfied by his permanent placement with his current foster parents.  Compl. ¶ 184.  This is not the law. The Supreme Court has found that "best interests of the child," while "a proper and feasible criterion for making the decision as to which of two parents will be accorded custody"

> is not traditionally the sole criterion – much less the sole *constitutional* criterion – for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others. . . . [I]t is likewise not an absolute and exclusive constitutional criterion for the government's exercise of the custodial responsibilities that it undertakes, which must be reconciled with many other responsibilities.

---

[22] In *Troxel v. Granville*, for example, the Court carefully avoided elucidating any constitutional right on the part of the children to maintain familial relationships, even with grandparents.  *See also Jordan v. Jackson*, 15 F.3d 333, 343 n.10 (4th Cir. 1994).

*Flores*, 507 U.S. at 304.  Although McCarthy would have this Court break new ground to find one, a child in the custody of a state has no *constitutional* right to placement with a family as opposed to an institution, much less to a family placement guided by the child's "best interests."[23]

Third, Birth Parents maintain that this Court should extrapolate the right of parents to the care, custody, and control of their children to create a similar control over children to whom they have given up all legal rights.  Birth Parents would exercise their authority in this case to see their child placed with a non-compliant adoptive home, presumably one that BAF helped them select. But the rights of parents are not absolute.[24]  Neither the Supreme Court, nor the Fourth Circuit, have identified a constitutional right of birth parents to direct their child's adoptive placement.

Even if Arizona Plaintiffs were possessed of the rights they claim, however, neither ICWA nor the Guidelines impede their free exercise.  *See supra* Section I (noting that both counsel in favor of Plaintiffs' preferred outcome and that state law independently requires demonstration that a placement is in the child's best interests).  In some respects, ICWA actually gives birth

---

[23] The *Flores* Court reasoned that, if a given placement for children is not unconstitutional in itself, it would not become so simply because it is shown to be less desirable than some other arrangement for the particular child.  *Flores*, 507 U.S. at 303; *see id.* at 304.  Children must have their basic needs met, "but the decision to go beyond those requirements – to give one or another of the child's additional interests priority over other concerns that compete for public funds and administrative attention – is a policy judgment rather than a constitutional imperative."  *Id.*

[24] Because of the competing interests of the child and the State the Supreme Court has found that the interests of a biological parent – even one that has and wishes to continue an existing relationship with their child – may be erased completely by other considerations.  *See Michael H. v. Gerald D.*, 491 U.S. 110 (1989) (deeming it "a question of legislative policy and not constitutional law" whether state law could eliminate all parental rights of the biological father); *see Hodge v. Jones*, 31 F.3d 157, 163-64 (4th Cir. 1994) ("The maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest."). Arizona family law also reflects a balance of competing interests.  Birth parents do not have to select a specific family for adoptive placement, for example, *see* A.R.S. § 8-107(D)(1), and their direction is not always determinative.  *Id.* § 8-106(A) (requiring consent of children over 12, and from any guardian or State or private agency involved).  Arizona courts may also decline to revoke consent to adoption in non-ICWA cases even where placement has not been effectuated. *In the Matter of Appeal in Yuma Cnty.*, 682 P.2d 6, 10 (Ariz. Ct. App. 1984).

parents *more* control over adoptive placement of their children than they would have under state laws. *Compare Yuma Cnty.*, 682 P.2d at 10 *with Cheree L. v. Ariz. Dept. of Econ. Sec.*, 66 P.3d 1248 (Ariz. Ct. App. 2003) (permitting birth mother of Indian child to revoke consent to adoption when prospective adoptive parents declined to adopt). To the extent that compliance with these precepts requires some additional burden, it is tailored as narrowly as possible to satisfy "Federal policy that, where possible an Indian child should remain in the Indian community." *Holyfield*, 490 U.S. at 37 (internal citations omitted). Counts II and V should be dismissed.

> D.     Arizona Plaintiffs' Claim That ICWA Exceeds Congress' Authority Must Be Dismissed Because It Understates the Breadth of the Indian Commerce Clause.

