**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

---

NATIONAL COUNCIL FOR ADOPTION,       )
BUILDING ARIZONA FAMILIES on behalf  )
of itself and its birth-parent clients, birth )
parents D.V. and N.L., and baby boy T.W. by  )
and through his guardian ad litem PHILIP )
(JAY) MCCARTHY, JR.,                  )
                                      )
        Plaintiffs,               )
                                      )
        v.                        )          Case No. 1:15-cv-00675
                                      )
SALLY JEWELL, in her official capacity as )
Secretary of the United States Department of )
the Interior, KEVIN WASHBURN, in his  )
official capacity as Assistant Secretary of )
Indian Affairs, BUREAU OF INDIAN     )
AFFAIRS, and the UNITED STATES        )
DEPARTMENT OF THE INTERIOR,           )
                                      )
        Defendants.               )

---

**REPLY IN SUPPORT OF PLAINTIFF NATIONAL COUNCIL FOR ADOPTION'S
MOTION FOR SUMMARY JUDGMENT ON APA CLAIM**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.     The 2015 Guidelines Are "Legislative" Because They Issue
Commands To State Courts And Other Regulated Entities,
Including NCFA's Member Agencies ................................................................................2

II.    Because They Are Legislative, The 2015 Guidelines Constitute
"Final Agency Action" ................................................................................................10

III.   NCFA Has Both Individual And Associational Standing Because It
And Its Member Adoption Agencies Have Been Concretely
Harmed By The 2015 Guidelines, And Vacatur Of The Guidelines
Would Redress That Harm............................................................................................11

CONCLUSION.................................................................................................................16

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.T. Massey Coal Co. v. Holland*,
    472 F.3d 148 (4th Cir. 2006) .................................................................. 8

*American Mining Congress v. Mine Safety & Health Administration*,
    995 F.2d 1106 (D.C. Cir. 1993) ............................................................. 6

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) .......................................................... 3, 6

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ............................................................................. 5

*Chambers Med. Techs. of S.C., Inc. v. Bryant*,
    52 F.3d 1252 (4th Cir. 1995) .............................................................. 14

*Chevron, USA, Inc. v. FERC*,
    193 F. Supp. 2d 54 (D.D.C. 2002)
    *aff'd sub nom. Williams Companies v. FERC*,
    345 F.3d 910 (D.C. Cir. 2003) ............................................................ 13

*Cmty. Nutrition Inst. v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ............................................................. 3

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
    901 F.2d 107 (D.C. Cir. 1990) ............................................................ 15

*Equity In Athletics, Inc. v. Dep't of Educ.*,
    639 F.3d 91 (4th Cir. 2011) ........................................................... 14, 15

*Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S.E.P.A.*,
    313 F.3d 852 (4th Cir. 2002) ............................................................... 7

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ......................................................... 3, 10

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ........................................................................... 15

*Hydro Res., Inc. v. EPA*,
    608 F.3d 1131 (10th Cir. 2010) .......................................................... 13

*In re J.M.B.*, 353 P.3d 470 (Kan. Ct. App. 2015) ...................................... 8

*Investment Co. Institute v. CFTC*,
    891 F. Supp. 2d 162 (D.D.C. 2012),
    *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) ................................................. 14

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
    874 F.2d 205 (4th Cir. 1989) ......................................................... 3, 5, 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 14

**TABLE OF AUTHORITIES** (*continued*)

**Page(s)**

*National Ass'n of Homebuilders v. U.S. Army Corps of Engineers,*
417 F.3d 1272 (D.C. Cir. 2005) ........................................................................................ 10

*Oglala Sioux Tribe v. Van Hunnik,*
No. CIV. 13-5020-JLV, 2015 WL 1466067 (D.S.D. Mar. 30, 2015) ...................................... 8

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands,
LLC,*
713 F.3d 175 (4th Cir. 2013) ....................................................................................... 13, 15

*Salt Inst. v. Thompson,*
345 F. Supp. 2d 589 (E.D. Va. 2004)
*aff'd sub nom. Salt Inst. v. Leavitt,*
440 F.3d 156 (4th Cir. 2006) .......................................................................................... 7

