## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| NATIONAL COUNCIL FOR ADOPTION BUILDING ARIZONA FAMILIES on behalf of itself and its birth-parent clients, birth parents D.V. and N.L., and baby boy T.W. by and through his guardian ad litem PHILIP (JAY) MCCARTHY, JR., <br><br>　　　　　Plaintiffs, <br><br>　　v. <br><br> SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior, KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs, BUREAU OF INDIAN AFFAIRS, and the UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br>　　　　　Defendants. | Civil Action No. 1:15cv00675 |

## BRIEF OF AMICI CURIAE NATIONAL CONGRESS OF AMERICAN INDIANS, ASSOCIATION ON AMERICAN INDIAN AFFAIRS, AND NATIONAL INDIAN CHILD WELFARE ASSOCIATION

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* file this Corporate Disclosure Statement, as required by Rule 7.1(A)(1)(a) of the Local Rules for the Eastern District of Virginia.

The National Congress of American Indians, the Association on American Indian Affairs, and the National Indian Child Welfare Association are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in *amici curiae*. Therefore, *amici curiae* have nothing to report under Rule 7.1(A)(1)(a) of the Local Rules for the Eastern District of Virginia.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................................................ i

INTRODUCTION ........................................................................................................................1

INTEREST OF AMICI CURIAE.................................................................................................3

ARGUMENT ...............................................................................................................................5

I.    CONGRESS ENACTED ICWA IN RESPONSE TO THE WIDESPREAD ABUSES
COMMITTED BY STATE CHILD WELFARE SYSTEMS AGAINST INDIAN
CHILDREN AND FAMILIES. ..........................................................................................5

II.   BECAUSE ICWA IS IMPLEMENTED BY STATE COURT SYSTEMS THE BIA'S
GUIDELINES ARE NECESSARY FOR UNIFORM INTERPRETATION OF THE
LAW. ................................................................................................................................9

      A.    ICWA's Procedural and Substantive Provisions .............................................9

      B.    The Guidelines are Critically Necessary for ICWA's Uniform
Application across State Child Welfare Systems. ......................................12

III.  BECAUSE SOCIAL WORK PRACTICE AND CHILD WELFARE LAW HAS
PROGRESSED CONSIDERABLY IN THE PAST THIRTY-SIX YEARS REVISIONS
TO THE GUIDELINES WERE APPROPRIATE AND NECESSARY. .........................16

CONCLUSION...........................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Adoptive Couple v. Baby Girl*,
   133 S. Ct. 2552 (2013) .......................................................................................2

*Ex parte Burrus*,
   136 U.S. 586 (1890) ..........................................................................................17

*Fisher v. Dist. Ct.*,
   424 U.S. 382 (1976) ..........................................................................................14

*Mississippi Band of Choctaw Indians v. Holyfield*,
   490 U.S. 30 (1989) ..................................................................................... *passim*

*Morton v. Mancari*,
   417 U.S. 553 (1974) ..........................................................................................10

*Oglala Sioux Tribe v. Van Hunnick*,
   No. CIV. 13-5020-JLV, 2015 WL 1466067 (D.S.D. Mar. 30, 2015) ........................2

*Rice v. Cayetano*,
   528 U.S. 495 (2000) ....................................................................................10, 11

*Santa Clara Pueblo*,
   436 U.S. 49 (1978) .......................................................................................11, 17

*Seminole Nation v. United States*,
   316 U.S. 286 (1942) ............................................................................................9

*Seminole Tribe v. Florida*,
   517 U.S. 44 (1996) .............................................................................................10

*Smith v. Offer*,
   431 U.S. 816 (1977) ...........................................................................................13

*United States v. Wheeler*,
   435 U.S. 313 (1978) ...........................................................................................11

## State Cases

*Adoption of Riffle*,
   922 P.2d 510 (Mont. 1996) .................................................................................13

*C.L. v. P.C.S.*,
  17 P.3d 769 (Alaska 2001)....................................................................................13

*In re Damian C.*,
  178 Cal. App. 4th 192 (2009) ...............................................................................15

*In re Jayden D.*,
  842 N.W.2d 199 (Neb. Ct. App. 2013)..................................................................15

*Matter of N.L.*,
  754 P. 2d 863 (Okla. 1988)...................................................................................13

*Native Vill. of Tununak v. State, Dep't of Health & Social Servs., Office of*
  *Children's Servs.*,
  303 P.3d 431 (Alaska 2013)..................................................................................12

*In re Shane G.*,
  166 Cal. App. 4th 1532 ( 2008) ............................................................................15

*In re Welfare of Child of T.T.B. & G.W.*,
  724 N.W.2d 300 (Minn. 2006)..............................................................................15

## Constitutional Provisions

U.S. CONST.,
  Article I, § 8, cl. 3 ...................................................................................................9

## Federal Laws

25 U.S.C.
  § 1901...................................................................................................................1, 9
  § 1902......................................................................................................................9
  § 1903...............................................................................................................10, 11
  § 1911...............................................................................................................11, 14
  § 1911.....................................................................................................................14
  § 1912.........................................................................................................11, 15, 16
  § 1915...............................................................................................................11, 12

42 U.S.C.
  § 622(a)...................................................................................................................17
  § 670.......................................................................................................................17
  § 1305.....................................................................................................................18

Adoption and Safe Families Act,

Pub. L. No. 105-89, 111 Stat. 2115 (1997)................................................................18

Adoption Assistance and Child Welfare Act,
    Pub. L. No. 96- 272, 94 Stat. 500 (1980)...............................................................18

Child Abuse Prevention Adoption and Family Services Act,
    Pub. L. No. 100-294, 102 Stat. 102 (1988)............................................................18

Child and Family Services Improvement and Innovation Act,
    Pub. L. No. 112-34, 125 Stat. 369 (2011)..............................................................18

Fostering Connections to Success and Increasing Adoptions Act,
    Pub. L. No. 110-351, 112 Stat. 3949 (2008)..........................................................18

Keeping Children and Families Safe Act,
    Pub. L. No. 95-266, 2 Stat. 205 (2003).................................................................18

Multiethnic Placement Act,
    Pub. L. No. 103-382, 108 Stat. 3518 (1994)..........................................................18

