**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

_____

NATIONAL COUNCIL FOR ADOPTION,
BUILDING ARIZONA FAMILIES, on
behalf of itself and its birth-parent clients,
birth parents D.V. and N.L., and baby boy
T.W. by and through his guardian ad litem
PHILIP (JAY) MCCARTHY, JR.,

        Plaintiffs,

        v.

SALLY JEWELL, in her official capacity as
Secretary of the United States Department of
the Interior, KEVIN WASHBURN, in his
official capacity as Assistant Secretary of
Indian Affairs, BUREAU OF INDIAN
AFFAIRS, and the UNITED STATES
DEPARTMENT OF THE INTERIOR,

        Defendants.
_____

Case No. 1:15-cv-00675

**BUILDING ARIZONA FAMILIES' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS AND FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.  BAF May Challenge The 2015 Guidelines ............................................................. 2

    A.  As An Interpretive Rule, The 2015 Guidelines Are Final
    Agency Action Subject To Judicial Review Under The APA .............. 2

    B.  BAF Has Standing To Challenge The 2015 Guidelines ........................ 5

    C.  BAF May Raise Claims On Behalf Of Its Birth-Parent Clients ........... 8

II.  The 2015 Guidelines, As An Interpretive Rule, Are Contrary To Law ......... 12

    A.  The 2015 Guidelines Violate The APA Because They Are
    Contrary To ICWA And To The Constitution ................................... 12

        1. The Complaint Alleges That The 2015 Guidelines
        Contravene The Statute ............................................................... 12

        2. The 2015 Guidelines Violate The Constitution's Guarantees
        Of Due Process And Equal Protection .................................... 15

        3. The 2015 Guidelines Are Contrary To Law Because The
        Underlying Statute Exceeds Congress's Authority ............................. 12

        4. The 2015 Guidelines Violate The Tenth Amendment By
        Commandeering State Entities ................................................. 20

III.  BAF Has Stated A Viable Claim On Behalf Of Its Birth-Parent
    Clients That Defendants Have Unlawfully Promoted The Violation Of
    Birth Parents' Constitutional Rights ................................................................. 23

    A.  Abstention Is Inappropriate .................................................................. 24

    B.  Federal Officials Violate The Constitution When They Urge
    Others To Violate The Constitution ..................................................... 26

    C.  The 2015 Guidelines Violate The Constitution .................................... 28

CONCLUSION ................................................................................................................. 28

## INTRODUCTION

A district court reviewing a Rule 12(c) motion applies the same standard that applies to motions made under Rule 12(b)(6). *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). This Court thus "accept[s] all well-pleaded allegations in the plaintiff's complaint as true and draw[s] all reasonable factual inferences from those facts in the plaintiff's favor," and dismissal is appropriate only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Id.* Plaintiff Building Arizona Families ("BAF") has stated valid claims on behalf of itself and its birth-parent clients under that standard. Even if they are non-binding interpretive rules, the Complaint states a valid claim that the 2015 Guidelines, 80 Fed. Reg. 10,146 (Feb. 25, 2015), are unlawful and must be set aside because they (1) contravene and exceed the statute they purport to interpret; (2) violate birth parents' constitutional rights to due process and equal protection of the laws; and (3) otherwise exceed constitutional limits on federal power. BAF has also stated a valid *Bivens* claim against the individual Defendants, who have publicly urged the violation of birth parents' constitutional rights through publication of the 2015 Guidelines.

The government strains to avoid judicial scrutiny of the words that Defendants published in the Federal Register, but its jurisdictional and abstention arguments have no merit. The 2015 Guidelines are reviewable as final agency action because they are concededly the Department's final word on the subjects they address, and legal consequences flow from their publication. Indeed, that is their express purpose: to affect *legal proceedings*. Although the government is shouting from the rooftops *today* that the Guidelines have no "binding" force, the words printed in the Federal Register claim to prescribe "minimum Federal standards" for "compliance with [Indian Child Welfare Act]," and state that the "purpose of these guidelines" is "to *ensure* that ICWA is applied in all States" in a manner that is consistent with the

Department's interpretation of the Act's text and purpose.  80 Fed. Reg. at 10,150, 10,152 (emphasis added).  Until and unless they are adjudicated as non-binding in a final judgment on the merits—or withdrawn or amended by the Department—the 2015 Guidelines inflict concrete injuries upon BAF and its birth-parent clients, as alleged in the Complaint, that would be redressed by a ruling setting them aside as unlawful.  Defendants' motion should be denied.

## ARGUMENT

I.     **BAF May Challenge The 2015 Guidelines.**

    A.     **As An Interpretive Rule, The 2015 Guidelines Are Final Agency Action Subject To Judicial Review Under The APA.**

This Court has concluded that the 2015 Guidelines are "non-binding interpretive rules not subject to APA notice-and-comment procedures."  Order at 2.  Even so, as an interpretive rule, the 2015 Guidelines are subject to review under the Administrative Procedure Act ("APA").

"[I]t is well established that an interpretive guidance issued without formal notice and comment rulemaking can qualify as final agency action."  *Arizona v. Shalala*, 121 F. Supp. 2d 40, 48 (D.D.C. 2000) (collecting cases); *see Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000).  "[A]n agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review."  *Indep. Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 929 (D.C. Cir. 1976); *see also, e.g.*, *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 707 F.2d 548, 560 (D.C. Cir. 1983) ("Having characterized the rule as interpretative, we must now review it."); *US West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000) (observing that "'final orders' include both interpretive and legislative orders"); *Am. Ambulance Serv. of Penn., Inc. v. Sullivan*, 911 F.2d 901, 907-08 (3d Cir. 1990) (recognizing that interpretive rules must be evaluated for whether the rules "accurately reflect Congress's intention when drafting the

statute"). Subjecting interpretive rules to review under the APA as final agency action is consistent with the Supreme Court's admonition that courts should take a "pragmatic" and "flexible" view of finality. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).[1] In order to qualify as "final agency action," an interpretive rule must (1) constitute the consummation of the agency's decision-making process, and it must (2) determine rights or obligations *or* cause legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

The government does not dispute that the 2015 Guidelines constitute the consummation of the agency's decision-making process. Opp. to NCFA's Partial Mot. for Summ. J. at 21. And, although this Court concluded that the Guidelines were not "'final agency action' within the meaning of the APA because they do not create legal rights and obligations," Order at 2, that determination arose from NCFA's motion for partial summary judgment regarding whether the Guidelines were a legislative rule subject to the APA's notice-and-comment requirements. Even if the Guidelines do not "create legal rights and obligations" because they are non-binding, the Guidelines are reviewable as final agency action because *legal consequences* flow from them. *See Bennett*, 520 U.S. at 178.