Arizona Plaintiffs' claim that ICWA exceeds Congress' authority relies on a cramped interpretation of the Indian Commerce Clause ("ICC") that finds no basis in law. In Counts IV and VII, Arizona Plaintiffs request a declaration that ICWA cannot constitutionally apply to T.W. and Birth Parents because, *inter alia*, the statute is not authorized by the ICC or any other constitutional authority. Compl. ¶¶ 198-202, 219-223. But the Supreme Court has recognized the "plenary power of Congress to deal with the special problems of Indians . . . drawn both explicitly and implicitly from the Constitution itself." *Mancari*, 417 U.S. at 551-52. The central function of the ICC, U.S. CONST. art. I, § 8, cl. 3, "is to provide Congress with plenary power to legislate in the field of Indian affairs." *United States v. Lara*, 541 U.S. 193, 200 (2004) (citing cases).[25]

Arizona Plaintiffs argue that the ICC could not provide the requisite authority because children are not chattels that may be bought or sold in "commerce." Compl. ¶¶ 138, 139. In doing so, Arizona Plaintiffs confuse the ICC with the Interstate Commerce Clause, which have

---

[25] The Treaty and Supremacy Clauses have also been cited as sources of federal legislative authority over Indians, as well as "the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government . . . ." *See Lara*, 541 U.S. at 201; Cohen's Handbook of Federal Indian Law § 5.01[1] (2005 ed.).

"very different applications." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989).

Rather, Congress has plenary authority over Indian affairs under the Constitution and relied on

this authority and the United States' trust relationship with Indian tribes in enacting ICWA. *See*

25 U.S.C. § 1901; *Cotton Petroleum*, 490 U.S. at 192; *Lara*, 541 U.S. at 201. Pursuant to these

authorities, the United States has sought to protect the integrity and resources of Indian tribes,

none of which is "more vital" than their children. 25 U.S.C. § 1901(3). Arizona Plaintiffs have

failed to state a claim that ICWA is an *ultra vires* exercise of congressional authority.

E.    Organizational Plaintiffs Cannot, As a Matter of Law, Demonstrate That the
      Guidelines Impermissibly Commandeer State Courts or State or Private Agencies.

Organizational Plaintiffs' Count VIII challenging the Guidelines fails to state a claim

under the Tenth Amendment, as the "anti-commandeering" principle they cite has no relevance

to: (a) federal guidance to State courts on the interpretation of federal laws; (b) state regulatory

agencies' directives to private-adoption agencies, or (c) a so-called "unfunded mandate" to private

actors. *See United States v. Printz*, 521 U.S. 898, 935 (1997) (federal government may not

"command the States' officers . . . to administer or enforce a federal regulatory program").

First, the "anti-commandeering principle" does not apply to federal directives to state

courts, and especially does not apply to non-binding guidelines. Plaintiffs argue that the

Guidelines impermissibly "mandate[] that state courts perform investigations" into the tribal

status of children, and "dictate procedural rules to state courts" to qualify expert witnesses in

ICWA cases. Compl.¶¶ 132-33. Federal directives are permissible where, as here, states "retain

the ultimate decision as to whether or not [to] comply." *New York v. United States*, 505 U.S. 144,

168 (1992). Even if the Guidelines were mandatory, however, the Supreme Court expressly

withholds the protection of the "anti-commandeering principle" from state courts, *New York*, 505

U.S. at 929 (internal citations omitted), as the Supremacy Clause establishes that "judges in every

28

State shall be bound" by federal law.  U.S. CONST., art. VI; *cf. F.E.R.C. v. Mississippi*, 456 U.S.

742, 760 (1982) (Congress may even require state *agencies* to apply federal law "while acting in a

judicial capacity").  State courts must hear ICWA cases as they would hear any other dispute

arising under a federal statute.  Congress can also set procedures in state courts where necessary

to effectuate a substantive right created by the statute.[26]  *See, e.g.*, *Brown v. Western Ry.*, 338 U.S.