**Statutes**

Administrative Procedures Act,
5 U.S.C. §500 et seq. ................................................................................................... 2, 9

Indian Child Welfare Act of 1978,
29 U.S.C. §§1901-1963 ................................................................................................ 4

**Other Authorities**

Guidelines for State Courts; Indian Child Custody Proceedings,
44 Fed. Reg. 67,584 (Nov. 26, 1979) ........................................................................... 5, 8

**Rules**

Fed. R. Civ. P. 56(d) .................................................................................................. 12, 15

Guidelines for State Courts and Agencies in Indian Child Custody
Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015).................................................. 2, 9, 13, 14

**Constitutional Provisions**

U.S. Const., art. III ................................................................................................ 2, 10, 11

## INTRODUCTION

The question for this Court is a simple one.  Are the 2015 Guidelines phrased such that they create new duties and thus should be considered the functional equivalent of legislative rules?   The government's opposition purports to identify three reasons why summary judgment should be denied, but all three turn on the government's claim that the 2015 Guidelines, despite their language, are "simply a guidance document."  Opp. at 16.  That is indeed the question before this Court: whether the 2015 Guidelines are "simply a guidance document"—otherwise known as an "interpretive rule" or "policy statement"—or whether they cross the line between mere "suggestions," on the one hand, and legislative rules, on the other.   If NCFA is correct that the 2015 Guidelines constitute a legislative rule, then it is both "final agency action" and invalid under the APA, as the government concedes that it did not comply with notice-and-comment procedures.  If, however, the court concludes that the 2015 Guidelines are merely "interpretive rules," then the Department did not have to comply with notice-and-comment.

The 2015 Guidelines fall clearly on the "legislative rule" side of that line, in light of their pervasive mandatory language, their stark departure from the 1979 Guidelines, and their directives to regulated persons to undertake new duties and to apply the Department's new interpretations of ICWA in state-court proceedings.  But perhaps most telling is the Department's intentional omission of the language in the 1979 Guidelines that explained to state courts, state agencies, and the public that the 1979 Guidelines were simply guidance, and not legislative rules.  The government offers no explanation for that glaring omission; nor is there any plausible explanation for it, but that it reflects the Department's hope and expectation that state courts and agencies would begin "immediately" to follow its new mandates.  That omission indelibly marks

the Department's 2015 Guidelines as substantive legislative rules subject to the APA's notice-and-comment requirements.

And because the 2015 Guidelines are properly viewed as legislative rules, their publication must be deemed final agency action that this Court has jurisdiction to review under the APA.

Finally, NCFA has sufficiently demonstrated its Article III standing to sue, both in its own right and on behalf of its members.  The government's principal standing argument is, like its other arguments, entirely dependent on its litigation position that the 2015 Guidelines are just "guidance."  But the 2015 Guidelines purport to impose burdensome requirements on NCFA's members, and NCFA has diverted significant resources toward educating its members about and helping them comply with those requirements, which are contrary to its mission of securing safe, permanent homes for children who need them.  The government's attempt to delay this Court's adjudication of NCFA's motion with unnecessary discovery should be rejected.  The declaration attached to NCFA's motion is sufficient to establish NCFA's standing, and the government does not deny the core averment that NCFA diverted vital resources away from their core mission and toward the 2015 Guidelines.  Nor does the government seriously contest NCFA's associational standing on behalf of its members who are directly regulated by the 2015 Guidelines.  NCFA and its members have suffered concrete injury caused by the 2015 Guidelines' directives, and vacatur of the 2015 Guidelines would redress their injuries.