Preventing Sex Trafficking and Strengthening Families Act,
    Pub. L. No. 113-183, 128 Stat. 1919 (2014)..........................................................18

Safe and Strengthening Abuse and Neglect Courts,
    Pub. L. No. 106-314, 114 Stat. 1266 (2000)..........................................................18

Safe and Timely Interstate Placement of Foster Children Act,
    Pub. L. No. 109-239, 120 Stat. 508 (2006)............................................................18

## **Legislative History**

*Indian Child Welfare Program: Hearings before the Subcommittee on Indian
    Affairs of the Senate Committee on Interior and Insular Affairs*, 93rd Cong, 2d
    Sess., (1974) ...................................................................................... *passim*

*Hearing on S. 1214,* 95th Cong. (1978)........................................................................6

*Hearing on S. 1214 Before the Select Comm. on Indian Affairs*, 95th Cong. 142
    (1977).....................................................................................................7

H.R. REP. No. 95-1386 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530................................ *passim*

S. REP. No. 95-597 (1977) ........................................................................................8

124 CONG. REC. 38,103 (1978).............................................................................6, 8

## Administrative Materials

American Indian Affairs, *Comments on Bureau of Indian Affairs Guidelines for State Courts: Indian Child Custody Proceedings* (Apr. 2014) *available at* https://turtletalk.files.wordpress.com/2014/05/bia-icwa-guideline-comments_nicai_ncai_narf_aaia.pdf ....................................................................................20

Guidelines for State Courts in Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979)............................................................. *passim*

Guidelines for State Courts in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015) ............................................................. *passim*

Letter Re: Comments on BIA Guidelines from Barbara Atwood, University of Arizona College of Law, et al, to Assistant Secretary Kevin Washburn, Department of the Interior 10-12 (Apr. 30, 2014) *available at* https://turtletalk.files.wordpress.com/2014/05/biaguidelinecommentsprofsfinal.pdf ...............................................................................................................3

Letter Re: Notice of Proposed Rulemaking – Regulations for State Courts and Agencies in Indian Custody Proceedings – RIN 1076-AF25 from Casey Family Programs to Elizabeth Appel, Office of Regulatory Affairs and Collaborative Action, Bureau of Indian Affairs  (May 19, 2015) *available at* http://www.nativeamericanbar.org/wp-content/uploads/2014/01/CFP-et-al-Support-Letter-Re-Proposed-ICWA-Regulations.pdf. .............................................2

## Other Materials

Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 EMORY L.J. 587 (2002) ..........................13

Casey Family Programs to Elizabeth Appel, Office of Regulatory Affairs and Collaborative Action, Bureau of Indian Affairs 1 (May 19, 2015) *available at* http://www.nativeamericanbar.org/wp-content/uploads/2014/01/CFP-et-al-Support-Letter-Re-Proposed-ICWA-Regulations.pdf .............................................2

CHILD WELFARE FOR THE TWENTY-FIRST CENTURY: A HANDBOOK OF PRACTICES, POLICIES, AND PROGRAMS (Gerard P. Mallon & Peg McCartt Hess, eds, 2005).....................18

ELLEN SLAUGHTER, INDIAN CHILD WELFARE: A REVIEW OF THE LITERATURE (1976) *available at* http://files.eric.ed.gov/fulltext/ED138422.pdf ...........................................5

FACING THE FUTURE, THE INDIAN CHILD WELFARE ACT AT 30 (Matthew L.M. Fletcher et al., eds., 2009) ................................................................18, 19

Megan Scanlon, *From Theory to Practice: Incorporating the "Active Efforts" Requirement in Indian Child Welfare Act Proceedings*, 43 ARIZ. ST. L.J. 629 (2011).................................................................................................................................16

MARGARET JACOBS, A GENERATION REMOVED: THE FOSTERING AND ADOPTION OF INDIGENOUS CHILDREN IN THE POSTWAR WORLD (2014) ......................................................5

Palmiste, Claire, *From the Indian Adoption Project to the Indian Child Welfare Act: the Resistance of Native American Communities*, Indigenous Policy Journal, Vol XXII, No. 1 (Summer 2011) ...............................................................................5

Press Release, National Council of Juvenile and Family Court Judges, *NCJFCJ Encourages Judges to Apply Revised BIA ICWA Guidelines* (May 9, 2015), *available at* http://www.ncjfcj.org/ICWA-Revised..................................................................21

## INTRODUCTION

Congress enacted the Indian Child Welfare Act of 1978 (ICWA or the "Act"), 25 U.S.C. § 1901 *et seq.*, in response to a nationwide crisis — namely, the widespread and wholesale displacement of Indian children from their families by State and private child welfare agencies at rates far disproportionate to those of non-Indian families.  Studies and Congressional testimony revealed the devastating impact of this displacement on Indian tribes and families and identified significant and pervasive abuses in state child welfare and private adoption practices as contributing to these harms.[1]  As a result, ICWA was carefully crafted to protect the rights of Indian children, families, and tribes by establishing federal standards to govern state child welfare proceedings involving Indian children.

During the years prior to ICWA's passage, state social workers, sometimes with the complicity of the federal government, routinely removed Indian children from their homes and schools based on vague allegations of poverty and neglect.  H.R. REP. No. 95-1386, at 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532 ("H.R. REP. No. 95-1386").  By 1978, "an alarmingly high percentage" of Indian children had been "placed in non-Indian foster homes and institutions." 25 U.S.C. § 1901(4).  In passing ICWA, Congress intended to combat this deliberate, collaborative abuse of the child welfare system and to restore the integrity of Indian families and Indian tribes.

To further these Congressionally-mandated goals, the BIA in 1979 published its Guidelines for State Courts in Indian Child Custody Proceedings.  44 Fed. Reg. 67,584 (Nov. 26, 1979) ("1979 Guidelines").  Since their publication, the 1979 Guidelines have proven an

---

[1] For this Court's convenience, the legislative history underlying the enactment of the Indian Child Welfare Act may be found publicly on the website of the National Indian Law Library. LEGISLATIVE HISTORY, INDIAN CHILD WELFARE ACT OF 1978, http://www.narf.org/nill/documents/icwa/federal/lh.html (last visited Sept. 18, 2015).

invaluable tool to state courts applying ICWA in countless child welfare cases across the nation. But as useful as the 1979 Guidelines have been, much has changed in the 35 years since they were published:  Congress has enacted further legislation affecting state child welfare practices generally, the U.S. Supreme Court has twice been called upon to interpret ICWA's statutory language,[2] and state courts have delivered inconsistent interpretations of — and sometimes ignored outright — ICWA's mandates.