"Legal consequences" unquestionably flow from the Department's publication of the 2015 Guidelines. Indeed, while it is true that the BIA does not have authority to enforce the Guidelines, the government cannot deny that the entire purpose of the Guidelines is to *affect the*

---

[1] In its Rebuttal Brief in support of its Motion for Partial Summary Judgment, National Council For Adoption ("NCFA") suggested that if the Guidelines were not a legislative rule, then they also would not be reviewable under the APA. ECF No. 54 at 11 n.2. As the cases cited above indicate, however, this was not correct. While it is true that all legislative rules necessarily constitute final agency action, it does not follow that all *non*-legislative rules are *not* final; in particular, interpretive rules, while not legislative, can constitute final agency action.

*conduct and the results of legal proceedings*.  Their intended effects are set forth in the Federal

Register in plain terms:

> A.1. What is the purpose of these guidelines?
>
> These guidelines clarify the *minimum Federal standards*, and best practices, governing implementation of the Indian Child Welfare Act (ICWA) *to ensure that ICWA is applied* in all States consistent with the Act's express language, Congress' intent in enacting the statute, and the canon of construction that statutes enacted for the benefit of Indians are to be liberally construed to their benefit.  In order to fully implement ICWA, *these guidelines should be applied in all proceedings and stages of a proceeding in which the Act is or becomes applicable*.

80 Fed. Reg. at 10,150 (emphases added); *see also, e.g.*, *id.* at 10,152 ("These guidelines provide

*minimum Federal standards* and best practices *to ensure compliance* with ICWA and should be

applied in all child custody proceedings in which the Act applies.") (emphases added); *id.* at

10,146 ("The updated BIA Guidelines . . . promote compliance with ICWA's stated goals and

provisions . . . ."); *id.* at 10,147 ("These updated BIA guidelines *provide standard procedures*

and best practices *to be used* in Indian child welfare proceedings in State courts.") (emphases

added).  Regardless of whether the Guidelines determine "rights or obligations" by imposing

binding rules of law, the Guidelines exist in order to affect the process and outcomes of legal

proceedings, and they inevitably will do so.  Indeed, at least one state appellate court has

reversed a lower court ruling for failure to follow the Guidelines, *see In re J.M.B.*, 353 P.3d 470

(Kan. Ct. App. 2015) (per curiam) (unpublished), and the Guidelines are no doubt affecting

countless other cases pending in juvenile courts across the country.[2]  The government cannot

very well deny that the purpose of the Guidelines, though non-binding, was to affect legal

proceedings involving children defined as "Indian"—even if the Department cannot directly

---

[2]  In another context, the D.C. Circuit has suggested that an agency order that is relied on in subsequent legal proceedings may have sufficient legal consequences to be "final."  *See Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1104 (D.C. Cir. 2001).

compel an outcome in a particular case because it has no enforcement role and lacks the authority to issue binding regulations. That is sufficient to establish that "legal consequences" flow from the Guidelines, and this Court should reject the government's attempt to insulate them from judicial review.

### B. BAF Has Standing To Challenge The 2015 Guidelines.

BAF has standing to challenge the legality of the Guidelines. To establish standing at the pleading stage, a plaintiff need only allege an injury that is (1) "concrete and particularized" and "actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). That standard is satisfied here.

<u>Injury</u>. In the Complaint, BAF alleges two types of injury. It alleges that it is expending significant resources in order to comply with the Guidelines' dictates, *see* Compl. ¶ 42, and it alleges that complying with the Guidelines interfere with its ability to carry out its mission of assisting birth parents in directing the adoptive placement of their children, *see id.* ¶¶ 42, 44. At this stage in the proceedings, each of these allegations must be regarded as true, and, so construed, each plainly qualifies as an injury in fact. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (organization had standing to challenge action that "impaired [its] ability to provide counseling and referral services for low- and moderate-income homeseekers," a key component of the organizations' mission); *see also White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460-61 (4th Cir. 2005) (organization had standing to challenge statute that would impair organization's ability to disseminate values and educate youth regarding organization's mission); *cf. Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 499 (E.D. Va. 2002) (Lee, Judge) ("[A]n organization has standing under the FHA when it has . . . devoted significant resources to identifying and counteracting the defendant's discriminatory practice [and] such practices have

frustrated the organization's efforts.").

The government's motion (appropriately, because it is a motion for judgment on the pleadings) does not dispute that compliance with the 2015 Guidelines entails a significant expenditure of resources on the part of an adoption agency such as BAF.  Nor does it dispute that compliance with the 2015 Guidelines impedes the ability of BAF to assist birth parents of Indian children to secure adoptive placements in non-ICWA-preferred families.  Instead, the government argues that BAF is not injured by the 2015 Guidelines because its compliance with the Guidelines is "voluntary."  Mot. 11-13.  But that is not an argument about injury-in-fact; it is an argument about causation—specifically whether BAF's alleged injuries are caused by the Guidelines or "BAF's decision to start complying."  Mot. 12.

Causation. The government argues that BAF's injuries are not caused by Defendants, but instead are self-inflicted because any efforts to comply with the 2015 Guidelines are "voluntary." Mot. 11-13.   Certainly that was not true at the time BAF filed its Complaint.  At that time, the government had not yet disclaimed that the Guidelines were not binding, and this Court certainly had not adjudicated them as such.  At the time the Complaint was filed, all BAF had to go on was what was published in the Federal Register, and the Guidelines themselves do not remotely suggest that they are not binding.  To the contrary, they invoke the Department's alleged rulemaking authority, claiming to prescribe "minimum Federal standards" for "compliance with ICWA" that were "effective immediately." 80 Fed. Reg. at 10,147, 10,152.  As alleged in the Complaint, BAF's license requires compliance with applicable laws, Compl. ¶ 41, and on their face, the Guidelines very much appear to be federal *requirements*.  So the government is quite wrong to state that BAF's compliance with the Guidelines has been "voluntary."