294, 296 (1949) (State "rules of practice and procedure" may not "dig into substantive [federal]

rights.").  Where, as with ICWA, the statute has a remedial purpose, preemption of state

procedural rules is especially appropriate.  *See Felder v. Casey*, 487 U.S. 131 (1988); *Holyfield*,

490 U.S. at 45 (ICWA's "congressional findings . . . demonstrate that Congress perceived the

States and their courts as partly responsible for the problem it intended to correct.")

    Second, plaintiffs' claim that the Guidelines "commandeer" state regulatory agencies

misunderstands the structure of ICWA, and fails as a matter of law.  Plaintiffs allege that because

"the Department of the Interior and BIA do not administer voluntary adoptions," it is necessary

for the "regulatory apparatuses of the States to enforce the compliance of state-licensed agencies."

Compl. ¶¶ 167, 170, 227.  But the Supreme Court has routinely upheld statutes inducing states to

regulate, so long as the "enactment of such laws remains the prerogative of the States."  *South

Dakota v. Dole,* 483 U.S. 203, 211 (1987); *New York*, 505 U.S. at 172-74 (confirming that

conditional spending and conditional preemption are appropriate methods of "inducing" states).

Here, while ICWA preempts state law by denying state jurisdiction over adoptions of certain

Indian children, 25 U.S.C. § 1911, and creates specific federal rights for parents, children, and

tribes, enforceable by state courts, *see, e.g.*, *id*. § 1912, the Guidelines do not require any action,

---

[26] The authority Plaintiffs cite refers to establishment of procedures for wholly *state* claims. *See
Congressional Authority to Require State Courts to Use Certain Procedures in Products Liability
Cases*, 13 Op. O.L.C. 372, 373-74 (noting next that "it is also clear that federal law may properly
govern certain procedural issues in state court in suits concerning federal causes of action.").

including action by state agencies.  Arizona has chosen to incorporate ICWA – but not the Guidelines – into state licensing requirements for adoption agencies, *see* Ariz. Admin. Code R6-5-7006 (regulators "may deny a license to [applicants who violate] ICWA during a licensing year").  Plaintiffs cannot make out a claim that the Guidelines commandeer state agencies.

Finally, Organizational Plaintiffs' claim that private-adoption agencies themselves have been "commandeered" by the Guidelines is deficient in both fact and law.  As stated above, the Guidelines are not binding upon private-adoption agencies unless voluntarily adopted by the state agencies that oversee their activities.  Even if the Guidelines did regulate Plaintiffs, "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals." *New York*, 505 U.S. at 166. The anti-commandeering principle does not reach regulation of "the conduct of private parties" if it "impose[d] no requirements whatsoever upon States or state officials."  *McConnell v. FEC*, 540 U.S. 93, 186 (2003) *overruled on other grounds*, 558 U.S. 310 (2010).  Nor would federal regulations be cast aside merely because regulated entities must spend resources to comply.  *See* Compl. ¶ 170 (describing Guidelines as "unfunded mandates").  Such a holding would eliminate much of the federal-regulatory apparatus.  Count VIII should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss or abstain from consideration of Plaintiffs' claims.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:     _____/s/_____
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:       (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

JOANN KINTZ
STEVEN MISKINIS
Indian Resources Section
CHRISTINE W. ENNIS
Law and Policy Section
Environment and Natural Resources Div.
United States Department of Justice
REBEKAH KRISPINKSY                     P.O. Box 44378
Assistant Solicitor                    Washington, D.C. 20026
United States Department of the Interior   Email: steven.miskinis@usdoj.gov
                                       Telephone: (202) 305-0262
                                       Fax: (202) 305-0275

DATE: September 11, 2015               ATTORNEYS FOR DEFENDANTS

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to the following:

Jacob Stephen Siler
Gibson Dunn & Crutcher LLP (DC)
1050 Connecticut Avenue N.W., Suite 300
Washington, DC  20036
Email: Jsiler@gibsondunn.com

Date: September 11, 2015

                                          _____/s/_____
                                          DENNIS C. BARGHAAN, JR.
                                          Assistant U.S. Attorney
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          Telephone: (703) 299-3891
                                          Fax:      (703) 299-3983
                                            Email:  dennis.barghaan@usdoj.gov

                                          ATTORNEY FOR DEFENDANTS

32