## ARGUMENT

### I.  The 2015 Guidelines Are "Legislative" Because They Issue Commands To State Courts And Other Regulated Entities, Including NCFA's Member Agencies

As explained in NCFA's opening brief, the Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015) ("2015 Guidelines") are

legislative in character because the plain language, especially in the context of the predecessor guidelines, is not susceptible to any other reasonable interpretation.  It is no answer to point out, as the government repeatedly does, that the BIA's pronouncement is styled as mere "Guidelines."  "'The entire Guidance, from beginning to end . . . reads like a ukase.  It commands, it requires, it orders, it dictates.'"  *Gen. Electric Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000)) (brackets omitted) (ellipsis in original); *see also id.* ("[T]he mandatory language of a document alone can be sufficient to render it binding . . . . If the document is couched in mandatory language, or in terms indicating that it will be regularly applied, a binding intent is strongly evidenced.") (citation omitted).  More than one hundred times, the 2015 Guidelines dictate to state courts, state social services agencies, and state-licensed foster and adoption agencies, what they "must" do in addressing cases involving the custody and placement of "Indian children." On ten more occasions, the Guidelines tell state courts and agencies what they "may not do."  In this way, the 2015 Guidelines indisputably direct state courts and agencies to undertake a host of new duties and obligations and to apply the Department's newly minted interpretations of ICWA in cases before them.  And its use, in this connection, of "this type of mandatory, definitive language is a powerful, even potentially dispositive, factor suggesting that [these 'guidance' documents] are substantive rules."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987) (per curiam); *see also Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207, 208 (4th Cir. 1989) (concluding that a so-called "interpretive statement" was actually a legislative rule because the "plain language" of the rule "command[ed] performance" and "eliminat[ed] a former exemption").

Were there any doubt that the 2015 Guidelines were intended to have legislative effect, it would be resolved by the conspicuous and curious manner in which, in addressing that topic, the 2015 Guidelines depart from the 1979 Guidelines.  The 1979 Guidelines stated explicitly that they were "not intended to have binding legislative effect."  Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979) ("1979 Guidelines"). They recognized that "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id.*  They emphasized that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.*  And they further stated that "[n]othing in the legislative history indicates that Congress intended this Department to exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters.  For Congress to assign to an administrative agency such supervisory control over courts would be an extraordinary step." *Id.* "Assignment of supervisory authority over the courts to an administrative agency is a measure so at odds with concepts of both federalism and separation of powers that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect." *Id.* The 1979 Guidelines thus assured state courts that they were "free to act contrary to what the Department has said if they are convinced that the Department's guidelines are not required by the statute itself." *Id.*  This language was *the* signature feature of the 1979 Guidelines that marked them as interpretive guidance, and the 2015 Guidelines omits *all* of it.

This is a stark shift in agency policy, with the Department stepping in to resolve what it characterizes as "interpretive disagreements over ICWA that have arisen among state courts . . . since the 1979 Guidelines." Opp. 29.  As the government concedes, when it is undertaken

without notice and comment, such a reversal of course by an agency demands "heightened scrutiny" because "the greater [the] effects, the less likely the change can be considered merely interpretive." Opp. 29 (quoting *Jerri's Ceramic Arts*, 874 F.2d at 208). And so it is here. Whereas the 1979 Guidelines advised that state courts had "flexibility" in applying ICWA, and that the Department could not "exercise supervisory control over state . . . courts or to legislate for them with respect to Indian child custody matters," 44 Fed. Reg. at 67,584, the Department now has abandoned that position and instead, in the 2015 Guidelines, instructed state courts and agencies over one hundred times what they "must" and "may not" do in Indian child custody matters. The only inference that a regulated person or entity reasonably could draw from this radical shift is that the new 2015 Guidelines, unlike the 1979 version, are indeed binding rules that must be followed.

The government offers three principal arguments in support of its contrary assertion that the 2015 Guidelines are mere "interpretive" suggestions that are not subject to the APA notice-and-comment requirement, none of which is persuasive. First, the government offers its own circular assurance that the Guidelines "are not binding." As nice as it is to have the Department's lawyers on record on that point, that post-hoc litigation position is not relevant to whether the 2015 Guidelines, when issued, were functionally legislative rules. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). What matters is the language the agency uses in its publication and the duties and obligations it purports to impose on regulated persons.