Recognizing these changes, the BIA published earlier this year the first revision of the Guidelines since 1979.  Guidelines for State Courts in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015) ("2015 Guidelines").  The 2015 Guidelines synthesize thirty-six years of case law, legislative changes, and evolution in social work practice in order to provide state courts with additional guidance and clarity in implementing the law.

This revised guidance is sorely needed, as many of the problems ICWA sought to remediate persist today, largely through misapplication or misinterpretation.  Indeed, just this year the United States District Court for South Dakota found that a South Dakota state judge and the State Department of Social Services [DSS] systematically "failed to protect Indian parents' fundamental rights to a fair hearing by not allowing them to present evidence to contradict the State's removal documents" and "by not allowing the parents to confront and cross-examine DSS witnesses . . . . Indian children, parents and tribes deserve better."  *Oglala Sioux Tribe v. Van Hunnick*, No. CIV. 13-5020-JLV, 2015 WL 1466067, at *20, *34 (D.S.D. Mar. 30, 2015).

---

[2] *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989); *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552 (2013).

*Amici* and other mainstream child welfare organizations continue to view the law as the "gold standard" for child protection.[3]  Together with ICWA's statutory language, BIA's 2015 Guidelines provide a critical update to a trusted legal source cited in more than forty state supreme court opinions.[4]

Plaintiffs, consisting of several adoption organizations and individual Arizona residents, filed this action challenging the validity of the 2015 Guidelines and the constitutionality of the Indian Child Welfare Act.  In so doing, Plaintiffs would have this Court undo decades of progress in child welfare made possible by ICWA.  *Amici* agree with Defendants that this Court should decline Plaintiffs' invitation and dismiss this matter for the reasons stated in Defendants' Memorandum of Law in Support of Motion to Dismiss (Doc. 52), but write separately to address the critical nature of ICWA and the Guidelines to the preservation of Indian children, families, and tribes.

## INTEREST OF AMICI CURIAE

*Amici* are three national organizations dedicated to the interests of American Indians and Indian tribes.  Collectively, *amici* share a commitment to the well-being of Indian children and an understanding that the ICWA is essential to the protection of Indian children and their families, and to the continued vitality of tribes.  *Amici* and their members share a substantial interest in promoting and securing national conformity with the procedural mandates of ICWA

---

[3] *See* Letter Re: Notice of Proposed Rulemaking – Regulations for State Courts and Agencies in Indian Custody Proceedings – RIN 1076-AF25 from Casey Family Programs to Elizabeth Appel, Office of Regulatory Affairs and Collaborative Action, Bureau of Indian Affairs 1 (May 19, 2015) *available at* http://www.nativeamericanbar.org/wp-content/uploads/2014/01/CFP-et-al-Support-Letter-Re-Proposed-ICWA-Regulations.pdf.
[4] *See* Letter Re: Comments on BIA Guidelines from Barbara Atwood, University of Arizona College of Law, et al, to Assistant Secretary Kevin Washburn, Department of the Interior 10-12 (Apr. 30, 2014) *available at* https://turtletalk.files.wordpress.com/2014/05/biaguidelinecommentsprofsfinal.pdf.

and the important protections for tribes and Indian families in state child welfare and adoption proceedings that these mandates provide.

*Amicus* National Congress of American Indians (NCAI) is the largest national organization addressing American Indian interests, and represents more than 250 American Indian Tribes and Alaskan Native villages since 1944.  As part of its efforts, NCAI has worked closely with state governments and organizations to develop productive models of state-tribal cooperation, including cooperation relating to Indian child welfare.

*Amicus* Association on American Indian Affairs (AAIA) is a 93-year-old Indian advocacy organization that began its active involvement in Indian child welfare issues in 1967. AAIA studies were a central focus of the legislative hearings and committee reports underlying the enactment of ICWA, and, at the invitation of Congress, AAIA was closely involved in the drafting of the Act.  Since 1978, AAIA has continued to work with tribes to implement ICWA.

*Amicus* National Indian Child Welfare Association (NICWA) is a non-profit membership organization founded in 1987 and dedicated to the well-being of American Indian and Alaska Native children and families.  NICWA is committed to efforts to protect and preserve ICWA, and promotes ICWA compliance through trainings and technical assistance, research, advocacy, and information sharing.

## ARGUMENT

I.   **CONGRESS ENACTED ICWA IN RESPONSE TO THE WIDESPREAD ABUSES COMMITTED BY STATE CHILD WELFARE SYSTEMS AGAINST INDIAN CHILDREN AND FAMILIES.**

Congress did not enact ICWA in a vacuum.  In 1959, the Bureau of Indian Affairs ("BIA") along with Child Welfare League of American ("CWLA") created the "Indian Adoption Project." Palmiste, Claire, *From the Indian Adoption Project to the Indian Child Welfare Act: the Resistance of Native American Communities*, Indigenous Policy Journal, Vol XXII, No. 1, at 1 (Summer 2011).  The policy mandated that Indian children were to be adopted out to primarily non-Indian families  in order to reduce the populations of Indian reservations, lower federal education costs, and address the growing demand for adoptive children.  *Id.*, at 1, 3.  Project-approved state agencies took on the responsibility of enacting this policy of "Indian extraction." ELLEN SLAUGHTER, INDIAN CHILD WELFARE: A REVIEW OF THE LITERATURE (1976) 61 *available at* http://files.eric.ed.gov/fulltext/ED138422.pdf.[5]

The abuses that followed are well documented.  During the years prior to the final vote on the Act in 1978, Congressionally-commissioned reports and wide-ranging testimony taken from "the broad spectrum of concerned parties, public and private, Indian and non-Indian," H.R. REP. No. 95-1386, at 28, wove together a chilling narrative — state and private child welfare agencies, with the backing of many state courts and the collaboration of the federal government, had engaged in the systematic removal of Indian children from their families without evidence of harm or due process of law.  By the time of ICWA's passage, state agencies had removed