It is only since BAF filed its Complaint that the government has rushed to disclaim the

binding effect of the 2015 Guidelines.  But the litigating position of the Justice Department does not alter the contents of the Federal Register any more than it could alter the United States Code. And while this Court has issued an order stating that the Guidelines are "non-binding interpretive rules," that is far from a final judgment that would bind the Secretary and make clear to those to whom the Guidelines apply that they are, as a legal matter, not binding.  Before BAF's compliance with the Guidelines possibly could be said to be "voluntary," either there must be a final judgment on the merits holding them, despite their appearance, to be non-binding, or the Interior Department would have to amend the Guidelines to make plain their non-binding nature. Neither of those things has happened, so it cannot yet be said that BAF's compliance with the Guidelines is "voluntary."

Relatedly, because the Guidelines have not been finally adjudicated to be non-binding, and because the Department seems unwilling to amend them to make clear to state courts that they are not binding, the government cannot benefit from the proposition that an injury is not traceable to a defendant when it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or to predict."  Mot. 4 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).  Nothing on the face of the Guidelines would indicate to a state court that the matters covered by the Guidelines were within "the broad and legitimate discretion" of that state court.  The Guidelines say the opposite:  The 2015 Guidelines say they were promulgated precisely because the BIA and the Department were dissatisfied with the disparate manner in which state courts were interpreting and implementing ICWA, and sought to promote uniformity. 80 Fed. Reg. at 10,148-49 (seeking to eliminate "inconsistent" state court application of ICWA). The Department explicitly called out state court decisions with which it disagrees.  *Id.* at 10,148

("[T]here is no existing Indian family [EIF] exception to the application of ICWA."). And needless to say, the word "must," replete through the Guidelines, does not connote discretion. Because state courts understandably could consider the Guidelines to be the "minimum Federal standards" they say they are, BAF must assume that they will. BAF cannot run into state court preemptively and ask the court if it intends to follow the 2015 Guidelines. Moreover, it does not have the luxury of taking a wait-and-see approach because to do so would place at risk a child's adoptive placement many months down the line—after the child has bonded with adoptive parents.

Because, by all appearances, the 2015 Guidelines appear to be mandatory requirements, and because they have not been finally adjudicated to be otherwise, BAF must continue to undertake the requirements imposed by the 2015 Guidelines as described in the Complaint. BAF's injuries therefore are traceable to the government rather than to their own "voluntary" choices.

Redressability. Finally, BAF's injury is redressable by a favorable ruling from this Court. The government contends that "[e]ven if the Guidelines are withdrawn, state courts may apply the same principles, many of which originated in state law." Mot. 8. But they may not, and there is no reason for this Court to assume that those state courts would apply interpretive rules that this Court has ordered vacated as contrary to law, in lieu of their own state decisional law interpreting ICWA and their own state procedural laws governing child custody proceedings. In any event, BAF need only establish that "the practical consequence of [vacatur] would amount to a significant increase in the likelihood that [it] would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). It obviously would.

## C.     BAF May Raise Claims On Behalf Of Its Birth-Parent Clients.

In addition to its standing to bring claims for the direct injuries caused to itself, BAF also

has standing to bring claims on behalf of its birth-parent clients.  Contrary to the government's argument, Mot. 8-9, the prudential limitation on third-party standing poses no impediment here. "To overcome the prudential limitation on third-party standing, a plaintiff must demonstrate:  (1) an injury-in-fact; (2) a close relationship between herself and the person whose right she seeks to assert;  and  (3)  a hindrance  to  the  third  party's  ability  to  protect  his  or  her  own interests." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002).  Those elements are all satisfied here.

First, as described above, the Guidelines cause concrete injury to BAF.  *See supra* at 5-8. The Guidelines injure BAF's birth-parent clients by imposing substantial impediments to a prompt placement of their child with adoptive parents they have chosen.  *See Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) (delay in consideration of permit application constituted injury-in-fact for standing purposes).  And by instructing state courts and state agencies to treat the birth parent clients' wishes to direct the adoptive placement of their "Indian children" differently based on their ancestry and that of their "Indian children," Defendants are attempting to induce state courts and state agencies to violate the liberty interests of BAF's birth parent clients and brand them with the stigma of discrimination.  Those injuries are concrete and particularized.

Second, BAF has "a close and confidential relationship with its birth-parent clients." Compl. ¶ 43.  As BAF has alleged, many of its birth-parent clients "come to BAF pregnant, alone, and in despair."  *Id.*  The confidential relationship between BAF and its birth-parent clients, who are making the intensely personal and often difficult choice to place a child for adoption, is akin to the confidential relationships held to be sufficient for third-party standing in *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965), and *Singleton v. Wulff*, 428 U.S. 106, 115

(1976) (plurality opinion).  In *Griswold*, the Court held that a physician could assert the privacy rights of a married couple that he had advised regarding contraception because of the nature of the physician-patient relationship.  381 U.S. at 481.  Similarly, in *Singleton*, the Court held that physicians who performed abortions had a sufficiently close relationship with women seeking abortions to press their rights.  428 U.S. at 116-17.  The relationship between BAF and its birth-parent clients is likewise close and confidential, and the government does not dispute that.  Mot. 9-10.