The government cites *American Mining Congress v. Mine Safety & Health Administration* for the proposition that mandatory language will not always be dispositive in

determining whether an agency has issued a legislative rule, but that case hardly supports its position here.  In that case, the D.C. Circuit noted that an agency's use of mandatory language may not be dispositive "in the interpretive/legislative rule context," because, when an agency is offering its interpretation of a statute or regulation it often "will use imperative language . . . if the interpreted term is part of a command" just as "it will use permissive language . . . if the interpreted term is in a permissive provision."  995 F.2d 1106, 1111 (D.C. Cir. 1993).  But the 2015 Guidelines are not merely "interpreting" terms that are "part of" a statutory command of ICWA.  Rather, what the 2015 Guidelines "command" of state courts and agencies is that they *apply* the Department's interpretation of ICWA and its detailed new procedures for "compliance with ICWA's stated goals."  80 Fed. Reg. at 10,146.

That is the very definition of a substantive legislative rule.  Indeed, *American Mining Congress* itself recognized that an agency's exercise of "its judgment as to how best to implement a general statutory mandate" that "establishes a duty" would be a "legislative rule." 995 F.2d at 1110.  *American Mining Congress* thus cannot be made to stand for the proposition that an agency's use of mandatory language can be disregarded in determining whether agency action is a legislative rule.  That case recognizes that agency statements that "establish a duty" are legislative rules and an agency's use of mandatory language certainly is relevant—indeed, often dispositive—in determining whether the agency directive establishes a duty to act or refrain from acting.  That is why the agency's use of such language was important to the Fourth Circuit in *Jerri's Ceramic Arts* and the D.C. Circuit in *Appalachian Power*—because it gave regulated persons "their marching orders" (*Appalachian Power*, 208 F.3d at 1023 (internal quotation marks omitted)), and rendered the agency's suggestion that it was merely "urg[ing]

compliance" and not "command[ing] performance . . . simply incredible" (*Jerri's Ceramic Arts*, 874 F.2d at 208).

Here, there can be no doubt that the 2015 Guidelines give state courts and agencies numerous "marching orders" that go far beyond any command of ICWA itself.  And the Department's pervasive use of mandatory language—along with its conspicuous omission of language disclaiming binding effect—demonstrates that the Department was attempting to "command performance," not merely "urge compliance."

Other cases cited by the government involve agency publications that are informational reports of research data containing no mandatory language whatsoever and are thus readily distinguishable.  In *Salt Institute v. Thompson*, for instance, the agency "merely described the results of [scientific] trials," and this Court held that such "dissemination of advisory information" did not constitute final agency action.  345 F. Supp. 2d 589, 602 (E.D. Va. 2004) *aff'd sub nom. Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006).  Similarly, in *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, the EPA issued a report that "analyzed the effects of secondhand smoke on human health" and "provide[d] important new documentation of the emerging scientific consensus that tobacco smoke is not just a health risk for smokers."  313 F.3d 852, 856 (4th Cir. 2002) (citation omitted) (alteration in original).  In addition, the relevant statute expressly prohibited any such report "from having any regulatory effect."  *Id.* at 858.  Such agency reporting quite plainly bears no resemblance to the 2015 Guidelines, and these cases accordingly lend no support to the government's position that the 2015 Guidelines are mere interpretative suggestions.

Second, the government observes that a few state court decisions have declined to treat the 2015 Guidelines as binding.  Opp. 22-23.[1]  Some of those decisions nevertheless hold (erroneously) that the 2015 Guidelines are "entitled to great weight," *Oglala Sioux Tribe v. Van Hunnik*, No. CIV. 13-5020-JLV, 2015 WL 1466067, at *14 (D.S.D. Mar. 30, 2015), thus treating them as legislative in character.  *See A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 166 (4th Cir. 2006) (*Chevron* deference limited "to circumstances where (1) Congress has given the agency authority to make rules carrying the force of law and (2) the agency's interpretation is rendered in the exercise of that authority").  The fact that some state courts agree with Plaintiffs that the 2015 Guidelines cannot *lawfully* be binding is not relevant to whether they are, on their face, legislative in character.  In any event, the government's confident assertion that "[n]o state court considering the 2015 Guidelines has held them to be binding" is quite wrong.  Opp. 7.