---

[5] In taking on this responsibility state child welfare systems became, in many ways, successors to the devastating federal boarding school era—a period where federal government sponsored programs removed native children from their communities and placed them without parental consent in military-style boarding schools. *See* MARGARET JACOBS, A GENERATION REMOVED: THE FOSTERING AND ADOPTION OF INDIGENOUS CHILDREN IN THE POSTWAR WORLD 6 (2014); *see also* House Report 95-1386 at 9.

between 25 and 35 percent of all Indian children nationwide from their families, placing about 90 percent of those removed children in non-Indian homes.  *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32-33 (1989) (*citing Indian Child Welfare Program: Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs*, 93rd Cong, 2d Sess., 15, 75-83 (1974) (statement of William Byler) ("1974 Hearings")).  Of those removals, 99 percent were cited for vague reasons of "neglect" or "social deprivation," and the emotional damage the children might be subject to by continuing to live with their Indian families.  House Report 95-1386 at 10.

In conducting removals of Indian children, State officials, agencies, and procedures "fail[ed] . . . to take into account the special problems and circumstances of Indian families and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future."  House Report 95-1386 at 19, *see also Holyfield*, 490 U.S. at 45, n.18 ("'[S]tate courts and agencies and their procedures share a large part of the responsibility' for crisis threatening 'the future and integrity of Indian tribes and Indian families.'") (*citing* 124 Cong. Rec. 39,103 (letter of Rep. Morris Udall to Assistant Atty. Gen. Patricia M. Wald)).  Many removals by child welfare agencies were conducted with "no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing," which excluded Indian family members as the most appropriate — or even viable — placements. *Holyfield*, 490 U.S. at 34-35 (*citing Hearing on S. 1214,* 95th Cong. 191-92 (1978) (statement of the Nat'l Tribal Chairmen's Assoc.)).

In fact, Congress found that "many social workers, ignorant of Indian cultural values and social norms, make decisions that are wholly inappropriate in the context of Indian family life and so they frequently discover neglect or abandonment where none exists."  House Report 95-

1386, at 10; *see also id*. at 10 (" . . . the dynamics of Indian extended families are largely

misunderstood.  An Indian child may have scores of, perhaps more than a hundred, relatives who

are counted as close, responsible members of the family."); 1974 Hearings at 473 (statement of

Sen. Abourezk) ("We've had testimony here that in Indian communities throughout the Nation

there is no such thing as an abandoned child because when a child does have a need for parents

for one reason or another, a relative or friend will take that child in. It's the extended family

concept."); *Holyfield*, 490 U.S. at 35, n.4.  Legislation ultimately enacted as ICWA thus

contained protections that, in the words of one clinical psychologist and hearing witness,

"support the general proposition that it is in the best interests of [Indian] children to be raised by

their natural family and that every opportunity should be provided to maintain the integrity of the

natural family."  *Hearing on S. 1214 Before the Select Comm. on Indian Affairs*, 95th Cong. 142

(1977) (statement of Marlene Echohawk, Ph.D., NCAI) ("1977 Hearings").

 Congress also expressed particular concerns about the failure of both state and private

adoption agencies to utilize Indian families for placement.  *See, e.g.*, 1974 Hearings at 61

(testimony of Dr. Carl Mindell, Department of Psychiatry and Child Psychiatry, Albany Medical

College) ("[W]elfare agencies tend to think of adoption too quickly without having other options

available . . . Once you're at the point of thinking about adoption . . . welfare agencies are not

making adequate use of the Indian communities themselves. They tend to look elsewhere for

adoption type of homes."); *id.* at 117 (statement of Mel Sampson, Northwest Affiliated Tribes)

("The standards that have been established by adoption agencies have created an additional

burden . . . as they are white status quo oriented . . . As you well know, this automatically leaves

the Indian out."); 1977 Hearings at 271 (testimony of Virgil Gunn, Chairman of the Health,

Education and Welfare Committee of the Colville Tribal Business Council) ("Through various

ways, the State of Washington public assistance and private placing agencies can completely go around the issue and place without contact to that child's tribe, until the action is completed and irreversible"); *see also* 1974 Hearings at 147 (testimony of Leon Cook, Dept. of Indian Work).

The result of this Indian child welfare crisis was dire: "[t]he wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today."  House Report 95-1386 at 9; *see also* 124 CONG. REC. 38,103 (1978) (statement of Rep. Lagomarsino) ("[f]or Indians generally and tribes in particular, the continued wholesale removal of their children by nontribal government and private agencies constitutes a serious threat to their existence as ongoing, self-governing communities)"; *id*. at 38,102 (statement of sponsor Rep. Morris Udall) ("Indian tribes and Indian people are being drained of their children and, as a result, their future as a tribe and a people is being placed in jeopardy"); *Holyfield,* 490 U.S. at 34, n.3.  Abusive child welfare practices also proved harmful to Indian children.  Congress was concerned about "the placement of Indian children in non-Indian homes . . . based in part on evidence of the detrimental impact on the children themselves of such placement outside their culture." *Holyfield*, 490 U.S. at 49-50.  Congress heard multiple examples of Indian children placed in non-Indian homes later suffering from identity crises when they reached adolescence and adulthood. *See, e.g.*, 1974 Hearings at 114 (statement of James Shore, former Chief, Mental Health Office, Portland Area Indian Health Service, and William Nicholls, Director, Health, Welfare and Social Services, Confederated Tribes of The Warm Springs Reservation).  Such testimony led Congress to conclude that "[r]emoval of Indians from Indian society has serious long-and short-term effects . . . for the individual child . . . who may suffer untold social and psychological consequences." S. REP. No. 95-597, at 43 (1977).

Congress explicitly recognized and attempted to remediate this national crisis through ICWA — a statute designed to establish "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes," 25 U.S.C. § 1902, to be implemented by state and private agencies and applied by state courts with the intention "to promote the stability and security of Indian tribes and families." *Id.* The Congressional findings further "make[] clear that the underlying principle of the bill is in the best interest of the Indian child." House Report 95-1386 at 19; 25 U.S.C. § 1902 ("Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children . . ."). At its core, ICWA "seeks to protect the rights of the Indian child *as an Indian* and the rights of the Indian community and tribe in retaining its children in its society . . . by establishing 'a Federal policy that wherever possible, an Indian child should remain in the Indian community.'" *Holyfield*, 490 U.S. at 37 (1989) (*quoting* House Report 95-1386, at 23) (emphasis added).