Instead, the government asserts that there is a "conflict of interest" between BAF and its birth-parent clients.  Mot. 9-10.  The government does not point to anything in the Complaint (or outside the pleadings, for that matter) that could plausibly support its conflict-of-interest theory.  *See* Answer ¶ 43 ("Defendants are without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 43" regarding BAF's relationship with its birth-parent clients).  At this stage of the proceedings, that contention must be rejected.  Taking the allegations in the Complaint as true, it is clear that the interests of BAF and its birth-parent clients are "parallel."  *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 15 (2004) (citing *Singleton*, 428 U.S. at 113-18).[3]

Third, BAF's birth-parent clients cannot adequately protect their own interests.  As alleged in the Complaint, there are significant obstacles to individual birth-parent clients bringing suit in their own name, including the risk of bringing wide publicity to their personal choice to place a child for adoption, and the time-sensitive nature of that choice.  Compl. ¶ 44.  In *Singleton*, the Court recognized several similar obstacles to women seeking an abortion

---

[3]   In *Newdow*, the Supreme Court concluded that Newdow could not represent the interests of his daughter because his interests were "antagonistic" to both his daughter's asserted interests and those of the child's mother and legal custodian.  542 U.S. at 15.  The pleadings reveal no similar conflict between BAF and its birth-parent clients.

bringing suit in their own names.  "She may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit."  428 U.S. at 117.  "A second obstacle is the imminent mootness, at least in the technical sense, of any individual woman's claim," because once the baby is born or develops to a certain stage, the woman could no longer seek an abortion.  *Id.*  Similarly, here, birth parents who do not wish to publicize their intensely personal and difficult choices "may be chilled" from bringing suit; and it may be impossible for a birth parent to litigate his or her claim during the short window before a baby is born.  The Complaint thus adequately alleges impediments to birth parents pressing their claims.

The government asserts that "[i]t would be absurd to suggest that birth parents are not capable of bringing these claims on their own behalf," Mot. 9, but that is not the standard; women seeking abortions, too, are "capable" of bringing claims individually.  The doctors in *Singleton* were not precluded from representing the interests of their patients just because Norma McCovey previously had sued as Jane Roe in *Roe v. Wade*, 410 U.S. 113 (1973).

None of the cases cited by the government suggests that the obstacles faced by birth parents are insufficient.  In *Lucas v. Henrico County School Board*, 822 F. Supp. 2d 589 (E.D. Va. 2011), for example, the plaintiff "[did] not allege third-party standing."  *Id.* at 606.  And in *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002), a physician seeking to bring claims on behalf of her dialysis patients presented "no evidence that [her patients were] hindered from presenting their own claims."  *Id.* at 215.  BAF's birth-parent clients allege obstacles substantially similar to those identified in *Griswold* and *Singleton* as sufficient to support third-party standing.[4]

---

[4]  If the Court determines that the Complaint is insufficient at the pleading stage, BAF respectfully requests that it be granted leave to amend its Complaint.

## II.   The 2015 Guidelines, As An Interpretive Rule, Are Contrary To Law.

### A.   The 2015 Guidelines Violate The APA Because They Are Contrary To ICWA And To The Constitution.

Under the APA, an agency interpretation that violates the governing statute or the Constitution may be held "unlawful and set aside."   5 U.S.C. § 706.   BAF has sufficiently alleged that the 2015 Guidelines are contrary to ICWA's plain text and violate the Constitution in a number of ways.

#### 1.   The Complaint Alleges That The 2015 Guidelines Contravene The Statute.

The Complaint alleges that the 2015 Guidelines do not comport with ICWA because they run contrary to the plain terms of the statute or otherwise constitute an unreasonable interpretation of statutory language.  Compl. ¶¶ 83-95.  An interpretive rule that "runs contrary to the plain meaning of the statute . . . must be reversed." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1309 (D.C. Cir. 1991).  And BIA's interpretation of ICWA in the Guidelines—"which lack the force of law"—is not entitled to "*Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).  The 2015 Guidelines are not a lawful "interpretation" of ICWA because they run contrary to, and otherwise exceed, the statute.

For example, the 2015 Guidelines prohibit state courts from considering the child's "best interests" in determining whether, as ICWA requires, there is "good cause" to deviate from ICWA's statutory placement preferences.  80 Fed. Reg. at 10,158.  When considering "good cause," state courts are now admonished not to consider "ordinary bonding, or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement that does not comply with the Act." *Id.*  But ICWA expressly allows for consideration of "good cause," 25 U.S.C. § 1915, and Congress chose not to further define that term because it was intended to be a flexible safety valve to allow state courts

to exercise discretion and consider a broad range of factors.  *See* Sen. Rep. No. 95-597, 95th Cong., 1st Sess., p.17 (1977) ("good cause" standard is used "to provide State courts with a degree of flexibility in determining the disposition of a placement proceeding involving an Indian Child").

The Guidelines also interpret ICWA as requiring "the party seeking departure from the preferences" to prove good cause "by clear and convincing evidence."  80 Fed. Reg. at 10,158. The statute does not require proof by clear and convincing evidence, although Congress was clearly capable of requiring such a heightened showing, as it did elsewhere in ICWA.  *See, e.g.*, 25 U.S.C. § 1912(e) ("No foster care placement may be ordered . . . in the absence of a determination [of damage to the child], supported by clear and convincing evidence . . . ."); *id.* at § 1912(f) ("No termination of parental rights may be ordered . . . in the absence of a determination [of damage to the child], supported by evidence beyond a reasonable doubt . . . .").

Moreover, the Guidelines impose an affirmative and onerous requirement on state agencies to seek out and solicit alternative, competing "preferred" placements if the adoptive parents chosen by the birth parents do not fall within ICWA's preferences.  80 Fed. Reg. at 10,149.  This violates the plain meaning and design of ICWA, as recently interpreted by the Supreme Court.  In *Adoptive Couple v. Baby Girl*, the Supreme Court held that the adoption placement preferences in Section 1915(a) are "inapplicable in cases where no alternative party has formally sought to adopt the child."  133 S. Ct. 2552, 2564 (2013).  In reaching that conclusion, the Court necessarily rejected the 2015 Guidelines' view that placement agencies or their clients—birth parents and prospective adoptive parents—have an affirmative duty to conduct a "diligent search" for competing prospective adoptive homes.

The 2015 Guidelines' definition of "active efforts" also contravenes Section 1912(d) of

ICWA, as interpreted by the Supreme Court of the United States. Section 1912(d) of ICWA requires "active efforts [to] have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d). In *Adoptive Couple*, the Supreme Court held that Section "1912(d) applies only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights. The term 'breakup' refers in this context to '[t]he discontinuance of a relationship,' or 'an ending as an effective entity.'" 133 S. Ct. at 2562 (citation omitted) (alteration in original). Accordingly, when the "child has never been in the Indian parent's legal or physical custody, there is no 'relationship' that would be 'discontinu[ed]'—and no 'effective entity' that would be 'end[ed]'—by the termination of the Indian parent's rights. In such a situation, the 'breakup of the Indian family' has long since occurred, and § 1912(d) is inapplicable." *Id.* (alterations in original). Yet, the 2015 Guidelines state that "the requirement to engage in 'active efforts'" is triggered "the moment the possibility arises that an agency case or investigation may result in the need for the Indian child to be placed *outside the custody of either parent*"—without regard to whether the child is, or ever was, *in* the custody of an Indian parent. 80 Fed. Reg. at 10,152 (emphasis added). This provision of the 2015 Guidelines is irreconcilable with the statute as interpreted in *Adoptive Couple* and is thus contrary to law.