The Kansas Court of Appeals, for example, recently reversed a lower court ruling for not following the 2015 Guidelines.  *In re J.M.B.*, 353 P.3d 470 (Kan. Ct. App. 2015) (per curiam) (unpublished).  In that case, the adoptive child's grandmother had notified the court that she was registered in the Sisseton-Wahpeton tribe.  *Id.* at *9.  The tribe later notified the court that the child did not meet the tribe's blood quantum requirement, and the court accordingly found that the child was not an "Indian child" and terminated parental rights.  *Id.* at *3, *10.  Reversing, the court of appeals held that the 2015 Guidelines "instruct that '[i]f there is any reason to believe the child is an Indian child, the agency and the state court must treat the child as an Indian child, unless and until it is properly determined that the child is not a member or is not eligible for

---

[1] It is certainly no surprise that state courts unanimously treated the 1979 Guidelines as advisory, Opp. 21-22, considering how clearly and explicitly the 1979 Guidelines state that they are not and could not be binding.  44 Fed. Reg. at 67,584-85.

membership in an Indian tribe.'" *Id.* at *10 (quoting 80 Fed. Reg. at 10,152).  The court of

appeals concluded that "the district court erred" because it did not follow this "authority."   *Id.*

The 2015 Guidelines, the court of appeals noted, "expressly state: 'A tribe need not formally

enroll its members for a child to be a member or eligible for membership. . . . The only relevant

factor is whether the tribe verifies that the child is a member or eligible for membership.'"  *Id.*

(quoting 80 Fed. Reg. at 10,153).  This decision was not based on the text of ICWA or of the

1979 Guidelines, but rather on the 2015 Guidelines' new mandate.  Thus, not all state courts are

so confident that the 2015 Guidelines do not mean what they say.  And because state family

courts typically do not publish their decisions, it is impossible to know how many more cases

have already been affected by the 2015 Guidelines' mandates.

     And the government has no answer at all to the conundrum faced by state-licensed foster

and adoption agencies that are the subject of numerous new duties and obligations under the

2015 Guidelines' requirements as a condition of their licenses and insurance to follow applicable

law, including federal law.  The 2015 Guidelines are phrased as unambiguous legal commands.

State-licensed adoption agencies can have no assurance that state licensing authorities and

insurance carriers will not interpret the 2015 Guidelines accordingly, so they have no choice but

to follow the 2015 Guidelines' many dictates.  Having drafted the 2015 Guidelines in the manner

that it did, the Department cannot seriously maintain that no state court or agency is taking the

Department's mandatory language at face value and complying with 2015 Guidelines as law.

     Finally, the government points to the fact that the Department and BIA are now

undertaking a formal rulemaking proceeding.  Opp. 7-8.  No doubt aware of the outrage

engendered by its issuance of the immediately-effective 2015 Guidelines without notice, the

Department issued a notice of proposed rulemaking weeks later proposing to formalize as notice-

and-comment regulations many of the provisions in the 2015 Guidelines.  The government offers

no authority for the proposition that an agency can "cure" a violation of the APA by later

initiating a proceeding that may or may not culminate in rules that comply with the APA.  The

Department may or may not issue a final rule at the end of that process, and it may or may not

clarify which portions of the 2015 Guidelines are intended to be binding.  In the meantime, state

court proceedings are being affected today by the 2015 Guidelines, which were phrased in

mandatory terms when issued, because the Department and BIA wanted state courts and other

regulated parties immediately "to follow" them.

The text of the 2015 Guidelines as published in the Federal Register, in the context of the

stark departure from the 1979 Guidelines, establishes that the 2015 Guidelines are legislative.