## II. BECAUSE ICWA IS IMPLEMENTED BY STATE COURT SYSTEMS THE BIA'S GUIDELINES ARE NECESSARY FOR UNIFORM INTERPRETATION OF THE LAW.

### A. ICWA'S PROCEDURAL AND SUBSTANTIVE PROVISIONS

The United States has a "distinctive obligation of trust" to federally recognized tribes. *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942). ICWA explicitly recognizes this obligation in no uncertain terms:

> Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources . . . there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe.

25 U.S.C. §§ 1901(2)-(3).  The findings also explicitly recognize Congress' exclusive

constitutional authority to legislate Indian affairs. 25 U.S.C. § 1901(1); s*ee also* U.S. CONST. art.

I, § 8, cl. 3 (charging Congress with the exclusive authority to "regulate commerce . . . with the

Indian Tribes"); *Seminole Tribe v. Florida*, 517 U.S. 44, 62 (1996) (summarizing the Indian

Commerce Clause's broad grant of authority to Congress over Indian affairs); *Rice v. Cayetano*,

528 U.S. 495, 519 (2000) ("Congress may fulfill its treaty obligations and its responsibilities to

the Indian tribes by enacting legislation dedicated to their circumstances and needs.").

However, ICWA is unique within the body of federal Indian law in that, while "the main

effect" of the statute "is to curtail state authority," *Holyfield*, 490 U.S. at 45 n.17, the primary

responsibility for carrying out ICWA's mandate is left to the states.  Generally, ICWA provides

the framework for its application, defining to whom it applies and under what circumstances.  It

also provides various procedural and substantive mandates to protect Indian families and

children under the jurisdiction of state court systems.  *Holyfield*, 490 U.S. at 36.

ICWA applies only to child custody proceedings involving an "Indian child." 25 U.S.C. §

1903(4).  This definition does not, as Plaintiffs claim, include children "based solely on their

ancestry."  *Complaint* (Doc. 1) at 32.  Rather, ICWA's application is directly tied to the child's

membership in a federally recognized tribe or her eligibility to be enrolled in a federally

recognized tribe.  25 U.S.C. § 1903(4).  This membership-based definition is clearly based on the

political status of the child, and not the child's race.  *See Morton v. Mancari*, 417 U.S. 553, 553-

55, 553 n.24 (1974).  And indeed, ICWA's definition of "Indian child" is such that it is likely to

"exclude many individuals who are racially to be classified as 'Indians'" but that do not

otherwise qualify for membership.  *See id.*[6]  The Supreme Court's pronouncements on this point are clear:  "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."  *Santa Clara Pueblo*, 436 U.S. 49, 72 n.32 (1978); *Rice*, 528 U.S. at 527 ("[A] Native American tribe has broad authority to define its membership."); *United States v. Wheeler*, 435 U.S. 313, 322 (1978) (same).  Under this broad political authority, the fact that some federally recognized tribes might employ blood quantum or descendancy as a means to define membership is entirely irrelevant.

ICWA's mandates apply to four defined types of state child custody proceedings:  (1) foster care placement; (2) termination of parental rights; (3) preadoptive placement; and (4) adoptive placement.  25 U.S.C. § 1903(1).  The Act also delineates the division of jurisdiction in such proceedings between tribal and state courts, *see* 25 U.S.C. § 1911, and provides explicit protections for families in state court proceedings that involve the involuntary removal of an Indian child from her parent or Indian custodian, *see, e.g.*  25 U.S.C. § 1912(d) and (e) (requiring that the party seeking to effect the removal prove to a court that "active efforts have been made to prevent the breakup of the Indian family" and that the continued custody of the child by the parent or Indian custodian is "likely to result in serious emotional or physical damage").  ICWA requires that "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . ." 25 U.S.C. § 1912(a).

---

[6] *Amici* agree with Defendants (Doc. 52 at 19-28) that, based on *Mancari* and other authority, ICWA easily passes constitutional muster.  Accordingly, those arguments will not be repeated at length here.

The "most important substantive requirement imposed on state courts" in the Act are the adoptive placement preferences codified at 25 U.S.C. § 1915. *Holyfield*, 490 U.S. at 36-37. These preferences establish a "Federal policy that, where possible, an Indian child should remain in the Indian community," and that Indian child welfare decisions should not be made according to "white, middle-class standard[s] which, in many cases, foreclose[] placement with [an] Indian family." *Id*. at 37 (*quoting* House Report 95-1386, at 24).

**B.   THE GUIDELINES ARE CRITICALLY NECESSARY FOR ICWA'S UNIFORM APPLICATION ACROSS STATE CHILD WELFARE SYSTEMS.**

The *Holyfield* Court explicitly recognized the need for uniformity in the interpretation and application of ICWA's terms:

> [M]ost fundamentally, the purpose of the ICWA gives no reason to believe that Congress intended to rely on state law for the definition of a critical term; quite the contrary. It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-a-vis state authorities.

*Holyfield*, 490 U.S. at 44.  State courts have echoed the need for uniformity in interpreting ICWA's terms.  *See e.g. Native Vill. of Tunanak v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 303 P.3d 431, 448-49 (Alaska 2013) (surveying other state court interpretations of ICWA's required burdens of proof), *order vacated in part*, 334 P.3d 165 (Alaska 2014), *reh'g denied* (June 10, 2015).  Since 1979, state courts have regularly used the Guidelines to assist their interpretation and implementation of ICWA within their respective child welfare systems.  The Guidelines serve as a critical bridge between the BIA, the federal agency charged with overseeing Indian affairs, and the state courts responsible for implementing and integrating ICWA into the day-to-day mechanics of the state child welfare systems.  The

revised Guidelines provide much needed clarity in areas where state courts have struggled over the past 35 years to effectively implement ICWA.  Four brief examples illustrate this point.