The 2015 Guidelines' interpretation of ICWA as requiring notice to tribes in voluntary proceedings is also unlawful. The 2015 Guidelines state: "In seeking verification of the child's status, in a voluntary placement proceeding where a consenting parent evidences a desire for anonymity, the agency or court must keep relevant documents confidential and under seal. A request for anonymity does not relieve the obligation to obtain verification from the tribes or to provide notice." 80 Fed. Reg. at 10,153. But Section 1912(a) of ICWA requires notice to tribes

only of *involuntary* proceedings involving the custody of an "Indian child." *See* 25 U.S.C. § 1912(a). The text and legislative history of ICWA establish that notice to tribes is not required in voluntary proceedings, as every reported case to have considered the issue has concluded. *See, e.g.*, *Navajo Nation v. Superior Court*, 47 F. Supp. 2d 1233 (E.D. Wash. 1999); *Catholic Soc. Servs., Inc. v. C.A.A.*, 783 P.2d 1159 (Alaska 1989). Moreover, the 1979 Guidelines made it clear that "[t]he Act mandates a tribal right of notice and intervention in involuntary proceedings but *not in voluntary ones*." 44 Fed. Reg. at 67,586 (emphasis added). The 2015 Guidelines' imposition of a notice requirement in voluntary proceedings exceeds the statute.

Similarly, the 2015 Guidelines purport to authorize a tribe to petition for a transfer to tribal court in "each distinct Indian child custody proceeding." 80 Fed. Reg. at 10,149. Yet, Congress made only two types of proceedings subject to transfer: foster care and termination proceedings. *See* 25 U.S.C. § 1911(b). The 2015 Guidelines further hamstring a state court's ability to deny such petitions for "good cause," instructing that state courts may not consider, as they had under the 1979 Guidelines, whether the proceeding is "at an advanced stage" at the time the tribe requests the transfer.

In sum, the 2015 Guidelines violate ICWA in a number of ways and should be set aside.

**2.       The 2015 Guidelines Violate The Constitution's Guarantees of Due Process And Equal Protection.**

The 2015 Guidelines also violate the due process and equal protection rights of birth parents seeking to place their children in non-Indian homes.

<u>Due Process</u>. Due Process "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" *Russell v. Virginia*, No. 4:09CV29, 2010 WL 8756376, at *4 (E.D. Va. Mar. 23, 2010) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). The Supreme Court has long recognized "[t]he fundamental liberty interest of natural

parents in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Troxel*, 530 U.S. at 66 (invoking "the fundamental right of parents to make decisions concerning the care, custody, and control of their children"). This fundamental right to dictate how one's child is raised belongs to parents so long as they are "fit." *Id.* at 67-69; *see In re Interest of N.N.E.*, 752 N.W.2d 1, 11-16 (Iowa 2008) (birth mother's fundamental right to direct care of her child is not lessened because she intended to terminate her rights in favor of adoptive placement). The Supreme Court has repeatedly upheld this right of fit parents to manage how their children are raised. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *see also Moore v. East Cleveland*, 431 U.S. 494-99 (1977) (the United States Supreme Court "has long recognized that freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment").

A parent's due process rights to direct the upbringing of her child persists until her parental rights are terminated, which, in a voluntary adoption case, generally does not occur until the final judgment of adoption is entered.[5] The government observes that the Fourth Circuit has not yet recognized a constitutional right to direct their child's adoptive placement. Mot. 26. But the Supreme Court has recognized parents' due process right to direct their child's school placement. *See Wisconsin v. Yoder*, 406 U.S. 205 (1972). And the government suggests no reason why parents' due process right would not extend to the far more consequential decision of an adoptive placement.

The government next argues that the Guidelines do not "impede the[] free exercise" of a

---

[5] For this reason, the government errs when it suggests that BAF's clients claim a due process right to direct the upbringing of "children to whom they have given up all legal rights." Mot. 26.

birth parent's ability to direct an adoptive placement.  Mot. 26.  But even a cursory reading of the Guidelines reveals that to be false.  The 2015 Guidelines interpret ICWA in a manner that imposes delay, and may frustrate entirely, a fit birth parent's ability to choose permanent caregivers for her child.  For example, the 2015 Guidelines require that the child's Indian tribe be provided notice of the voluntary adoption proceedings and the opportunity to intervene in the proceedings.  80 Fed. Reg. at 10,157.  The 2015 Guidelines further mandate application of ICWA's placement preferences, which, under the 2015 Guidelines can be set aside only upon a showing of good cause by "clear and convincing evidence."  *Id.*  And under the 2015 Guidelines, the "request of the parents" may provide evidence of "good cause" to depart from the placement preferences only where "*both parents* attest that they have reviewed the placement options that comply with the order of preference."  *Id.* at 10,158.  At a minimum, this requirement imposes substantial delay on birth parents' ability to secure a safe and permanent home for a child.   And it effectively disables a sole-custodial birth mother of an Indian child from placing her child in a voluntary adoption where an ICWA-preferred placement is identified through the Guidelines' unlawful notice and diligent search requirements.  It also effectively disables the parents of an "Indian child" from directing the placement of the child in the event of their death to persons who are not preferred by ICWA.  These are substantial burdens on birth parents' fundamental liberty interest and are presumptively unconstitutional.

As a last redoubt, the government argues the burden on birth parents' liberty interests are narrowly tailored to satisfy "Federal policy that, where possible an Indian child should remain in the Indian community."  Mot. 27 (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989)).  This fails first because most of BAF's clients' children have not yet been born and therefore have never been "in the Indian community."  But more fundamentally, where the

statutory policy of ICWA conflicts with fundamental liberties, the statutory policy must yield, just as it did in *Yoder*.