## II.    Because They Are Legislative, The 2015 Guidelines Constitute "Final Agency Action."

The government separately argues that this Court lacks jurisdiction to review the 2015

Guidelines because they do not constitute "final agency action."   Opp. 20-24.  The government

concedes that the 2015 Guidelines meet the first prong of "final agency action," because they

represent the culmination of the BIA's decisionmaking process.  Opp. 21.  Because legislative

rules are, by definition, reviewable "final agency action," the government's jurisdictional

argument hinges entirely on its argument on the merits that the 2015 Guidelines are merely

advisory, interpretive rules, not legislative in character.  *See, e.g.*, *Nat'l Ass'n of Homebuilders v.*

*U.S. Army Corps of Engineers*, 417 F.3d 1272, 1285-86 (D.C. Cir. 2005).  Courts routinely

exercise jurisdiction to determine whether a rule is interpretive or legislative, as the cases cited

by the government and in NCFA's opening brief demonstrate.  *See, e.g.*, *GE*, 290 F.3d at 385

(holding that the court had jurisdiction and that it was "clear that GE must prevail on the merits"

of its APA claim, because EPA's guidance document was a legislative rule).[2]

**III.   NCFA Has Both Individual And Associational Standing Because It And Its Member Adoption Agencies Have Been Concretely Harmed By The 2015 Guidelines, And Vacatur Of The Guidelines Would Redress That Harm.**

The Complaint, NCFA's Motion for Partial Summary Judgment, and the Declaration of

Charles Johnson establish that NCFA has suffered concrete injury due to the 2015 Guidelines,

and there is no genuine issue of material fact precluding summary judgment.  Mot. 8-10.  NCFA

has incurred costs in its efforts to comply with the 2015 Guidelines, primarily by educating its

members about compliance with the 2015 Guidelines.  Mot. 8-9.  That constitutes a concrete

injury sufficient to confer Article III standing.  The government argues, in circular fashion, that

NCFA's efforts to comply have been "voluntary," because the 2015 Guidelines are "simply a

guidance document."  Opp. 16.  That begs the ultimate legal question before the Court, and if the

government had its way, no one would have standing to challenge any agency action couched as

"guidance."  The government does not dispute that NCFA has "spen[t] time and money

complying with the 2015 Guidelines," Opp. 16, but suggests that those expenditures do not

constitute an injury in fact because NCFA's "mission includes education of its members," Opp.

18.  Education of its members as a general matter surely is within NCFA's mission.  But the

2015 Guidelines, in particular, are contrary to NCFA's mission.  NCFA and its members seek to

---

[2]   The government's jurisdictional argument might add something if NCFA's summary judgment motion had asked this Court to adjudicate substantive challenges to the 2015 Guidelines.  But it does not.  And, as a practical matter, given the government's admission that the Department failed to comply with the APA's procedural requirements, this Court will not need to reach Plaintiffs' substantive challenges to the 2015 Guidelines.  If this Court finds that the 2015 Guidelines are legislative in character, then they must be vacated, because they are procedurally invalid.  If they are not legislative, then the APA's procedural requirements do not apply and they also are not reviewable under the APA.

find safe, nurturing, permanent, homes for all children in foster care or placed for adoption.[3] The 2015 Guidelines substantially impair that mission, by design. NCFA's efforts to respond to the unlawful 2015 Guidelines have thus diverted time and other resources away from its core mission. That satisfies Article III's injury requirement, which is not a particularly high bar.

The government's Rule 56(d) declarations do not raise a genuine issue of material fact as to NCFA's standing. The government speculates that NCFA's declarations, made under penalty of perjury, may be "incomplete," but there is no reason to credit that speculation. The government offers the declaration of Tobin Smith, of pro-ICWA advocacy organization the National Indian Child Welfare Association ("NICWA"). That declaration alleges that NCFA invited Smith to participate in a webinar about ICWA that occurred *prior to the new 2015 Guidelines*, and that NCFA charged $35 to members and $40 to non-members to participate. The government implies that discovery may show that NCFA, a non-profit organization, is actually making money on its efforts to educate its members and assist them with compliance. That is ridiculous and offensive. Even assuming the dubious premise that such a meager fee could come close to covering the cost of that particular webinar, accounting for the many hours of professional time spent, it does not undercut the declaration, made under penalty of perjury, as to NCFA's expenditures caused by the 2015 Guidelines, specifically. The government's spurious allegations and aggressive discovery requests are unfortunately in keeping with the Department's efforts thus far to insulate the 2015 Guidelines from judicial review.