 *Placement Preferences.*  ICWA enumerates lists of preferred placements for Indian children removed from their homes and subject to foster care, preadoptive, or adoptive proceedings in state court.  25 U.S.C. § 1915(a)-(b).  Sections 1915(a)-(b) mandate that, absent good cause to the contrary, Indian children shall be placed according to the stated preferences.  However, "ICWA does not define good cause, nor does it set forth factors to be considered in determining whether good cause exists."  *C.L. v. P.C.S.*, 17 P.3d 769, 773 (Alaska 2001).

 The 1979 Guidelines sought to bridge this gap by providing factors for state courts to consider when charged with making this "good cause determination."  1979 Guidelines at 67,594.  The Guidelines were written specifically to discourage courts from applying a "best interest" analysis in support of a good cause determination:

> Conspicuously absent from the list of justifications for deviating from the placement preferences is a determination that adherence to the preferences would not be within the child's best interests-presumably because the BIA did not wish to invite state courts to engage in a highly discretionary and potentially biased analysis.

Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 EMORY L.J. 587, 643-644 (2002); 1979 Guidelines, § D.3 (commentary) ("A child may not be removed simply because there is someone else willing to raise the child who is likely to do a better job or that it would be 'in the best interests of the child' for him or her to live with someone else"); House Report 95-1386, at 19 (noting that "judges too may find it difficult, in utilizing vague standards like 'the best interests of the child,' to avoid decisions resting on subjective values") (*quoting Smith v. Offer*, 431 U.S. 816, 835 n.36 (1977)).

- 13 -

Despite this history, confusion subsequently arose over whether to apply this subjective standard to ICWA's placement preferences.  *Compare, e.g.*, *Matter of Adoption of Riffle*, 922 P.2d 510, 514 (Mont. 1996) (finding it "most improbable that Congress intended to allow state courts to find good cause wherever they determined that a placement outside the preferences . . . was in the Indian child's best interests") *with Matter of N.L.*, 754 P. 2d 863, 870 (Okla. 1988) (court should consider whether "good cause" exception to placement preferences "is met by the child's best interests").  The 2015 Guidelines provide additional clarity in this regard, recommending that while the "extraordinary physical or emotional needs of the child" may warrant good cause to deviate from the placement preferences, such a determination should not include an "independent consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the act."  2015 Guidelines, § F.4.[7]  As noted above, this recommendation is consistent with the view of ICWA's legislative history, the 1979 Guidelines, scholars, and courts alike.

*Jurisdiction*.  While "[t]ribal jurisdiction over Indian child custody proceedings is not a novelty of the ICWA," *Holyfield*, 490 U.S. at 42, ICWA provides that tribal courts have *exclusive* jurisdiction over custody proceedings involving Indian children domiciled in Indian Country.  25 U.S.C. § 1911(a), *see also Fisher v. Dist. Ct.*, 424 U.S. 382 (1976).  In addition, the statute provides that tribal courts have *concurrent* and *presumptive* jurisdiction over Indian child custody cases where the child is domiciled outside of Indian Country.  25 U.S.C. § 1911(b);

---

[7] Plaintiffs, in excoriating the 2015 Guidelines for making clear here what the 1979 Guidelines already implicitly recommended, effectively concede that their real argument is not with the Guidelines, but with the statute.  *See* Complaint (Doc. 1) at 7 (claiming that "ICWA's subordination of the best interests of "Indian children" discriminates against those children on the basis of their  "Indian ancestry" . . .).  As demonstrated above and by Defendants, this argument is wholly without merit.

*Holyfield*, 490 U.S. at 36.  At the request of a parent or of the tribe, the state shall transfer

jurisdiction of an Indian child welfare case to tribal jurisdiction.  25 U.S.C. § 1911(b).

However, the law also allows a state court to deny a tribe's request to transfer if there is

"good cause" to do so.  *Id.*  Determining what constitutes "good cause" to deny transfer has been

the subject of considerable litigation, in part because the 1979 Guidelines permitted denial of a

tribe's request to transfer if the matter was at an "advanced stage of the proceedings."  With no

other guidance, state courts have split on when a proceeding was at an "advanced stage."

*Compare, In re Welfare of Child of T.T.B. & G.W.*, 724 N.W.2d 300, 307-08 (Minn. 2006)

(affirming denial of transfer and considering the 1979 Guidelines) *with In re Jayden D.*, 842

N.W.2d 199, 206 (Neb. Ct. App. 2013) (reversed and ordered transfer, stating that foster care and

termination of parental rights are separate proceedings for an advanced stage analysis).  To

address this quandary, the revised Guidelines explicitly state that courts should no longer

consider if a case is at an advance stage of the proceedings when a transfer request is made.

2015 Guidelines, § C.3(c).

*Notice*.  Described by the Department of the Interior at the time of passage as "a major

element" of the Act, House Report 95-1386 at 31 (Report of the Department of the Interior, June

6, 1978), ICWA requires that a state court in an involuntary proceeding involving an Indian child

provide "notice" to the parent or Indian custodian and the Indian child's tribe.  25 U.S.C. §

1912(a).  But ICWA does not expressly define what events trigger notice, nor does it enumerate

what constitutes adequate notice.  The 1979 Guidelines included specific recommendations

concerning the provision of, and the information to be included in, notice to tribes.  1979

Guidelines, § B.5.  However, despite this guidance, disagreements have arisen in many state

courts (and sometimes courts within the same state) concerning when notice is required and what

information is to be included in the notice.  *Compare In re Damian C.*, 178 Cal. App. 4th 192

(2009) *with In re Shane G.*, 166 Cal. App. 4th 1532 ( 2008).  The 2015 revisions seek to rectify

this confusion through additional clarification about when ICWA's notice requirement is

triggered, 2015 Guidelines, § A.3(c)-(d), as well as what types of information the notice should

contain.  2015 Guidelines, § B.6.

     *Active Efforts.*  As noted above, ICWA requires that "active efforts" be made to "provide

remedial services and rehabilitative programs designed to prevent the breakup of an Indian

family."  25 U.S.C. 1912(d).  The 1979 Guidelines explain that active efforts "shall take into

account the prevailing social and cultural conditions and the way of life of the Indian child's

tribe. They shall also involve and use the available resources of the extended family, the tribe,

Indian social services agencies, and individual Indian care givers."  1979 Guidelines, § D.2.