Because the 2015 Guidelines thus violate birth parents' substantive due process rights to direct the upbringing of their children, they are contrary to law and must be set aside.

Equal Protection.  The 2015 Guidelines also violate the equal-protection guarantees embodied in the Fifth Amendment to the United States Constitution, by mandating that ICWA applies to all children who are eligible for tribal membership and have a parent who is a member of a tribe, regardless of whether they have ever been domiciled on Indian lands or have any other non-biological connection to the tribe.  The Guidelines thus discriminate against birth parents based on their children's race or ancestry.

ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C. § 1903.  When ICWA's placement preference scheme is applied to an "Indian child" who has never been domiciled on Indian lands and whose only connection to the tribe is biological, it unlawfully discriminates against that child and his birth parents on the basis of ancestry, because it is not "reasonable and rationally designed to further Indian self-government."  *Morton v. Mancari*, 417 U.S. 535, 555 (1974).  This is manifestly the case for the children of BAF's clients who are *unborn*.

State courts have avoided this constitutional defect by construing ICWA as inapplicable to children who have never been part of a family with cultural, social, or political ties to a tribe, an approach that has become known as the "Existing Indian Family Doctrine."  *See, e.g.*, *In Interest of S.A.M.*, 703 S.W.2d 603, 608-09 (Mo. Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653-54 (S.D. 1987); *Matter of Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Matter*

*of Adoption of Crews*, 825 P.2d 305, 311 (Wash. 1992); *Hampton v. J.A.L.*, 658 So. 2d 331, 335

(La. Ct. App. 1995); *Rye v. Weasel*, 934 S.W.2d 257, 261-64 (Ky. 1996); *In re Santos Y.*, 112

Cal. Rptr. 2d 692 (Ct. App. 2001) (describing split in California state appellate courts); *In re*

*Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880, at *1 (Tenn. Ct. App. Nov. 19, 1997);

*Ex parte C.L.J.*, 946 So. 2d 880 (Ala. Civ. App. 2006); *In re N.J.*, 221 P.3d 1255, 1264-65 (Nev.

2009).  *But see Thompson v. Fairfax Cty. Dep't of Family Servs.*, 747 S.E.2d 838, 847-48 (Va.

App. 2013) (collecting cases from state courts rejecting the Existing Indian Family Doctrine).

*Cf.  Adoptive Couple*, 133 S. Ct. at 2565 (noting that interpreting ICWA's parental termination

provisions as applicable in any case where a child has an Indian ancestor, "even a remote one . . .

would raise equal protection concerns").  The 2015 Guidelines, however, interpret ICWA in a

manner that places front-and-center the equal protection concerns identified by the Supreme

Court in *Adoptive Couple*, by declaring that there "is no existing Indian family (EIF) exception to

application of ICWA."  80 Fed. Reg. at 10,148.

### 3.  The 2015 Guidelines Are Contrary To Law Because the Underlying Statute Exceeds Congress's Authority

The 2015 Guidelines are contrary to law for the additional reason that the statute they

purport to interpret and implement exceeds Congress's enumerated powers under the Indian

Commerce Clause.  The Indian Commerce Clause gives Congress authority "[t]o regulate

commerce . . . with the Indian tribes," U.S. Const. art. I, § 8, cl. 3, and is the only plausible

constitutional font of congressional authority to regulate Indian affairs.  *See* Matthew Fletcher,

*The Supreme Court and Federal Indian Policy*, 85 Neb. L. Rev. 121, 137 (2006) ("As a matter of

federal constitutional law, the Indian Commerce Clause grants Congress the only explicit

constitutional authority to deal with Indian tribes.");  Robert Natelson, *The Original*

*Understanding of the Indian Commerce Clause*, 85 Denver U. L. Rev. 201, 210 (2007) (rejecting

any source other than the Indian Commerce Clause supporting congressional power over Indians).

ICWA exceeds Congress's authority under the Indian Commerce Clause.  The Indian Commerce Clause gives Congress authority "[t]o regulate *Commerce* . . . with the Indian tribes." Art. I, § 8, cl. 3 (emphasis added).  "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring) (citations omitted). Congress may regulate Commerce "with the Indian *tribes*," but  "the Clause does not give Congress the power to regulate commerce with all Indian *persons* any more than the Foreign Commerce Clause gives Congress the power to regulate commerce with all foreign nationals traveling within the United States." *Id*.  A straightforward reading of the text, thus, confirms that Congress may regulate only commercial interactions—"commerce"—taking place with established Indian communities—"tribes." *Id*.  ICWA, however, regulates state child custody proceedings—not commerce; and its provisions do not regulate Indian tribes as tribes.  "Because adoption proceedings . . . involve neither 'commerce' nor 'Indian tribes,' there is simply no constitutional basis for Congress' assertion of authority over such proceedings." *Id.* at 2571.

ICWA thus exceeds Congress's enumerated powers by regulating the adoption proceedings of all "Indian children," domestic relations that have long been regarded as a virtually exclusive province of the states. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975).

### 4.  The 2015 Guidelines Violate the Tenth Amendment by Commandeering State Entities

The 2015 Guidelines violate the Tenth Amendment to the United States Constitution by impermissibly commandeering state courts and state-licensed agencies in numerous ways.  "The Federal Government may neither issue directives requiring the States to address particular

problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *United States v. Printz*, 521 U.S. 898, 935 (1997). Although the government now characterizes the 2015 Guidelines as recommendations, and not binding directives, they commandeer state courts and agencies on their face. *See supra* at 5-8. Unless and until there is a final judgment on the merits holding them to be non-binding suggestions—or the Department amends the Guidelines to make plain that they are merely suggestions—the 2015 Guidelines violate anti-commandeering principles.

The 2015 Guidelines unconstitutionally commandeer state courts and state-licensed agencies in numerous ways. The 2015 Guidelines require adoption agencies, including BAF, to "conduct an investigation into whether the child is an Indian child." *Id*. at 10,152. Where there is "any reason" to believe a child "could be" an "Indian child," the 2015 Guidelines further require the agencies to "obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership." *Id*. Where it is discovered that a child is eligible for membership in an Indian tribe, "the agency should take the steps necessary to obtain membership for the child." *Id*. at 10,153. The 2015 Guidelines further state the agencies "must always follow the placement preferences." *Id*. at 10,157. In furtherance of that federal policy agenda, the 2015 Guidelines require the Adoption Agency Plaintiffs to conduct a "diligent search . . . to seek out and identify placement options that would satisfy the placement preferences." *Id*.