At any rate, the government has essentially no response to NCFA's associational standing argument. NCFA's members are state-licensed adoption agencies. Johnson Decl. ¶ 5. The 2015

---

[3]  *See* National Council For Adoption, "Mission," *at* https://www.adoptioncouncil.org/who-we-are/mission (last visited Sept. 14, 2015) (explaining that NCFA is "[p]assionately committed to the belief that every child deserves to thrive in a nurturing, permanent family").

Guidelines issue directives that purport to regulate these member adoption agencies. *See id.* at 3-4. "The 2015 Guidelines . . . impose significant burdens (financial and otherwise) on NCFA's member agencies." *Id.* ¶ 9. "To maintain their state licenses, NCFA's member agencies must comply with applicable laws," *id.* ¶ 11, and the 2015 Guidelines purport to tell them what they "must" do in order to comply with ICWA. For example, NCFA's member agencies must "conduct a 'diligent search' for an adoptive placement that fulfills ICWA's placement preferences." Johnson Decl. 4 (quoting 80 Fed. Reg. at 10,157). "Under the 2015 Guidelines, this effort must include 'an explanation of the actions that must be taken to propose an alternative placement,' to, among others, all 'reasonably identifiable[] members of the Indian child's extended family members.'" *Id.* (quoting 80 Fed. Reg. at 10,157) (alteration in original).

An association has standing to bring a suit on behalf of its members when "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (citation omitted).

NCFA's members clearly have standing to challenge the 2015 Guidelines because those agencies are the object of that regulation. "'[C]ompulsion by unwanted and unlawful government edict is injury per se. Certainly the costs of obeying the regulations constitutes injury.'" *Chevron, USA, Inc. v. FERC*, 193 F. Supp. 2d 54, 61 (D.D.C. 2002) *aff'd sub nom. Williams Cos. v. FERC*, 345 F.3d 910 (D.C. Cir. 2003) (quoting *NCAA v. Califano*, 622 F.2d 1382, 1389 (10th Cir. 1980)). "[T]he out-of-pocket cost to a business of obeying a new rule of government . . . suffices to establish an 'injury in fact.'" *Hydro Res., Inc. v. EPA*, 608 F.3d 1131,

1144-45 (10th Cir. 2010) (internal quotation marks omitted); *see also Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 185 (D.D.C. 2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) (holding that investment companies have standing to challenge new trading rules because they "will face the relative increased regulatory burden and the associated costs of that regulation"). Indeed, the Fourth Circuit has found standing when a regulated entity incurs costs to monitor developments to ensure compliance with a regulation. *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265-66 (4th Cir. 1995).

The government argues generally that voluntary actions not mandated by regulation do not constitute injury-in-fact, Opp. at 16, but here NCFA's members are undertaking actions to comply with unequivocal commands addressed to them. *E.g.*, 80 Fed. Reg. at 10157 (requiring agency to demonstrate in all cases that it conducted a "diligent search" for preferred placements). Compliance with these unambiguous commands can hardly be deemed "voluntary." Failure to comply would put NCFA's member agencies at risk of losing their licenses, and would expose their clients and "Indian children" to an intolerable risk of disruption of foster and adoptive placements. Absent withdrawal of the 2015 Guidelines, agencies have no choice but to assume that they must do what the BIA tells them they "must." NCFA's member agencies' injuries are thus directly caused by the unlawful 2015 Guidelines. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (when a plaintiff is subject to challenged agency action, "there is ordinarily little question that the [government] action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"). NCFA's members thus have standing to challenge the 2015 Guidelines.