Many state courts have drawn upon this guidance to find that active efforts require more than the

standard services offered parents in non-ICWA cases; however, others have concluded that

ICWA's "active efforts" requirement is equivalent to the reunification services offered in a non-

ICWA case — "reasonable efforts."  *See* Megan Scanlon, *From Theory to Practice:*

*Incorporating the "Active Efforts" Requirement in Indian Child Welfare Act Proceedings*, 43

ARIZ. ST. L.J. 629, 629 (2011) (compiling cases).  The 2015 Guidelines address these

inconsistencies by providing a clear definition of active efforts, enumerating more than a dozen

factors constituting active efforts, and specifically stating that active efforts is a higher standard

than "reasonable efforts."  2015 Guidelines, § A.2.

**III.   BECAUSE SOCIAL WORK PRACTICE AND CHILD WELFARE LAW HAS
PROGRESSED CONSIDERABLY IN THE PAST THIRTY-SIX YEARS
REVISIONS TO THE GUIDELINES WERE APPROPRIATE AND NECESSARY.**

Much of child welfare practice has changed since 1979.  Despite the advancement and progression in the practice, the Guidelines remained static.  This rendered them outdated and incompatible with the current state of child welfare practice and court proceedings.  The 2015 Revisions are, therefore, a critical and necessary resource for the continued informed application and implementation of ICWA.

Not surprisingly, given the passage of time, the 1979 Guidelines contain incorrect statements of law.  For example, the 1979 Guidelines define the term "domicile" on the basis that "[t]here is no indication that these state law definitions tend to undermine in any way the purposes of the Act."  1979 Guidelines at 67,585.  The Supreme Court expressly overruled this construction of "domicile" in *Holyfield*, yet the invalidated definition remained in the Guidelines until BIA published revisions in February 2015.  Additionally, the 1979 Guidelines failed to incorporate the Supreme Court's 1978 statement that "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."  *Santa Clara Pueblo*, 436 U.S. 49, 72 n.32 (1978).  This apparent oversight was not corrected until the revised Guidelines were published in February 2015.

The 1979 Guidelines also have failed to account for significant changes in federal child welfare legislation.  The primary responsibility for providing child welfare services rests with the states.  *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890).  However, states must conform to federal requirements to be eligible for Federal child welfare funding programs.  *See, e.g.*, Social Security Act Title IV-E Federal Payments for Foster Care and Adoption Assistance, 42 U.S.C. § 670 ("The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary [of the Department of Health and Human

Services ("DHHS")], State plans under this part."); Social Security Act Title IV-B Child and

Family Services, 42 U.S.C. § 622(a) ("In order to be eligible for payment under this subpart, a

State must have a plan for child welfare services which has been developed jointly by the

Secretary [of DHHS] and the State agency designated pursuant to subsection (b)(1), and which

meets the requirements of subsection (b) . . . ."). Federal funding legislation, therefore, prompts

state level responses and changes. Such responses typically include new state legislation,

revision of state agency policy and procedures, and implementation of new child welfare

practices and programs.

Since 1979, Congress has passed at least 30 laws addressing child welfare funding that

have had a significant impact on state child welfare policy and practice.[8] In addition to changing

child welfare practice for all children, these changes also directly affect how states implement

ICWA and coordinate its requirements with child welfare practice more generally. *See, e.g.*, B.J.

Jones, *Differing Concepts of "Permanency:" The Adoption and Safe Families Act and the Indian*

*Child Welfare Act* in FACING THE FUTURE, THE INDIAN CHILD WELFARE ACT AT 30, 127

(Matthew L.M. Fletcher et al., eds., 2009). The revised guidelines account for these changes.

*See, e.g.* 2015 Guidelines, § A.2 "active efforts" (stating "'Active efforts' are separate and

distinct from requirements of the Adoption and Safe Families Act (ASFA), 42 U.S.C. § 1305.

ASFA's exceptions to reunification efforts do not apply to ICWA proceedings.").

---

[8] *E.g.*, Preventing Sex Trafficking and Strengthening Families Act, Pub. L. No. 113-183, 128 Stat. 1919 (2014); Child and Family Services Improvement and Innovation Act, Pub. L. No. 112-34, 125 Stat. 369 (2011); Fostering Connections to Success and Increasing Adoptions Act, Pub. L. No. 110-351, 112 Stat. 3949 (2008); Safe and Timely Interstate Placement of Foster Children Act, Pub. L. No. 109-239, 120 Stat. 508 (2006); Keeping Children and Families Safe Act, Pub. L. No. 95-266, 2 Stat. 205 (2003); Safe and Strengthening Abuse and Neglect Courts, Pub. L. No. 106-314, 114 Stat. 1266 (2000); Adoption and Safe Families Act, Pub. L. No. 105-89, 111 Stat. 2115 (1997); Multiethnic Placement Act, Pub. L. No. 103-382, 108 Stat. 3518 (1994); Child Abuse Prevention Adoption and Family Services Act, Pub. L. No. 100-294, 102 Stat. 102 (1988); Adoption Assistance and Child Welfare Act, Pub. L. No. 96- 272, 94 Stat. 500 (1980).

Federal laws have been the primary force driving child welfare change for the past 35 years.  Gerard P. Mallon & Peg McCartt Hess, *Preface* in CHILD WELFARE FOR THE TWENTY-FIRST CENTURY: A HANDBOOK OF PRACTICES, POLICIES, AND PROGRAMS xii (Gerard P. Mallon & Peg McCartt Hess, eds, 2005).  Yet practices have also been shaped, to a lesser degree, by changes in social work practice as well as ideological and planning orientations.  *Id*.  The most pronounced change in social work practice since 1979 is the use of empirical evidence and the movement towards implementing "evidence-based practices."  *Id*. at xiii.  This evolution of child welfare practice, and other shifts in orientation, were not and could not have been reflected in the 1979 Guidelines — thus making the 2015 revisions all the more necessary.  *See, e.g.*, 2015 Guidelines, § A.1 (incorporating into the definition of "active efforts" recent trends in social work practice including: keeping sibling groups together, conducting "diligent recruitment" for family placements, and providing post-reunification services); *id.*, § B.6 (incorporating recent trends in social work practice by allowed judges to request that social workers complete and present genograms to the court); *id.*, § A.3 (incorporating guidance on how ICWA applies in new evidence-based child welfare practices including: "alternative response," "differential response," or "diversion" programs).