The government argues that Congress can regulate adoption agencies because they are private parties. Mot. 30. Child welfare agencies, however, even private ones, can constitute state actors for constitutional purposes. *See, e.g.*, *Perez v. Sugarman,* 499 F.2d 761, 765 (2d Cir. 1974); *Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690, 738 (S.D.N.Y. 2006); *Harris v. Lehigh Cty. Office of Children & Youth Servs.*, 418 F. Supp. 2d 643, 651 (E.D. Pa.

2005); *Smith v. Beasley*, 775 F. Supp. 2d 1344, 1354 (M.D. Fla. 2011).  The 2015 Guidelines commandeer all "private State-licensed agenc[ies] . . . involved in and/or seeking to place a child in a child custody proceeding."  80 Fed. Reg. at 10,151.  These agencies, including BAF, are state actors for purposes of the anti-commandeering doctrine.

The 2015 Guidelines also violate the anti-commandeering doctrine by mandating that state courts perform various executive functions.[6]  The 2015 Guidelines order that state courts "in every child custody proceeding . . . conduct an investigation into whether the child is an Indian child."  *Id.* at 10,152.  If the court finds that the child is an Indian child, then the "agency or court must send notice of each such proceeding" to the relevant tribes.  *Id.* at 10,153-54.  Such investigative duties constitute executive functions.  Thus, the 2015 Guidelines conscript state courts to act as executive agents.  That violates *Printz*'s anti-commandeering principle.  *Cf. Mother & Father v. Cassidy*, 338 F.3d 704, 711 (7th Cir. 2003) ("[A]n order by the federal court directing the state court to assess the conduct of both parties in litigation that did not even occur before it would raise serious constitutional questions under the Supreme Court's anti-commandeering decisions.").

Finally, the 2015 Guidelines violate the anti-commandeering doctrine by dictating to state courts "[w]ho may serve as a qualified expert witness."  *Id.* at 10,157.  Rules of evidence regarding expert witnesses are rules of procedure.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 582 (1993).  The federal government may not order state courts to use a particular procedure for state-law causes of action.  *See Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636, 651 (7th Cir. 2014) (Sykes, J., concurring) ("[I]t's doubtful that Congress

---

[6]  BAF has standing to complain of the Guidelines' commandeering of state courts because it is an injury to our system of federalism that directly affects BAF's ability to accomplish its mission.  *See Bond v. United States*, 135 S.Ct. 2355, 2365 (2011) (litigant had standing to "challenge a law as enacted in contravention of constitutional principles of federalism").

has the power to prescribe procedural rules for state-law claims in state courts."); *Congressional Authority to Require State Courts to Use Certain Procedures in Products Liability Cases,* 13 Op. O.L.C. 372, 373-74 (1989) ("[P]otential constitutional questions" arise when Congress "attempts to prescribe directly the state court procedures to be followed in state law cases" because "state court procedures in applying state law would appear to be an area that is generally within a state's exclusive control.").

The Defendants argue that Congress can dictate federal procedures to state courts "where necessary to effectuate a substantive right created by the statute." Mot. 28-29. This statement, however, is true only when the underlying cause of action derives from federal, as opposed to state, law. *See, e.g., Brown v. Western Ry.*, 338 U.S. 294 (1949) (action under the Federal Employer's Liability Act); *Dice v. Akron, Canton & Youngstown R.R.*, 342 U.S. 359 (1952) (same). Here, however, the underlying state-court proceedings are creatures of state, not federal, law. The federal government may not prescribe the procedures "to be applied" in these state court proceedings.

The onerous and unfunded requirements imposed by the 2015 Guidelines turn BAF and state courts into an investigative arm of the federal government. These burdens violate the Constitution's anti-commandeering principle.

## III. BAF Has Stated A Viable Claim On Behalf Of Its Birth-Parent Clients That Defendants Have Unlawfully Promoted The Violation Of Birth Parents' Constitutional Rights.

The government argues that this Court should abstain from addressing BAF's constitutional claims under the doctrine of abstention and pursuant to the Anti-Injunction Act, 28 U.S.C. § 2283. Mot. 16-18. This Court should not abdicate its responsibility to decide the purely legal questions of federal law in this case.

A.      **Abstention Is Inappropriate.**

The proposition that federal courts may review federal claims is uncontroversial. *See England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 415-16 (1964). The government nevertheless argues that BAF must bring its federal statutory and constitutional claims not in this Court, but in state family court. The government is wrong.

A litigant may not be compelled to submit questions of federal constitutional law to state courts. *Id.* at 415. A contrary result "would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that '[w]hen a [f]ederal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.'" *Id.* The right of a plaintiff to choose federal court over state court in such circumstances "cannot be properly denied." *Id.* "Nor does anything in the abstention doctrine require or support" a result to the contrary. *Id.* Abstention is "a judge-fashioned vehicle for according appropriate deference to the 'respective competence of the state and federal court systems.'" *Id.* The doctrine's "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law." *Id.* at 415-16.

BAF's claims involve only federal statutory and constitutional questions concerning whether the 2015 Guidelines violate ICWA and the Constitution. *See* Compl. ¶¶ 68-228. *England* is clear that Plaintiffs "can[not] be compelled" to accept a state court's determination of these claims. 375 U.S. at 415.

The government's contention that *Pullman* abstention applies is meritless. Under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), abstention "may be appropriate where state action is being challenged in federal court as being contrary to the

federal Constitution, and resolution of *state law questions* might be dispositive of the case." *Wohl v. Keene*, 476 F.2d 171, 174 (4th Cir. 1973) (emphasis added). In this case, though, there are no ambiguous questions of state law that require resolution by a state supreme court. That is "[f]atal to [D]efendants' argument" under *Pullman* because "[i]t is obvious that, where no issue of state law exists, the federal constitutional issue cannot be avoided by 'a definitive ruling on the state issue.'" *Donohoe Const. Co. v. Montgomery Cty. Council*, 567 F.2d 603, 607 (4th Cir. 1977).