The interests that NCFA seeks to protect in this litigation, moreover, are "germane to its purpose." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). NCFA is

committed to helping children in need of placement find nurturing, permanent families, and as part of that mission educates and supports its member adoption agencies.  Johnson Decl. ¶ 8, 10. Indeed, it is "uncontested that the interests [NCFA] seeks to protect are germane to its purpose." *Equity In Athletics*, 639 F.3d at 99.  NCFA thus satisfies the undemanding second prong of the associational standing inquiry.  *See Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111 (D.C. Cir. 1990) ("Germaneness is satisfied by a mere pertinence between litigation subject and an organization's purpose.") (internal quotation marks and citation omitted).  Further, because the only relief NCFA seeks is vacatur of the 2015 Guidelines, there is no need for the presence of its member agencies in this lawsuit.  A "suit does not require the participation of its individual members" when the organization "seeks declaratory and injunctive relief against" an agency's interpretations and "actions predicated thereunder." *Equity In Athletics*, 639 F.3d at 99; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. at 333, 344 ("[A] request for declaratory and injunctive relief [does not] require[] individualized proof and . . . [is] thus properly resolved in a group context.").  Thus, NCFA has associational standing to challenge the 2015 Guidelines.

The government has not disputed or requested discovery related to NCFA's associational standing, either in its 56(d) statement or the body of its opposition brief.  And the government's perfunctory footnote on this topic is off the mark.  The government argues that NCFA cannot rely on injury suffered by its members because it has not alleged "specific members who were harmed."  Opp. 17 n.13.  The cases cited by the government do not stand for the proposition that specific members must be identified.  Indeed, it is sufficient to allege that all of an organization's members are harmed.  *S. Walk at Broadlands*, 713 F.3d at 185.  NCFA has alleged that all of its member agencies have been harmed by the 2015 Guidelines, Compl. ¶ 38-39, and the

government does not identify a genuine issue of material fact on that issue. But if this Court were interested, NCFA could readily supplement its declaration with the specific names of members who are injured by the 2015 Guidelines.

Finally, vacatur of the 2015 Guidelines would redress NCFA's and its members' injuries. The government argues that "even if this Court orders the 2015 Guidelines withdrawn, state courts and child welfare agencies may still apply the interpretations and practices recommended there." That is nonsense. Absent the commands of the 2015 Guidelines, state courts must follow state law in child custody proceedings, unless ICWA itself speaks to the particular issue. The government alleges that some states follow some of the "practices" commanded by the 2015 Guidelines, but cannot deny that some do not—and would not, absent the 2015 Guidelines' commands. That is the very reason the 2015 Guidelines were issued. Vacatur of the 2015 Guidelines would therefore redress NCFA's and its members' injuries.

## CONCLUSION

For the foregoing reasons, this Court should hold unlawful and set aside the 2015 Guidelines and grant summary judgment in NCFA's favor on its APA claims.

Date:  September 14, 2015                    Respectfully submitted,

<u>Jacob S. Siler</u>
JACOB S. SILER (Va. Bar No. 80934)
MATTHEW D. MCGILL (*pro hac vice*)
ROBERT GONZALEZ (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

LORI ALVINO MCGILL (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN LLP
777 6th Street, N.W.
Washington, DC 20001
Telephone:  (202) 538-8210
Facsimile:  (202) 538-8100

MARK D. FIDDLER (*pro hac vice* pending)
FIDDLER LAW OFFICE, P.A.
6800 France Avenue So., Suite 190
Minneapolis, MN  55435
Telephone:  (612) 822-4095
Facsimile:  (612) 822-4096

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of September, 2015, I will cause to be electronically filed the foregoing with the Clerk of the Court for the Eastern District of Virginia using the CM/ECF system, which will send a notification of such filing to the following:

> Dennis C. Barghaan, Jr.
> Assistant U.S. Attorney
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> Telephone: (703) 299-3891
> Fax: (703) 299-3983
> Email: dennis.barghaan@usdoj.gov

Date:  September 14, 2015

> Jacob S. Siler
> JACOB S. SILER (Va. Bar No. 80934)
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, DC  20036
> Telephone:  (202) 955-8500
> Facsimile:  (202) 467-0539
>
> *Counsel for Plaintiffs*