In addition, the ability of tribes to provide services, implement programs, manage and adjudicate cases has shifted dramatically since the passage of ICWA, and has had a profound impact on ICWA's implementation.  Terry L. Cross and Robert J. Miller, *The Indian Child Welfare Act of 1978 and Its Impact on Tribal Sovereignty and Governance* in FACING THE FUTURE: THE INDIAN CHILD WELFARE ACT AT 30, 13 (Matthew L.M. Fletcher et al., eds., 2009) ("In the years since the passage of the 1979 Guidelines tribal capacity has grown, tribal social service programs have expanded, and the number of tribal courts have increased.")  The

development of tribal child welfare capacity over the past 36 years further required revision to the Guidelines to account for the increased and refined role that tribes play in these proceedings. 2015 Guidelines § B.1 (d) (recognizing tribes increased and sophisticated infrastructure by allowing tribes to participate in state court hearings via telephone, videoconferencing, and other methods); *id.* § B.6 (c)(4)(iii) (protecting tribes' right to intervene to provide support, services, and influence at any point in a case); *id.* § A.4 (relying solely on tribal capacity to make these determinations of membership); *id.* § C.3 (recognizing tribe's expertise and asking agencies to work with tribes to find a tribal designee familiar with ICWA to assist adult adoptees in the process of reconnecting with their tribes); *id.* § B.4 (d) (recognizing tribes' capacity to work together to collaboratively identify a child's tribe when a child is eligible for membership in multiple tribes); *id.* § D.4 (stating a clear preference for qualified expert witnesses who are members of the child's tribe).

With this decades-long evolution of child welfare and ICWA practice, it comes as no surprise that when BIA invited comments on whether to revise the 1979 Guidelines "[a]n overwhelming proportion of the commentators requested that the Department update its ICWA guidelines and many had suggestions for revisions . . . ." 2015 Guidelines at 10,147. Specifically in response to this invitation, *amici* advocated for BIA to revise the Guidelines, stating that they were "long overdue for an update." National Indian Child Welfare Association, National Congress of American Indians, Native American Rights Fund, & Association on American Indian Affairs*, Comments on Bureau of Indian Affairs Guidelines for State Courts: Indian Child Custody Proceedings*, 1 (Apr. 2014) *available at* https://turtletalk.files.wordpress.com/2014/05/bia-icwa-guideline-

comments_nicwa_ncai_narf_aaia.pdf.  Perhaps even more compelling is the reaction to the 2015

Guidelines by the very state court judges that, according to Plaintiffs, suffer under their yoke:

> Since the release of the original guidelines it has become increasingly clear that additional clarification has been needed to assist with the interpretation of key provisions and to ensure consistent compliance. . . . [The 2015 Guidelines] clear up much of the ambiguity in the previous guidelines and should provide additional certainty for judges while still allowing for sufficient discretion when making tough decisions in these cases.

Press Release, National Council of Juvenile and Family Court Judges, *NCJFCJ Encourages*

*Judges to Apply Revised BIA ICWA Guidelines* (May 9, 2015), *available at*

http://www.ncjfcj.org/ICWA-Revised.

A close examination of the 2015 Guidelines in the full context of the changes to the

federal and state child welfare landscape that have taken place since ICWA's enactment reveal

both the necessity of these revisions and the hollowness of Plaintiff's claims.  In revising the

Guidelines, the Bureau of Indian Affairs took a long overdue, fully warranted, and absolutely

vital step to provide updated guidance that takes into account 36 years of child welfare practice

and state court decisions to assist with the uniform application of ICWA across the 50 states.

## CONCLUSION

For the foregoing reasons, *Amici Curiae* respectfully request the Court grant the United

States' Motion to Dismiss.


Dated:            September 18, 2015

                                           Respectfully submitted,


                                           _____/s/_____
                                           Drew W. Marrocco, (VSB # 38955)
                                           Samuel F. Daughety
                                           Samuel Kohn
                                           Dentons US LLP
                                           1301 K Street, N.W.
                                           Suite 600, East Tower
                                           Washington, DC 20005
                                           Telephone:    (202) 408-6400
                                           Facsimile:    (202) 408-6399
                                           E-mail:       dmarrocco@dentons.com

                                           Attorneys for *Amici Curiae*

*Of counsel:*

Matthew N. Newman                          Adrian T. Smith
Native American Rights Fund                National Indian Child Welfare Association
745 W. 4th Avenue, Suite 502               5100 SW Macadam Avenue, Suite 300
Anchorage, AK 99501-1736                   Portland, OR 97239
Phone :       (907) 276-0680               Phone:        (503) 222-4044
Fax:          (907) 276-2466               Fax:          (503) 222-4007


Kathryn E. Fort                            Christina Snider
Indigenous Law and Policy Center           National Congress of American Indians
Michigan State University College of Law   1516 P Street, NW
648 N. Shaw Lane                           Washington, DC 20005
East Lansing, MI 48823                     Phone:        (202) 466-7767
Phone:        (517) 432-6992               Fax:          (202) 466-7797
Fax:          (517) 432-6879

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of September, 2015, that I electronically filed with the Clerk the foregoing using the Court's Electronic CM/ECF System and that service was thereby accomplished upon:

> Dennis C. Barghaan, Jr.
> Assistant U.S. Attorney
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> Telephone: (703) 299-3891
> Fax: (703) 299-3983
> Email: dennis.barghaan@usdoj.gov

> *Attorney for Defendants*

> Jacob Stephen Siler
> GIBSON DUNN & CRUTCHER LLP (DC)
> 1050 Connecticut Avenue N.W., Suite 300
> Washington, DC 20036
> Email: Jsiler@gibsondunn.com

> *Attorney for Plaintiffs*

> _____/s/_____
> Drew W. Marrocco, (VSB # 38955)
> Dentons US LLP
> 1301 K Street, N.W.
> Suite 600, East Tower
> Washington, DC 20005
> Telephone:     (202) 408-6400
> Facsimile:     (202) 408-6399
> E-mail: dmarrocco@dentons.com

> Attorneys for *Amici Curiae*