The government's abstention argument under *Younger v. Harris* is even more misplaced. First, *Younger* abstention applies only to *ongoing* state proceedings. *Joseph v. Blair*, 482 F.2d 575, 578 (4th Cir. 1973). Second, the Supreme Court recently narrowed the scope of *Younger* abstention. *See Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584 (2013). In *Sprint Communications*, the Court clarified that once a plaintiff establishes federal jurisdiction, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Id.* at 591. "Parallel state-court proceedings do not detract from that obligation." *Id.* "[O]nly exceptional circumstances," the Court explained, "justify a federal court's refusal to decide a case in deference to the States" under *Younger*. *Id.*[7] The Court limited these "exceptional circumstances" to three types of proceedings: "ongoing state criminal proceedings"; "certain 'civil enforcement proceedings'"; and "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* None of these "exceptional circumstances" applies here.

---

[7] The three-prong test the government articulates "would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Sprint Commc'ns, Inc.*, 134 S. Ct. at 593. "That result is irreconcilable with [the Supreme Court's] dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.*

State court child-custody proceedings are not criminal or civil enforcement proceedings. Nor do they implicate "orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions," *id.*, which "involve challenges to the processes by which the State compels compliance with the judgments of its courts." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13-14 (1987). Since none of the "exceptional circumstances" described in *Sprint Communications* exists here, abstention is inappropriate.

Finally, the government's Anti-Injunction Act argument also lacks merit. The Anti-Injunction Act prohibits federal courts from "grant[ing] an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. BAF does not seek an injunction to stay state court proceedings. Nor would the relief BAF seeks have the same effect as an injunction. *See Denny's, Inc. v. Cake*, 364 F.3d 521, 528 (4th Cir. 2004). Accordingly, the Anti-Injunction Act plainly does not apply.[8]

## B. Federal Officials Violate The Constitution When They Urge Others To Violate The Constitution.

A government agent's inducement of another to violate constitutional rights itself violates those rights. *See, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1195-96 & n.3 (10th Cir. 2010). "Governmental officials may also be held personally liable in damages for constitutional infringements resulting from their establishment of unconstitutional policies. . . . For an official to be held accountable on this basis, he must actually prescribe policy—formally *or de facto*—

---

[8]   The government also argues that BAF's claims are not ripe for review. Mot. 14-15. In determining whether claims are ripe for consideration, courts should "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). Claims are fit for judicial decision "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* Whether the Guidelines exceed the BIA's statutory authority or violate the Constitution are purely legal questions that are ripe for review. *See, e.g.*, *Austin v. Berryman*, 955 F.2d 223, 225 (4th Cir. 1992).

that encourages improper means or ends.  To succeed on a policymaking theory, a plaintiff must demonstrate that the official against whom liability is asserted has the power—vested either formally *or as a practical matter*—to formulate policy, and has exercised that policymaking authority to generate improper practices.  As in the case of supervisory liability, a plaintiff seeking to recover against a policymaking official must demonstrate a causal connection between the policy established and the wrong committed against him." *Haynesworth v. Miller*, 820 F.2d 1245, 1263-64 (D.C. Cir. 1987) (emphasis added) (footnotes omitted), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006).  "Therefore, to establish a claim for policymaking liability under *Bivens,* a plaintiff must show that the official (1) established a policy (2) that was unconstitutional and (3) caused the plaintiff to be injured." *Weise v. Jenkins*, 796 F. Supp. 2d 188, 197 (D.D.C. 2011); *see also Shaw v. D.C.*, 944 F. Supp. 2d 43, 61 (D.D.C. 2013).

The governmental defendants do not need to have targeted the plaintiffs; they need only have created a policy that promotes the violation of constitutional rights.  As the Second Circuit has stated in the analogous context of claims brought under 42 U.S.C. § 1983, "[i]t is not necessary for § 1983 liability that the appellees directed any particular action with respect to these specific individuals, only that they affirmatively promoted a policy which sanctioned the type of action which caused the violations." *Duchesne v. Sugarman*, 566 F.2d 817, 831 (2d Cir. 1977); *see Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) ("[Section] 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution.") (quotation

27

marks and ellipses omitted).

Moreover, the defendants do not need to have promulgated an official binding policy; even a tacit, informal policy can support policymaker liability. The Fifth Circuit, for instance, recognized that a police department's unwritten policy of performing unwarranted searches could serve as the basis for liability. *Wanger v. Bonner*, 621 F.2d 675 (5th Cir. 1980). Accordingly, a non-binding interpretive rule that *encourages* others to violate the plaintiff's rights suffices to establish constitutional injury.

**C.      The 2015 Guidelines Violate The Constitution.**

For the reasons stated above, the 2015 Guidelines violate birth parents' constitutional rights to due process and equal protection. *See supra* Part II.B.2. Accordingly, BAF has stated a valid claim under *Bivens* that the Defendants have unlawfully urged others—through the 2015 Guidelines—to violate the constitutional rights of its birth-parent clients.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should deny Defendants' motion to dismiss for lack of subject-matter jurisdiction and for judgment on the pleadings.

Date:  October 16, 2015

Respectfully submitted,

/s/  Jacob S. Siler
JACOB S. SILER (Va. Bar No. 80934)
MATTHEW D. MCGILL (*pro hac vice*)
ROBERT GONZALEZ (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

LORI ALVINO MCGILL (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN LLP
777 6th Street, N.W.
Washington, DC 20001
Telephone:  (202) 538-8210
Facsimile:  (202) 538-8100

MARK D. FIDDLER (*pro hac vice*)
FIDDLER LAW OFFICE, P.A.
6800 France Avenue So., Suite 190
Minneapolis, MN  55435
Telephone:  (612) 822-4095
Facsimile:  (612) 822-4096

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of October, 2015, I will cause to be electronically

filed the foregoing with the Clerk of the Court for the Eastern District of Virginia using the

CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Dennis C. Barghaan, Jr.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

Date:  October 16, 2015

/s/  Jacob S. Siler
JACOB S. SILER (Va. Bar No. 80934)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*